November 7, 2023

**DR. HAROLD R. WANLESS,**
1300 Campo Sano Ave, Coral Gables, FL 33146

**Petitioner,**

**JANET YELLEN, SECRETARY** in her official capacity

**U.S. DEPARTMENT OF THE TREASURY**

**FINANCIAL STABILITY OVERSIGHT COUNCIL**

1500 Pennsylvania Ave., NW, Wash., DC  20220

**Respondents.**

Civil Action No. _____

**LIST OF PLEADINGS SUBMITTED**

**FOR DECLARATORY JUDGMENT**

# List of Pleadings Submitted as One Consolidated Filed Document

1. **Motion for a Hearing & Proposed Order for Injunctive Relief** to stop well-documented imminent threat to U.S. financial stability caused by Defendant's long-term refusal to act and communicate regarding its top non-discretionary statutory duty to preserve U.S. financial stability.

2. **Affidavit of Petitioner's Counsel on Defendant's Longstanding Bad Faith** refusal to act or communicate at all to avoid the need for this lawsuit including refusal to acknowledge receipt of 30-Day Notice.

3. **Request for Declaratory Judgment & Petition for Review of Final Agency Action.**

4. **Motion for $622,625 in Detailed Attorneys Fees due to Defendant's Long-term Bad Faith.**

5. **30-Day Notice to Defendant of Intent to File Petition for Review**

   Exhibit 1 – Record of Decision Communications, Document 1
   Exhibit 1 – Record of Decision Communications, Document 2
   Exhibit 2 – Treasury Announces Private Financing
   Exhibit 3 – Financial Stability Oversight Council Identifies Climate as a Threat to Financial Stability

6. **Certificates of Service on Defendant by registered mail insured for $5,000 for each service & by email.**

November 10, 2023

**DR. HAROLD R. WANLESS,**
1300 Campo Sano Ave, Coral Gables, FL 33146

     **Petitioner,**

**JANET YELLEN, SECRETARY** in her official
 capacity
**U.S. DEPARTMENT OF THE TREASURY**

**FINANCIAL STABILITY OVERSIGHT
COUNCIL**

1500 Pennsylvania Ave., NW, Wash., DC 20220

     **Respondents.**

Civil Action No. _____

**MOTION FOR A HEARING &
PROPOSED ORDER;
REQUEST FOR DECLARATORY
JUDGMENT**

# Motion for Injunctive & Declaratory Relief Hearing & Order for Settlement Conference with Magistrate Judge

## Immediate and Permanent Injunctive Relief are Warranted, and a Hearing of the Parties Before This Court.

   Rule 65 for a Hearing pursuant to the Rules of Civil Procedure is satisfied for the following reasons set forth in this Motion, by Defendant's 16 months of bad faith refusal to act or communicate, including its position on this Motion in violation of this Court's rules, on a well-documented imminent threat to U.S. financial stability.  Defendant's complete stonewall caused this lawsuit despite nine written and oral communications including the 30-Day Notice to Defendant, and by the Chairman of the statutory Inspector Generals' Oversight Council on Financial Stability and former Idaho Attorney General and Supreme Court Chief Justice.  Rule 57 on Declaratory Judgment also empowers this Court to conduct a hearing in addition to this Court's equitable powers:  *"The Court may order a speedy hearing of a declaratory judgment action."*  The Request for Declaratory Judgment is part of the consolidated pleadings document as is this Motion.

# There is Demonstrated Likelihood of Imminent Irreparable Harm.

1.     Summarizing from the Aug. 31, 2023 30-Day Notice to Defendant and the Request for Declaratory Relief that are part of this lawsuit's pleadings, there is an imminent threat to U.S. financial stability. This well-documented threat from rapidly accelerating sea level rise flooding is based on 29 years of NASA Jet Propulsion Laboratories (JPL) and EU ice-penetrating aerial imagery of *"explosive and disturbing"* glacial melt as stated by NASA JPL, requiring protections from 2' of sea level rise flooding and 10' of storm surge by 2030 codified to preserve commerce and national security.  In 2020, S&P threatened to downgrade Florida's credit rating if the protective financing was not deployed for this imminent threat, but the State has not acted.  (FL 2021 Debt Report at 5).  Figures 1-5 in the Request for Declaratory Relief and the 30-Day Notice contained in the consolidated pleadings document of this lawsuit including this Motion, visually show this unprecedented imminent and highly destructive economic threat without rapidly deployed flooding protections.

2.     **Time is of the essence to act.**  At any time now, about $1 trillion of South Florida Coastal real estate can be completely devalued, triggering massive litigation by the permanent mortgage holders to recover the value, very similar to financial contagion from Subprime Mortgage litigation that triggered the 2008 Financial Crisis as determined by the Financial Crisis Inquiry Commission.  The market is aware of this imminent threat and lack of protective financing, with the developer leader of the South Florida Urban Land Institute, calling it *"a grenade to South Florida's economy."*  "New South Florida Climate Change Financial Report: Spend Billions Or Lose Much, Much More," WUSF Public Media - WUSF 89.7 | By Alex Harris - Miami Herald, Published October 17, 2020 at 8:00 AM EDT.  The Urban Land Institute is the Florida, U.S., and global expert leaders in real estate finance and climate resilience.  Defendant publicly announced at its website that this threat exists, as was also stated by the global Financial Stability Board that Defendant is a member of.  Accordingly, there is no market confidence in a solution which is the trigger for financial contagion almost identical to the Subprime Mortgage cause of the 2008 Financial Crisis.

3.     South Florida's porous bedrock prevents permanent engineering solutions, and causes the flooding at both the tidal surface and upwelling from below the ground.  An estimated $90 billion in South

Florida protections are required now to be rapidly deployed to extend the South Florida coastal real estate life to prevent imminent, complete coastal real estate devaluation and financial contagion.

4. For the past 16 months Defendant has refused its top and non-discretionary statutory duty to protect U.S. financial stability by rapidly deploying the over $60 trillion in available private sector assets to pay for protections through Defendant's publicly-announced high priority private sector financing program or equivalent. During this time, Defendant was repeatedly notified of this financial stability threat and available solution including by the 30-Day Notice, but in bad faith refused to act or communicate at all including as set forth in Attorney's Declaration / Affidavit and Motion for $622,645 in Attorneys Fees that are part of the pleadings of this lawsuit. In addition to the 30-Day Notice, these requests included to the responsible Treasury officials, a July 8-23, 2022 written inquiry to Defendant by Rich Delmar, Chairman of the statutory Inspectors General Oversight Council on Financial Stability, and a Sept. 21, 2023 email by Jim Jones, former Idaho Attorney General and Supreme Court Chief Justice. Defendant's long term, complete, bad faith Stonewall regarding Defendant's non-discretionary, top statutory duty is the only reason Petitioner is before this Court.

5. Petitioner demonstrated that there is *"a real and immediate threat of future injury by the defendant."* City of Los Angeles v. Lyons, 461 U.S. 95, 107 n. 8 (1983).

6. The test for permanent injunctive relief is imminent irreparable harm that cannot be cured without judicial intervention, and is within the equitable powers of the court, *Zuckerman v. USPS,* D.C. Cir. No. 21-5283 (Apr. 14, 2023):

> *"The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Similarly, "the district court's decision whether to grant declaratory judgment is reviewed for abuse of discretion." Jackson v. Culinary Sch. of Wash., Ltd., 59 F.3d 254, 255 (D.C. Cir. 1995)."*

*Zuckerman* also provided the purpose of injunctive relief and the four qualifying factors extent in this lawsuit:

> *"As the Supreme Court explained in United States v. W.T. Grant Co., 345 U.S. 629 (1953):*
>
> *The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The [District Court's] decision is based on all the circumstances; [the District Court's] discretion is necessarily broad and a strong showing of abuse must be made to reverse it."*

*"A plaintiff seeking a permanent injunction "must satisfy a four-factor test before a court may grant such relief." eBay, 547 U.S. at 391. The plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. When the defendant is the government, factors (3) and (4) merge. Nken v. Holder, 556 U.S. 418, 435 (2009)."*

7.      The imminent irreparable injury suffered by Petitioner is the severe destruction of South Florida's coastal economy, and Petitioner's concomitant household net worth as a Coral Gables resident. Petitioner and the public will also suffer severe financial harm from contagion which is expected by this complete devaluation of South Florida coastal real estate.  As shown by the 2008 Financial Crisis, contagion and economic destruction can continue for years, and once it starts, it can in this instance be permanent without a Climate Crisis solution.  If Treasury acts after the fact as a continuing violation of Dodd-Frank, it will be too late and there may never be recovery.  To that end, just 2030 U.S. sea level rise flooding protection costs are calculated at $5 trillion which was not disputed as a contingent liability of the American Petroleum Institute in its recusal from voting in preliminary decisionmaking on the approved 3.0 national consensus resilience standard.  Massachusetts calculated sea level rise flooding protection costs are $326 billion. Massachusetts Partial Resilience Damage Costs (Capital Markets Partnership 2019).  Thus, the injury is existing.  The purpose of Dodd-Frank's financial stability mandates upon Treasury are *to prevent* U.S. financial instability.  Even without intractable accelerating sea level rise flooding, the 2008 Financial Crisis destroyed $20 trillion of U.S. household net worth and likely the same or more for business.   Chapter 15, The Financial Crisis and Great Recession, Macroeconomics in Context, Second Edition, Neva Goodwin et al., at 337 (2014 Tufts University), and Life of a Debt: Data Integrity in Debt Collection, An FTC – CFPB Roundtable, Robert M. Hunt, PhD, Vice President and Director, Payment Cards Center, Federal Reserve Bank of Philadelphia, page 3, June 6, 2013).

**8.      There is no adequate, or even discernable, remedy at law** to the South Florida and U.S. economies and Petitioner, for this imminent, irreparable economic harm of an unprecedented nature, scope, and consequential very large size.  Defendant has plenary authority to adequately remedy the imminent irreparable harm with its private financing program with over $60 trillion available, but over the last 16 months will neither act nor communicate at all.  Due to political chaos that caused the recent downgrade of the United States' credit

rating, Congress will not appropriate the funds.  Further, on September 22, 2022, White House Climate Envoy John Kerry finally announced that the governments of the world neither have the will nor money to solve the Climate Crisis. "In Pittsburgh, John Kerry says climate change solutions will be driven by private sector." NPR State (Sept. 22, 2022). The Supreme Court recently greenlighted some 30 State and City climate cost recovery suits with the most recent being California's, but the timing of any recovery is uncertain.

9. **There is no hardship to Defendant** in executing its announced high priority, private climate financing program or equivalent, to protect U.S. financial stability, including as offered with the Urban Land Institute and the private sector where the funds are available with higher-credit rated financing providing cheaper capital and higher property appraised value with no taxpayer funds required:

- Treasury's high priority private sector climate financing program can ensure U.S. financial stability as stated by Treasury to: "***Bring to bear the full force of the Treasury Department … leveraging finance … to confront the threat of climate change.***" (emphasis by Treasury) in Exhibit 2 to the 30-Day Notice. Secretary Yellen stated in the announcement *"Climate change requires economy-wide investments by industry … as well as actions to … mitigate climate-related risks to households, businesses, and our financial sector."* (Apr. 19, 2021)

In steep contrast, the hardship to South Florida's economy and Petitioner is severe and potentially permanent. There is no coastal South Florida economy if it is inundated and literally under sea water.  There is no ongoing or planned abandonment and retreat inland of this highly-developed coastal real estate.

10. **The public interest would not be disserved by a permanent injunction.**  It is foremost in the public interest that Treasury execute its high priority private sector financing program now or equivalent, to prevent imminent South Florida financial contagion from the very likely complete devaluation of South Florida Coastal real estate.

# There is a Demonstrated Likelihood of Success on the Merits of the Underlying Cause of Action.

11. There is nothing discretionary in Dodd-Frank about Treasury's top statutory duty to maintain U.S. financial stability, and that of the Dodd-Frank Financial Stability Oversight Council (FSOC) that Treasury Chairs.  That is the key purpose of Dodd-Frank:  *"To promote the financial stability of the United States."* An

Act. HR 4173 at 1, (Jan. 5, 2010), Dodd-Frank Wall Street Reform and Consumer Protection Act. Treasury's mandatory statutory duty to preserve U.S. financial stability is reviewable. Treasury made it clear as Chair of FSOC that Dodd-Frank requires it to act in this instance: *"Established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, FSOC is charged with identifying risks to U.S. financial stability, promoting market discipline, and responding to emerging threats to the stability of the U.S. financial system."* 30-Day Notice Ex. 2. Treasury by its own words of statutory construction unequivocally asserts its duty to respond to such emerging threats to U.S. financial Stability. The law is clear that this mandatory, non-discretionary Treasury statutory duty is reviewable by this Court:

> *"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n.9. Therefore, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id."*

> From 2023 Post Publication Update at 196 for *FEDERAL STANDARDS OF REVIEW*, prepared by Harry T. Edwards, Senior Circuit Judge U.S. Court of Appeals for the D.C. Circuit

Petitioner has found no precedent for this unacceptable stonewall placing about $1 trillion of coastal South Florida real estate at risk of being completely devalued with the threat to many $trillions of household net worth like the 2008 Financial Crisis where $20 trillion of household net worth was destroyed.

12.     There is no political question preventing judicial resolution of Treasury inaction since Dodd-Frank provides Treasury plenary authority and the responsibility to act to preserve and protect U.S financial stability. Further, there is no issue of liability of responsible parties that would require additional Congressional authority. There many $trillions of private sector financing available by investors ready to deploy through available higher-credit rated bonds to provide flooding protections.

# Request for a Hearing

**13.     A hearing need is demonstrated by Petitioner's Attorneys' Declaration as part of the consolidated pleadings document showing Defendant's bad faith stonewall of any communications on this**

**matter for 16 months.** This stonewall unnecessarily increased without any good faith cause, the unacceptable imminent threat to U.S. financial stability that can happen at any time by accelerating sea level rise flooding, as publicly stated by Defendant memorialized in the Request for Declaratory Judgment and 30-Day Notice at ¶¶ 8 & 18 in these pleadings of this lawsuit, e.g., *"As climate change intensifies, natural disasters and warming temperatures can lead to declines in asset values that could cascade through the financial system. … These impacts are not hypothetical. They are already playing out."* Remarks of Secretary Yellen to the Financial Stability Oversight Council (FSOC) (Mar. 7, 2023) published on the Treasury website.

**14.    Defendant's longstanding stonewall of any communication completely defeats compliance with this Court's LCvR 7(m) Motions' requirement — Duty to Confer with Opposing Counsel** on this Motion:

> *"(m) DUTY TO CONFER ON NONDISPOSITIVE MOTIONS.*
>
> *Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement. The duty to confer also applies to non-incarcerated parties appearing pro se. A party shall include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed."*

15.    Was there a rational basis for Defendant's longstanding stonewall, on a matter of imminent importance to U.S. financial stability?  In a conference call, Petitioner's attorneys asked Treasury attorney Mark Schlegel in the General Counsel's Office with climate responsibility, the following questions identified in Petitioner's Attorney's Sept. 16, 2023 Declaration / Affidavit that is part of these pleadings, which Schlegel refused to answer at all:

- *Did you receive the 30-Day Notice given that you previously provided your email address to Petitioner's counsel for this purpose?*

- *Why are you acting contrary to Treasury Order 107-04 that the General Counsel's Office accepts service?*

- *Why can you not discuss at all the documented imminent threat to U.S. financial stability and a possible remedy so the parties do not become adversarial and waste this Court's valuable time and resources?*

- *Who is the responsible official in the General Counsel's Office for this matter?*

What were the reasons for Defendant's Stonewall over 16 months on a recognized financial stability threat?

- Was Schlegel's highly unusual and inappropriate behavior very likely because he was instructed to continue the stonewall? If so, who instructed him to do this and why?

- Was he concerned that such instruction would jeopardize the public interest and U.S. financial stability?

- Was he concerned on how such instruction could lead to severe economic harm?

- Did he question what Treasury or the Administration would gain from such instruction?

- Did he see any public interest rational basis to such instruction?

- Was such instruction purely political, discounting the very likely severe economic harm, and thus contrary to the public interest?

- What was Treasury's planned response if any, for the imminent financial contagion?

- Was any thought given to how financial contagion and Treasury's long term stonewall would be justified to the courts, Congress and the public?

- Was any consideration given to the Combined Intelligence Agencies' 2023 National Security Threat Assessment identifying such climate threats as a major threat to U.S. national security?

- Was there an appropriate national security threat response available and should it have been executed?

- Was there any consideration to using available Climate Crisis emergency powers?

- Was there any discussion of possible, available remedies?

- Did he question whether he should withdraw from his role as improper conduct for a licensed attorney and likely outside his scope of work?

- Was such instruction lacking in any nefarious purpose but simply due to no or very limited Treasury internal qualifications to competently address the imminent threat, and lack of judgment to seek assistance?

16.     **Pursuant to this Court's Local Rules 7(f) and 65(1)(d), an oral hearing is requested** so the parties' attorneys can finally communicate on this matter of substantial economic consequence, entirely precluded by Defendant's complete stonewall for 16 months to Petitioner's attorneys. Local Rule 65(1)(d) allows Petitioner to request this hearing based on the facts in this Motion, which Petitioner believes makes Hearing expedition essential. More detailed facts and Figures are in the Request for Declaratory Judgment and 30-Day Notice part of the consolidated pleadings document of this lawsuit. Live testimony is not requested, simply an opportunity for the attorneys to communicate before the Court to facilitate an informed decision on this unprecedented matter adversely affecting U.S. financial stability. In the 30-Day Notice to Defendant,

available solutions were offered which could be executed now without wasting the Court's time and resources. As explained to Defendant's attorney who continued the stonewall, Petitioner believes this matter needn't be adversarial and could be settled if there is communication between the parties. An intentional, bad faith complete lack of communication by a party in a matter for over one year is highly unusual and Petitioner believes warrants a hearing to ensure communications as required by this Court's rules, that could effectively and efficiently resolve this dispute, advance the public interest and preserve U.S. financial stability. Given these unusual and consequential facts, Petitioner believes a Hearing is required to comply with this Court's Standing Order in Civil Cases that the parties, counsel and Court are responsible to *"secure the just, speedy, and inexpensive determination of every action and proceeding"* in federal court. Fed. R. Civ. P. 1.

17. **Petitioner respectfully requests a settlement conference before a magistrate judge** that could effectively and efficiently resolve this dispute, advance the public interest and U.S. financial stability, and preserve this Court's highly valuable time and resources, pursuant to the §15 on Settlement in this Court's Standing Order on Civil Cases.

<u>**CONCLUSION**</u>

Granting Petitioner's request for a hearing and settlement conference before a magistrate judge would force the communications of the parties required by this Court's Rules and facilitate settlement. A proposed order to this effect follows. Due to the long-term refusal of Defendant to communicate at all, Defendant's position on this Motion for a Hearing cannot be ascertained in order for the parties to ensure compliance with this Court's Rule. I declare under penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

# Mike Italiano

**Mike Italiano** DC Bar #411066, Member, D.C. District Court
mts@sustainableproducts.com
4919 Ashby St., NW, Wash., DC 20007
202-298-6556
**Attorney for Petitioner & Counsel of Record**

**Attorney Advisors**
**Brian H. Davis** MN Bar #0125714

brianhdavis@gmail.com
651-308-7141

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DR. HAROLD R. WANLESS,** | |
| **Petitioner,** | Civil Action No. _____ |
| | |
| **JANET YELLEN, SECRETARY** in her official capacity | |
| **U.S. DEPARTMENT OF THE TREASURY** | |
| **FINANCIAL STABILITY OVERSIGHT COUNCIL** | |
| **Respondents.** | |

## ORDER

Upon consideration of Petitioner's motion for a hearing, defendant's lack of any required communication including its position on this case and motions, and the entire record in this case, the Court finds that a hearing is justified due to the longstanding inability of the parties to communicate at all including no reasons provided for such lack of communication by Defendant, and the issue before the Court is detailed as an imminent threat to U.S. financial stability. Further, due to the described imminent threat, the parties shall meet at the earliest time possible before a Magistrate Judge to discuss possible settlement.

Therefore, it is hereby

ORDERED that Petitioner's motion for a hearing is granted and set for _____, 2023 at _____. This is a final, appealable order.

_____
UNITED STATES DISTRICT JUDGE

September 16, 2023

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DR. HAROLD R. WANLESS**

**Petitioner,**

**JANET YELLEN, SECRETARY** in her official
capacity

Civil Action No. _____

<u>**DECLARATION ON TREASURY'S**</u>

<u>**TERMINATION OF THE:**</u>

**30 DAY NOTICE TO TREASURY OF**
**PETITION FOR REVIEW OF**
**FINAL AGENCY ACTION**

**U.S. DEPARTMENT OF THE TREASURY**
**FINANCIAL STABILITY OVERSIGHT COUNCIL**

**Respondents.**

On September 7, 2023, the following Declarants called on a conference line, U.S. Treasury Attorney Mark Schlegel, and discussed with him the 30-Day Notice for Petition of Review of Final Agency action, the subject of this pleading. Mr. Schlegel answered his phone and he and Declarants discussed the 30-Day Notice sent by email to Treasury Secretary Janet Yellen, and General Counsel Neal McBride with others copied including Rich Delmar, Chairman, Inspector Generals' Oversight Council on Financial Stability. Mr. Schlegel provided his email address so Declarants could email a copy of the 30-Day Notice to Mr. Schlegel which they did as well as to Treasury Deputy General Counsel Eric Nguyen. Mr. Schlegel is identified as "Attorney-Advisor" to Treasury's Climate-related Financial Risk Advisory Committee of the Financial Stability Oversight Council, in the Committee's March 7, 2023 Minutes on Treasury's website.

On September 12, 2023, Declarants on a conference line again called Mr. Schlegel to see if he received the 30-Day Notice. Mr. Schlegel answered and was asked if he received the 30-Day Notice. He stated *"I can't answer that."* He was then asked who is point of contact for the 30-Day Notice? He again stated *"I can't answer that."*

Declarants told Mr. Schlegel that they believe a solution to the 30-Day Notice is available, this matter needn't be adversarial, public before the U.S. District Court, and that time was of the essence. They further stated that their partner the Urban Land Institute (ULI) is comprised of global real estate finance and climate resilience leaders, and the parties and ULI could talk about ready to execute private finance solution to stop imminent contagion threatening U.S. financial stability from rapidly accelerating sea level rise flooding. Mr. Schlegel again stated *"I can't respond to that."*

Declarants further told Mr. Schlegel that a currently-effective Treasury Directive from the Secretary required the Office of General Counsel to accept service of process. Schlegel stated *"send another email. There is no one to talk with."* Schlegel then unilaterally terminated the call. Declarants have received no response to their emails sent to Yellen, MacBride, and Nguyan.

The purpose of the 30-Day Notice was to ensure that Treasury was aware of the imminent financial contagion threat from rapidly accelerating sea level rise flooding by presenting to Treasury this extensive undisputed factual assessment based on 29 years of NASA JPL ice-penetrating aerial imagery, and that Treasury is required to immediately respond pursuant to its top statutory duty to protect U.S. financial stability from expected economic harm due to the lack of an estimated $90 billion to protect the about $1 trillion of coastal South Florida real estate from imminent and complete devaluation. Based on the NASA JPL actual and long-term data, coastal protections are required for 2' of sea level rise flooding and 10' of storm surge by 2030 to preserve commerce and national security as stated in the 30-Day Notice.

The Notice was submitted because Treasury completely stonewalled six separate, repeated inquiries to Treasury in July 2022 including by the Chairman of the Inspector General's Oversight Council on Financial Stability, as set forth in the 30-Day Notice of this imminent economic threat.

It is clear from the preceding continued stonewall of communications by Mr. Schlegel who was authorized to respond based on U.S. Treasury Order 107-04 to receive service, that Treasury had made up its mind committing final agency action as set forth in the 30-Day Notice. Accordingly, Declarants on behalf of Petitioner need not wait for the 30 days to expire, and can petition the court now for warranted injunctive relief, review of Treasury's final action, and request attorneys fees that the Court has the power to award for what Declarants believe is such a showing of bad faith and abrogation of legal duty, on a credible and imminent threat to U.S. financial stability. *"The law does not require the doing of a futile act."* State of OHIO v. Herschel ROBERTS, 100 S.Ct. 2531, 65 L.Ed.2d 597, No. 78-756, (June 25, 1980).

Treasury's complete stonewall for well over one year, especially given an offered and available but ignored private market financial solution that is a Treasury stated top priority to execute, has no rational basis in law or the public interest and precluded any informed discussion on an imperative, imminent matter Treasury is required by statute as a top priority to immediately address.

Attested under penalty of perjury on September 16, 2023 by:

*Carter J. Dillard*

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
cjd328@nyu.edu
310-795-1986

**Brian Davis**

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com

Attorneys for Petitioner

*Mike Italiano*

**Mike Italiano** DC Bar #411066
mts@sustainableproducts.com

November 10, 2023

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**DR. HAROLD R. WANLESS**
1300 Campo Sano Ave, Coral Gables, FL 33146

**Petitioner,**

Civil Action No. _____

**JANET YELLEN, SECRETARY** in her official
capacity

**U.S. DEPARTMENT OF THE TREASURY**

**REQUEST FOR DECLARATORY JUDGMEMT & HEARING, PETITION FOR REVIEW OF FINAL AGENCY ACTION**

**FINANCIAL STABILITY OVERSIGHT COUNCIL**
1500 Pennsylvania Ave., NW, Wash., DC 20220

**Respondents.**

# REQUEST FOR DECLARATORY JUDGMENT & PETITION TO REVIEW FINAL AGENCY ACTION

**Introduction.** This case is to stop imminent financial contagion from well-documented market awareness of complete devaluation at any time, of about $1 trillion of South Florida coastal real estate from rapidly accelerating sea level rise flooding demonstrated by 29 years of NASA and EU ice-penetrating aerial imagery. U.S. Treasury's top non-discretionary statutory duty is to prevent contagion to preserve U.S. financial stability, including through its stated high priority, private climate financing program where required protective financing of over $60 trillion in available investor assets can be rapidly deployed for protections. Figures 1-5 below show this demonstrated imminent threat.

Time is of the essence to act. The question is stark, unprecedented, and cannot be further delayed.

U.S. Treasury decided for 16 months, that it does not have the courage to either act or communicate to preserve U.S. financial stability, as shown by the 30-Day Notice to Treasury and this Request for Declaratory Judgment. At least Treasury should have the courage to step aside, and let this Court decide.

Treasury's decision to in effect terminate the 30-Day Notice of this Petition for Review by perpetuating its 16-month Stonewall is set forth in the September 16, 2023 Declaration / Affidavit of Petitioner's attorneys' communications with Treasury's General Counsel Office Attorney, part of the consolidated pleadings document that includes this Declaratory Judgment Request and the 30-Day Notice. This Attorneys' Declaration documents the continued Stonewall, and failure of Treasury to execute mandated U.S. financial stability protections including by its announced high priority private sector climate financing or equivalent.

Petitioner respectfully sets forth the facts for decision and legal basis for injunctive relief on this imminent threat to U.S financial stability contained in the Motion for Rules 57 and 65 Injunctive and Declaratory Relief Hearing as part of the consolidated pleadings submitted to the Court, with a Motion for Attorneys Fees for Treasury's long-term bad faith to either act or communicate thus forcing this lawsuit.

This Request for Declaratory Judgment includes the top non-discretionary statutory duty for Treasury to immediately act, covering facts, standing, jurisdiction, venue, final agency action, judicial review, declaratory judgment, and specific prayer for relief.

# Contents

**Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief**

1. Factual Summary
2. The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.
3. Treasury Top Management Has Been Completely Nonresponsive to Nine Repeated Written Requests Over 16 Months.
4. This Imminent Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision (RoD).
5. The Record of Decision (RoD), Included the Thwaites Glacier Impending Collapse Schematic
6. Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act.
7. South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise Flooding.
8. Dodd-Frank and Treasury's High Priority Private Sector Climate Financing Program or Equivalent Can Ensure U.S. Financial Stability.
9. Financial Stability Oversight Council (FSOC) Identified "*Climate Change As An Emerging and Increasing Threat to Financial Stability.*"
10. Importantly As Also Shown in the RoD, Treasury Was Notified That Available Required Protections for South Florida Can Be Rapidly Deployed.
11. The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now.
12. The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Resilience. About $90 billion is Required Now for South Florida Coastal Protections.
13. Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation.
14. State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections was NOT Deployed. However, the State Has Not Acted.
15. The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.
16. Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith, and Subjecting Treasury Top Management to Personal Liability.
17. There is Standing to Sue and Petition This Court.

18. Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued.
19. Emergency Injunctive Relief is Requested.
20. Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided.
21. Venue is the D.C. U.S. District Court.

## Treasury's 100% Stonewall Including the 30-Day Notice, Constitutes Final Agency Action.

22. Treasury's 100% Repeated Stonewall is Contrary to the Public Interest for a Top, Non-discretionary Statutory Duty.
23. The Supreme Court Test for Final Agency Action Has Been Met.
24. Petitioner Can Reach No Other Conclusion Than Treasury Has Completed its Decision-making Process.
25. Treasury's Final Agency Action Was Binding. It Had Made Up Its Mind.

## The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.

26. APA Judicial Review of Final Treasury Actions Governs This Matter.
27. To Protect U.S. Financial Stability, Interim Relief is Authorized & Should be Provided Pending Judicial Review.
28. This Matter is Not "Committed to Agency Discretion by Law."
29. This Court Has the Power to Force Treasury to Communicate About its Failure to Act to Protect U.S. Financial Stability.
30. There is No Political Question Preventing Judicial Resolution of Treasury Inaction.

## Request for Declaratory Judgment.

## The Judicially Remedial Right of Petitioner is Clear & Universal, Including Where There is No Other Adequate Remedy in Court: Protection of U.S. Financial Stability as a Top Statutory Duty.

## Prayer for Relief.

Figure 1.  NASA JPL Thwaites Glacier Impendin Collapse Schematic Prepared From 29 Years of Actual Data
Figure 2.  Thwaites Glacier Diagrams
Figure 3.  NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line (intersection of ice, bedrock, and ocean) retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.
Figure 4.  South Florida "Sunny Day" Sea Level Rise Flooding (2013)
Figure 5.  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)

# Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief

    1.  **Factual Summary.** The 30-Day Notice provided to Treasury and the Financial Stability Oversight Council (FSOC) was a final effort to conduct good faith discussions to overcome Treasury's complete 16 month "Stonewall" providing no response at all to nine separate written and oral inquiries to Treasury top management. The inquiries concerned Treasury's publicly-stated high priority private sector climate financing program supported by Dodd-Frank statutory duties of Treasury to protect U.S. financial stability. With investors with over $60 trillion in private sector assets ready to be rapidly deployed through available higher credit-rated financing, the impending systemic threat of financial contagion can be prevented as communicated to Treasury. This contagion threat was repeatedly documented to Treasury top management from expected complete devaluation at any time of about $1 trillion in South Florida coastal real estate from the very high probability failure of the real estate financing system to timely respond to existing well-documented accelerating sea level rise flooding.

Based on NASA Jet Propulsion Lab's Thwaites Glacier Impending Collapse Schematic prepared from 29 years of ice-penetrating aerial imagery with its 16 references sent to Treasury, protections from 2' of sea level rise flooding and 10' of storm surge are required by 2030 to preserve commerce and national security. Thwaites is the largest source of global, accelerating sea level rise flooding and affectionately named the "Doomsday Glacier" by the news media. See Figures 1 and 2 below. South Florida's densely populated and highly developed coast is within this 2' zone of rise requiring protections now. Since South Florida coastal porous bedrock prevents permanent engineering solutions, contagion can now be triggered through expected massive litigation by permanent mortgage holders to recover their lost real estate value, similar to Subprime Mortgage litigation that caused the global Financial Crisis. There is no market confidence that about $90 billion in required South Florida protections will be financed thus driving this contagion threat. Importantly as communicated to Treasury, the over $60 trillion in private funds are available and can be rapidly deployed eliminating this unacceptable contagion threat to U.S. financial stability.

Figure 3 is an actual image of the bedrock about 1,000 meters underneath Thwaites showing that the glacier has retreated inland to the precipice of a steep slope where it can at any time, collapse and plunge, greatly and rapidly accelerating global sea level rise flooding. Financial contagion can be triggered by Thwaites collapse or other means of market recognition of the lack of protections. Thwaites backstops other large glaciers also under irreversible collapse as announced at a NASA 2015 press conference with National Geographic. Figures 4 & 5 are pictures of accelerating "sunny day" sea level rise flooding in South Florida from 2013 and 2015 respectively.

Due to this recognized systemic threat, S&P in an unprecedented action, threatened to downgrade Florida's credit rating, but the State has failed to act. Treasury has publicly recognized this growing climate / sea level rise flooding contagion threat through its statutory responsibilities under Dodd-Frank to protect U.S. financial stability.

**Figure 1.  NASA JPL Thwaites Glacier Collapse Schematic Prepared From 29 Years of Actual Data** / ice-penetrating aerial imagery.



Thwaites as it is today, is different from what may occur when Thwaites collapses as depicted herein, which could be in the next five years or more based on over 20 years of NASA JPL & EU ice-penetrating aerial imagery.  To prevent unacceptable threats to commerce and national security since Thwaites is the greatest contributor to sea level rise flooding, protections by 2030 from two feet minimum of sea level rise are required by the approved 3.0 national consensus resilience standard.  The standard and this Collapse Schematic recognize it is uncertain exactly when a two feet increase will occur.



**Figure 2**

## Thwaites Glacier Diagrams



• Thwaites' grounding line ocean temperature is 3.6º F above ocean freezing and 5.4º F along the ocean bed farther into the Amundsen Sea Embayment. This warm ocean current is primarily causing the rapid retreat of Thwaites grounding line inland.

• The 3.6ºF water above freezing at the grounding line is likely a catalytic lubricant, which also may increase in force on the steep downslope further eroding the grounding line inland.



• Thwaites grounding line is moving about one mile / yr. toward the steep reverse slope facing inland. The grounding line is less than about 10 miles from the steep slope that can cause Thwaites' plunge.

• NASA documented "explosive & disturbing" melt of about 9 miles from 2015 –2017 in a cavity along Thwaites' grounding line



• Once past the steep slope, Thwaites current 4% contribution to global sea level rise will irreversibly and rapidly increase to about 40% since the inland ice sheet over bedrock is no longer held back by the floating ice shelf by "plunging into the deep part of Antarctica grounded about 2.5 km below sea level".

**Figure 3. NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.** This slide is the actual glacial subsurface at the grounding line from 29 years of NASA JPL and European Union ice-penetrating aerial imagery. The grounding line is the intersection of the ice, bedrock, and ocean interface where rapid melting is occurring from above freezing ocean bottom currents, causing Thwaites rapid retreat where it is expected to plunge into a deep inland depression and collapse, very likely triggering the collapse of the West Antarctic Ice Sheet that has been under irreversible retreat. This slide was a part of the information repeatedly sent to Treasury regarding this imminent and unacceptable threat to commerce, national security, and U.S. financial stability from accelerating sea level rise flooding.

Schematic Reference 4 and Figure 3 note that Thwaites has been receding inland from melt at about one mile per year, currently 3km from a steep slope where Thwaites can plunge downward and collapse. Reference 11 notes that based on marine and ice cores, Thwaites has undergone this instability collapsing before during periods of non-anthropogenic warming.



**Figure 4.  South Florida** "Sunny Day" Sea Level Rise Flooding, from Special Report: Sea Level Rise and Florida Impact -  Building & Infrastructure.  *Hot Spot:  Miami Beach Down the Drain* (July 8, 2013), Florida Trend:  Florida's Business Authority.



Areas of Miami Beach now experience "sunny day flooding," where high tides push water onto the streets.
Photo: Steve Rothaus / Miami Herald

**Figure 5.**  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)



*"Sunny Day flooding," as it is called, is now a phenomenon that is occurring throughout South Florida.  Without naming names, certain areas of Miami Beach, Fort Lauderdale and Delray Beach have now developed reputations for having streets with Sunny Day flooding"*
(from Zonelaw.com)

2.   **The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.**   The 2022-2023 repeated requests to Treasury top management for Treasury action, included a written request by Rich Delmar, Chairman, statutory Inspector Generals' Oversight Council on Financial Stability and Treasury Inspector General, to John Morton.  There was also a written request to Morton's successor Ethan Zindler.  There was a complete Stonewall by these responsible Treasury Officials and Morton's assistant, including to telephone inquiries.  The IG Oversight Council specific statutory authority to act in this regard is pursuant to Dodd-Frank §989E.

3.   **Treasury Top Management Has Been Completely Nonresponsive to Nine Repeated Written & Oral Requests Over 16 Months** to rapidly deploy the private financing with many tens of trillions of dollars available, or equivalent, to preserve U.S. financial stability:

**2022**

**June 30 –** Email request to Treasury Secretary Janet Yellen & her scheduler Ari Krupkin

**July 1 –**   Follow-up phone call with Krupkin forwarding July 1 email at his request

**July 8 –**   Follow-up phone call with Krupkin re-forwarding July 1 email at his request

**July 8 –**   Call with Rich Delmar, Inspector General about our requests

**July 20 –**   Email to Delmar forwarding him previous written requests to Treasury, which Delmar sent to John Morton, the responsible Treasury Official

**July 22 –**   Voicemail & email forwarding July 20 Delmar email to John Morton & his assistant Damian Richardson

**July 27 –**   Email re-forwarding to Morton and Richardson, the July 22 email to them

**2023**

**Aug 31 –**   30-Day Notice of Intent to File Petition for Review of Final Agency Action

**Sept 7 –**   Conference call of Petitioner's Attorneys with Treasury Office of General Counsel Attorney Mark Schlegel whereby Schlegel requested the 30-Day Notice to his email

**Sept 12 –**   Conference call of Petitioner's Attorneys with Schlegel during which he refused to answer or discuss whether (1) he received the Notice, (2) the fact that Treasury Order 107-04 provides for the Office of General Counsel to accept service, (3) what attorney in the General Counsel's Office is responsible for the 30-Day Notice, & (4) discussion that could preclude litigation.

**Sept 21 –**   Email to Treasury Climate Counselor Ethan Zindler from former Idaho Attorney General & Supreme Court Chief Justice Jim Jones requesting a discussion & transmitting a Draft Press Release to be issued if a lawsuit was filed because the public has a right to know. A follow-up voicemail was left with Zindler by Petitioner's Attorneys.

The 30-Day Notice to Treasury is part of the consolidated pleadings document along with this Request for Declaratory Judgment.

4. **This Imminent Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision** (RoD) as Exhibit 1 part of the 30-Day Notice and this Request for Declaratory Judgment. As a non-discretionary requirement, Dodd-Frank requires that Treasury rapidly act to stop documented, systemic threats to U.S. financial stability that can cause another Financial Crisis, including Financial Stability Oversight Council's (FSOC) duty to *"respond to emerging threats to the stability of the United States financial system. …, monitor the financial services marketplace in order to identify potential threats to the financial stability of the United States …* [and] *(I) to enhance the integrity, efficiency, competitiveness, and stability of United States financial markets; (II) to promote market discipline; and (III) to maintain investor confidence."* Dodd-Frank specifies that the Secretary of the Treasury is FSOC Chairman. Sections 111, 112 relating to FSOC, and the purpose of Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, as Amended Through P.L. 117–286, Enacted December 27, 2022. Section 202 of Dodd-Frank provides judicial review provisions none of which are applicable herein. No Treasury guidance for Review Petitions could be found in this matter, which is outside of Treasury's tax responsibilities.

5. **The Record of Decision (RoD), Included the Thwaites Glacier Impending Collapse Schematic** as Exhibit 1 to the 30-Day Notice to Treasury, which is summarized in preceding Figures 1 & 2, prepared with NASA Jet Propulsion Laboratory (JPL). NASA JPL stated *"explosive & disturbing"* glacial subsurface melt 3.6ºF above ocean freezing and impending Thwaites Glacier collapse as the largest contributor to global sea level rise flooding, were demonstrated by 29 years of ice-penetrating actual data aerial imagery. NASA JPL stated in the Schematic that this current unacceptable threat requires protections from 2' of sea level rise flooding minimum by 2030 to preserve commerce and national security as published by 26 news entities, and subsequently codified in 2022 by the 3.0 national consensus resilience standard. Federal statutes require Federal Agencies to follow national consensus standards unless Treasury has its own climate resilience standard which it does not.

6. **Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act** when there is a credible, imminent and documented threat to U.S. financial stability as was set forth in the communications to Treasury, the 30-Day Notice, and this Request for Declaratory Judgment. To the contrary, Dodd-Frank was enacted providing Treasury with non-discretionary plenary power to act to protect U.S. financial stability when

faced with imminent contagion from the complete devaluation of about $1 trillion of South Florida coastal real estate, and the harm to the real estate finance community comparable to Subprime Mortgages that caused the global Financial Crisis as determined by the Financial Crisis Inquiry Commission. Congress clearly did not want a repeat of the highly destructive 2008 Financial Crisis. Treasury is unequivocally directed by Dodd-Frank to *"respond to emerging threats to the stability of the United States financial system."*

7. **South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise** flooding both up from below ground and at the tidal surface preventing permanent engineering solutions. Miami Beach published its consulting engineer's preliminary solution which was sea walls with permanent subsurface vertical and horizontal barriers. This would have made Miami Beach as a barrier island a leaky bathtub at a cost of about $1 trillion. This specific type of Siren's Song geo-engineering was dismissed as unworkable at the September 2016 White House Resilience Summit by all participants which included Miami Beach's consulting engineer. Miami Beach is spending about $200 million in groundwater pumping discharged to the rising ocean, as a temporary solution to decrease sunny day flooding. However, the $200 million was paid for by fees encouraging additional Miami Beach development, thus increasing the dollar amount of the contingent liability to permanent mortgage holders. Mami-Dade County estimates that $4 billion is needed to connect to sewers, underground sewage septic systems leaking from subsurface rising seas submerging the systems, and releasing the nutrients nitrogen and phosphorous causing algae blooms in Biscayne Bay comprised of flesh-eating bacteria closing beaches to swimming and recreation. City of South Miami Sea Level Rise Flooding Pilot (2020) (reference 4 of the Thwaites Glacier Collapse Schematic). The roughly $90 billion for South Florida protections can only extend the life of the coastal property and stop the contagion threat, but is not a permanent engineering solution. Without rapidly deploying the available private sector financing, permanent South Florida coastal mortgage holders' property can at any time now, be completely devalued starting massive litigation to recover this value which can very quickly start U.S. financial contagion comparable to Subprime Mortgage litigation that caused the Financial Crisis. Contagion is caused by the lack of market confidence in the solution to a systemic financial threat, in this case, that financing for protections will NOT be rapidly deployed as required. As a long-term South Florida resident, Petitioner believes this is an imminent, unacceptable threat to his health, well-being and net worth, in addition to U.S. financial stability. Petitioner is an expert witness on sea level rise flooding, and thus qualified to deliver his opinion to Courts.

8. **Dodd-Frank and Treasury's Announced High Priority Private Sector Climate Financing Program or Equivalent, Can Ensure U.S. Financial Stability** as stated by Treasury to: *"**Bring to bear the full force of the Treasury Department … leveraging finance**"* (emphasis by Treasury) in Exhibit 2 to the 30-Day Notice. Secretary Yellen stated in the announcement *"Climate change requires economy-wide investments*

*by industry … as well as actions to … mitigate climate-related risks to households, businesses, and our financial sector."* (Apr. 19, 2021).

9.    **Financial Stability Oversight Council (FSOC) Identified** *"Climate Change As An Emerging & Increasing Threat to Financial Stability,"* reported in Treasury's press release on its website of October 21, 2021 in Exhibit 3 to the 30-Day Notice:   *"Established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, FSOC is charged with identifying risks to U.S. financial stability, promoting market discipline, and responding to emerging threats to the stability of the U.S. financial system."* In Treasury's announced FSOC finding, Secretary Yellen emphasized that *"Climate change is an emerging and increasing threat to America's financial system **that requires action**."* (emphasis added).

10.    **Importantly As Also Shown in the RoD, Treasury Was Notified That Required Protections for South Florida Can Be Rapidly Deployed** through available higher-credit rated private sector financing with Treasury's announced private financing program or equivalent.  The estimated $90 billion in required South Florida coastal protections is based on actual cost data.  <small>See Massachusetts and Pennsylvania Existing, Partial Climate Resilience Costs including for sea level rise flooding with Massachusetts existing sea level rise flooding protection calculated costs at $326 billion, and Pennsylvania's at $1.9 billion for tidal waters of the Delaware River beyond the northern limits of Philadelphia (Nov. 2017).</small>  For example, the Investor Network on Climate Risk has over $60 trillion in assets ready to be deployed through the available higher-credit rating private financing with assistance by the Urban Land Institute.

11.    **The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now** (stranded from sea level rise flooding) *"as a grenade to South Florida's economy,"* as stated publicly in 2020 by the leading expert of South Florida's real estate financing market, a South Florida Real Estate Developer and Chairman, South Florida Urban Land Institute (ULI).  ULI is an IRC §501(c)(3) nonprofit of leading real estate finance and climate resilience experts.  <small>*"New South Florida Climate Change Financial Report:  Spend Billions Or Lose Much, Much More,"* WUSF Public Media - WUSF 89.7 | By Alex Harris - Miami Herald, Published October 17, 2020 at 8:00 AM EDT.</small>

12    **The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Resilience** (out of $1 billion nationally) immediately

subsequent to these preceding requests to Treasury, creating a dangerous, illusory, false sense of security as reported by unwittingly duped local news.  About $90 billion in South Florida coastal protections are required now.  Sent to Treasury was an OpEd containing the photo of a leading FIU PhD. Scientist, Professor, former mayor, sea level rise expert, and an author of the Thwaites Schematic and OpEd published by 26 news entities.  Although the most knowledgeable at FIU and one of several in South Florida of this systemic threat, the Professor was not invited to the Press Conference.  Was this a coincidence?  *"VP Kamala Harris Visits FIU to Address 'Urgent' Climate Crisis and Announce $1B in Climate Resiliency Projects,"* NBC 6 South Florida (Aug. 1, 2022).

13.    **Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation**, including condo owners, whereby it's cost effective for them to initiate massive cost recovery litigation like what triggered Subprime / Global Financial Crisis:

- Prohibitive retrofit or relocation costs especially for condo owners that represent a large share of coastal property owners.  Collapsed Surfside Condo owners could not afford the requested, costly, protective retrofit.  A $1 billion settlement from insurers was judicially approved within a year of the filing of litigation.  Only three occupants survived and 98 were killed.

- Subsurface structural steel rebar, cement and concrete are not protected from corrosive ocean salt water.  Documented evidence of such salt water corrosion existed in the Surfside Condo basement.

- Potential defendants include insurers, local government, developers, realtors, law firms.  There is material evidence of fraud that would very likely pierce any local government immunity.

- South Florida's entire economy can be devastated and contage with U.S. and global economies.

Contagion triggers can be Thwaites collapse or a failure to issue coastal mortgages, another coastal condo collapse, further withdrawal of the property insurance market, continued publication of the threat by the news media, initiation of a cost recovery action by a mortgage holder, or another unforeseen cause.

14.    **State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit**

**Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections Was NOT Deployed.  However, the State Has Not Acted.**  (FL 2021 Debt Report at 5).

15.    **The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.**

Reinforcing the high priority of Treasury's announced private sector financing program, White House UN Special Climate Envoy John Kerry speaking on the private sector Climate Crisis engagement need in Pittsburgh on Sept. 22, 2022 finally announced: *"No government is going to solve this problem [or] … has enough money."* [1]   "In Pittsburgh, John Kerry says climate change solutions will be driven by private sector."  NPR State (Sept. 22, 2022).

16.    **Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith Stonewalling the 30-Day Notice, and Subjecting Top Management to Personal Liability.**  Given this well-documented unacceptable imminent financial threat to society, and the fact that many $trillions of private sector capital protections are ready to rapidly deploy to stop contagion, Treasury and possible collusive White House complete refusal to act and Stonewall lack of communication are:

- Extraordinarily reckless
- Dangerous
- Imprudent
- Illogical
- Antithetical to announced Treasury Climate and White House Policy furthering Dodd-Frank statutory requirements to protect U.S. financial stability
- Contrary to the public interest
- Substantially damaging to South Florida, its economy, social fabric, and quality of life
- With no rational basis
- In violation of law as shown below in case law precedent.
- Likely subjecting Treasury top management to personal liability for knowingly acting outside of its scope of employment, statutory duties, and Oath of Office, unprotected from any government immunity due to the extreme, imminent and unprecedented expected harm to society as gross negligence.

Vice President Harris administered on January 26, 2021 as recorded by C-SPAN.org, the Treasury Secretary's Oath of Office, whereby the Secretary raised her right hand with her left hand on the Bible and stated:

> *"I JANET YELLEN DO SOLEMNLY SWEAR THAT I WILL SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES. AGAINST ALL ENEMIES FOREIGN AND DOMESTIC, THAT I WILL BEAR TRUE FAITH AND ALLEGIANCE TO THE SAME, THAT I TAKE THIS OBLIGATION FREELY, WITHOUT ANY MENTAL RESERVATION OR PURPOSE OF EVASION, **AND THAT I WILL WELL AND FAITHFULLY DISCHARGE THE DUTIES OF THE OFFICE UPON WHICH I AM ABOUT TO ENTER**, SO HELP ME GOD."* (emphasis added)

Failure to *"well and faithfully discharge"* the top non-discretionary statutory duty of the Office is a violation of

the Secretary's Oath of Office, and there rationally can be no duty higher than to protect U.S. financial stability against credible, threats like imminent financial contagion that the Secretary is Stonewalling.  The Secretary is directed to address this specified sea level rise flooding threat pursuant to Dodd-Frank and the Secretary's statutory duty as Chair of the Financial Stability Oversight Council:

> "The Council is charged by statute with … responding to emerging threats to the stability of the U.S. financial system. ….
> The Council … mitigates risks to U.S. financial stability. ….  In 2021, the Council identified three key priorities related to
> significant vulnerabilities in the financial system: nonbank financial intermediation, **climate-related financial risk**, and
> Treasury market resilience."   Duties of the Financial Stability Oversight Council on Treasury's website.  (emphasis added).

The Secretary's violation of her Oath of Office by continuing to Stonewall her clear and paramount statutory duty to address imminent, large scale financial contagion threatening U.S. financial stability, is outside her scope of government employment, thus subjecting her to personal liability for any continuing Stonewall with no immunity due to the unprecedented severity of the imminent and destructive harm to U.S. financial stability.  If the Secretary continues to Stonewall, she has no government immunity because her failure to act on a top statutory duty foremost in the public interest with no discretion, is outside her scope of employment.  Harlow v. Fitzgerald, 457 U.S. 800 (1982).  The Secretary's abrogation of her duty to act placing her outside her scope of employment would be clear and convincing as completely contrary to her March 7, 2023 remarks to Treasury's Climate-related Financial Risk Advisory Committee published on Treasury's website:

> "In October 2021, FSOC [Financial Stability Oversight Council] published its Report on Climate-related Financial Risk.  As
> you know, the FSOC for the first time identified climate change as an emerging and increasing threat to U.S. financial
> stability.  **The report stated that climate change will likely become a source of shocks to the financial system in the coming
> years.  As climate change intensifies, natural disasters and warming temperatures can lead to declines in asset values that
> could cascade through the financial system.**  And a delayed and disorderly transition to a net-zero economy can lead to
> shocks to the financial system as well.
>
> **These impacts are not hypothetical.  They are already playing out.**  In the United States, there's been at least a five-fold
> increase in the annual number of billion-dollar disasters over the past five years compared to the 1980s, even after adjusting
> for inflation.  States like California, Florida, and Louisiana recently have seen especially severe storms and wildfires.  And
> recent devastating tornadoes across the South and intensifying storms on the West Coast are reminders of how climate
> change is accelerating.
>
> In addition to the terrible toll of these disasters on individuals and families, the economic and financial impacts of these
> events are significant.  **For example, in response to rising insured losses, some insurers are raising rates or even pulling
> back from high-risk areas.  This has potentially devastating consequences for homeowners and their property values.
> Developments like these can spill over to other parts of our interconnected financial system.**
>
> **Taking climate change into account is prudent risk management.**  Our work builds on the scientific consensus regarding
> the projected effects of climate change and is based on a widely accepted understanding of how the financial system works.
> (emphasis added).

17. **There is Standing to Sue and Petition This Court.** As a South Florida resident of Coral Gables and Professor at the University of Miami, the Petitioner is an immediately and adversely impacted South Florida resident with personal injury-in-fact standing to the adverse economic and social impacts of the imminent financial contagion to him and his community. Petitioner is also an expert witness on accelerating sea level rise flooding and worked with NASA JPL in preparing the Thwaites Collapse Schematic, its 16 scientific references, and its OpEd publication by 26 news entities. The Supreme Court confirms such Article III standing on Petitioner since he has a *"personal stake, … close relationship to the harm,"* concrete injury-in-fact with the harm to him, his net worth, and his community from impending complete devaluation of South Florida coastal real estate and the resulting economic and social harm to the economy, and the harm is *"likely to be redressed by a favorable ruling."* Such monetary harms qualify for standing. TRANSUNION LLC v. RAMIREZ, S. Ct. No. 20-2997 (June 25, 2021), and Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019).

18. **Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued** with filing of this Request for Declaratory Judgment as notified to Treasury in the Aug. 31, 2023 30-Day Notice and email of Sept. 21, 2023 by Jim Jones to Treasury Climate Counselor Ethan Zindler transmitting a Draft Press Release. Jones is former Idaho Attorney General and Supreme Court Chief Justice. Treasury was also told in the 30-Day Notice that attorneys' fees will be requested to this Court for Treasury's long-term bad faith, complete Stonewall as an unacceptable and unlawful threat to the U.S. and global economies, and that this Request for Declaratory Judgment will be linked to the Press Release since the public has a right to know about this unacceptable, yet preventable, imminent threat to U.S. financial stability completely caused by Treasury long-term bad faith.

19. **Treasury was Also Informed by the 30-Day Notice, that Emergency Injunctive Relief Will be Requested by Judicial Review** to compel Treasury's April 2021 announced private sector financing program, or equivalent, and financial stability protections required by Dodd-Frank, to rapidly deploy available, estimated $90 billion for sea level rise flooding protection required to prevent South Florida financial contagion. Treasury General Counsel requested, then Stonewalled the Notice, continuing its long-term bad faith inaction, increasing

the threat.  Imminent irreparable harm is unprecedented.

20.  **Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided** by 5 U.S.C. §706 scope of review to *"compel agency action unlawfully withheld or unreasonably delayed,"* since Treasury's 100% failure to act or communicate is *"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."*

21.  **Venue is the D.C. U.S. District Court.**  *"Suits against government officers acting in their official capacities or under color of office or legal authority, and against government agencies or the United States, may be brought, pursuant to 28 U.S.C. § 1391(e), in any judicial district in which:  A defendant in the action resides."*  U.S. DOJ Civil Resource Manual §41. Venue – Government Officers and Agencies as Defendants.

# Treasury's 100% Stonewall to Repeated Inquiries to Top Management, with Such Inquiries Facilitated by Treasury Inspector General and Chairman IG Oversight Council on Financial Stability, and the 30-Day Notice, Constitute Final Agency Action.

22.  **Treasury's 100% Repeated Long-term Stonewall is Contrary to the Public Interest for a Top Non-discretionary, Statutory Duty to preserve U.S. financial stability**, and such an egregious outlier of bad faith that no precedent could be found in the cases for such a profound, damaging, long-term, complete lack of action or communication.

23.  **The Supreme Court Test for Final Agency Action Has Been Met** and is:  Has the agency really reached a decision?  And did that decision produce real, legal consequences?  Both answers must be "yes" for a party to have its day in court.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Treasury reached a decision with profound legal consequences by saying absolutely nothing and not responding at all to this imminent contagion threat to U.S. financial stability that Treasury by statute with no discretion, is required to immediately act to stop.  Treasury has no higher priority duty.  A complete long-term Stonewall to Treasury's top non-

discretionary statutory duty to protect U.S. financial stability has the paramount legal consequence of jeopardizing commerce and national security of the United States and Petitioner's economic and social well-being.

24. **Petitioner Can Reach No Other Conclusion than Treasury Has Completed its Decision-Making Process,** since the 30-Day Notice was also Stonewalled and in effect rejected. Petitioner has exhausted its administrative remedies, and there is final Treasury action ripe for this Court's review.

25. **Treasury's Final Agency Action Was Binding. It Made Up Its Mind.** The D.C. Circuit held that in applying the Supreme Court's test in *Bennett*, the key consideration is whether the action was *"informal, or only the ruling of a subordinate official, or tentative."* Soundboard Ass'n v. FTC, 251 F. Supp. 3d 55, 1267 (D.D.C. 2017). The nine written and oral requests over 16 months to Treasury were to top Management, and Treasury's complete, 100% long-term Stonewall was not informal, not involving a subordinate official, and not tentative. These repeated requests to Treasury top Management by Petitioner were a comprehensive, substantive response to a serious, well-documented, imminent threat to U.S. financial stability. The 30-Day Notice to Treasury of this litigation was requested by the Treasury Office of General Counsel Attorney with climate responsibility in a conference call with Petitioner's attorneys, and then in a subsequent conference call with Petitioner's attorneys, Treasury's same attorney refused to: (1) answer if he received the 30-Day Notice, (2) discuss that Treasury Order 107-04 states that the Office of General Counsel accepts service, (3) discuss who in the Office of General Counsel is responsible for the 30-Day Notice, and (4) discuss any resolution of the Notice precluding litigation. The Treasury General Counsel Office Attorney refused to talk at all and unilaterally terminated the conference call. As part of the consolidated pleadings document of this lawsuit, the Sept. 16, 2023 Declaration of Petitioner's attorneys details these actions by a responsible Treasury Attorney official in the Office of General Counsel. Petitioner believes it's clear and unequivocal to any reasonable observer, that these demonstrated, entirely consistent material facts of Treasury's long-term failure to act or communicate, show that Treasury had made up its mind. Petitioner cannot reach any other conclusion and knows no other means to find out other than the requested Hearing by Motion, before this Court compelling

Treasury to participate.  The D.C. Circuit in *Friedman v. FAA*, ruled that the FAA's constructive denial of a pilot's petition for a commercial license constituted final agency action.  The court focused on the fact that *"in practical effect if not formal acknowledgment"* the agency had *"made up its mind."*  841 F.3d 537, 542 (D.C. Cir. 2016. In practical effect and formal acknowledgement that Treasury made up its mind, are the 100% Stonewall of nine separate requests to top management over 16 months facilitated by Treasury Inspector General and Chairman, statutory Inspector Generals' Oversight Council for Financial Stability, and requested and then specifically-Stonewalled 30-Day Notice by the Office of General Counsel.  The Notice was also sent, insured for $5,000, and received by Treasury by registered mail which by law is acceptable service to federal agencies as shown in the 30-Day Notice Certificate of Service part of the consolidated pleadings document of this lawsuit.  As of the date of this Request for Declaratory Judgment, there has still been no action by Treasury to reduce the demonstrated imminent threat to U.S. financial stability, or to communicate at all, thereby continuing to increase the threat to U.S. financial stability by extending the unacceptable delay.

# The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.

26.  **APA Judicial Review of Final Treasury Actions Governs This Matter** and concerns *"the whole, or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rulemaking."*  APA §2(d).  This matter is also Treasury action defined by APA §2(g):  *"Agency action includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."*  APA §10(a) provides Petitioner the right of judicial review: *"Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."*  APA §10(c) provides jurisdiction because this Treasury action for this matter is *"agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, …or … for an appeal to superior agency authority."*

27.   **To Protect U.S. Financial Stability, Interim Relief is Authorized & Should be Provided Pending Judicial Review To Prevent Irreparable Harm.**  Section 10(d) of the APA as confirmed by the Attorneys General's APA Manual and APA legislative history, grants this Court the discretionary authority to use its equitable powers pending judicial review to grant interim relief to *"the extent necessary to prevent irreparable injury. … The function of such a power is, as heretofore, to make judicial review effective. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277). Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4 (1942).*  Attorney's General Manual on the APA (1947), §10(d) Interim Relief.

28.   **This Matter is Not** *"Committed to Agency Discretion by Law"* because Dodd-Frank specifically empowers and instructs Treasury to immediately act to protect financial stability including through the Financial Stability Oversight Council (FSOC).

29.   **This Court Has the Power to Force Treasury to Communicate** because meaningful judicial review requires that Treasury must *"disclose the basis"* of its inaction on a well-documented imminent threat to U.S. financial stability.   Further, this Court may inquire into *"the mental processes of administrative decisionmakers"* upon a *"strong showing of bad faith or improper behavior,"* which Petitioner believes exists since the 30-Day Notice was also requested by, then Stonewalled by the Office of General Counsel, preventing any communications of the parties on a documented imminent threat to U.S. financial stability for over one year.   Quoted from Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019) *citing* Burlington Truck Lines, Inc. v. United States, 371 U. S. 156, 167–169. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 420 (1971).   On a *"strong showing of bad faith or improper behavior, an inquiry may be warranted and may justify extra-record discovery."*  Id. at 2573-74.

> *"The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.  Accepting contrived [or no] reasons would defeat the purpose of the enterprise."*
>
> Department of Commerce v. New York at 2575–76 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

This Court should inquire since reasons of bad faith acts are *"unlikely to ever appear within the four corners*

*of the official administrative record."* Earth Island v. Evans, 256 F. Supp. 2d at 1078 n.16; see *Beta Analytics Int'l, Inc. v. United States,* 61 Fed. Cl. 223, 226 (2004).  For example, government officials will *"seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate."*  Smith v. Town of Clarkton, 682 F.2d 1055, 1064 (4th Cir. 1982).  And *"agency officials are not likely to keep a written record of improper political contacts."*  Sokaogon Chippewa Cmty. v. Babbitt, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997).  Thus, in a case where bad faith or improper behavior is at issue, *"the court's responsibility to reach a just resolution"* may require that it have *"all relevant evidence before it,"* id. at 1280—including, at times, testimony from agency decisionmakers.  See *Latecoere Intern. v. U.S. Navy,* 19 F.3d at 1364-65 (11th Cir. May 1994).

Moreover, because this evidence is, by its nature, generally in the exclusive possession of agency defendants, discovery beyond the administrative record may be necessary to ensure effective judicial review.  The *"only way to uncover [improper] contacts,"* for example, may be *"by examining relevant phone records and by asking these officials about their discussions."* Sokaogon, 961 F. Supp. at 1281.  In appropriate circumstances, then, courts may authorize limited extra-record discovery of agency officials.  Without this ability, courts would be unable to carry out their *"important"* role in *"ensuring that agencies have engaged in reasoned decisionmaking."* Judulang v. Holder, 565 U.S. at 53.  The courts must inquire in certain circumstances, so that a reviewing court ultimately can determine whether an agency decisionmaker's unstated additional reasons were legally forbidden.  This is particularly true where, as here, available evidence suggests that Treasury sought to conceal important aspects of its decisionmaking process, including the reasons for its extended failure to act or communicate on an imminent threat to U.S. financial stability.  *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency,* 156 F.3d 1279, 1279-80 (D.C. Cir. 1998) (acknowledging that the *"actual subjective motivation of agency decisionmakers"* is relevant where *"there is a showing of bad faith or improper behavior"*).

Such an inquiry is warranted since an imminent threat to U.S. financial stability is documented to Treasury and Treasury failure to provide its statutorily required response is completely covered-up and repeatedly Stonewalled for 16 months, increasing the unacceptable imminent threat to the U.S. economy.

30.   **There is No Political Question Preventing Judicial Resolution of Treasury Inaction** since

Dodd-Frank provides Treasury plenary authority and the responsibility to act to preserve and protect U.S. financial stability. Further, there is no issue of liability of responsible parties that would require additional Congressional authority. The available many $trillions of private sector financing are by investors ready to deploy through higher-credit rated bonds for this purpose to provide required protections.

# Request for Declaratory Judgment

31.     The Declaratory Judgment Act authorizes this Court to *"declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought,"* so long as there is *"a case of actual controversy"* over which a federal court may exercise jurisdiction. *Committee on the Judiciary of the House v. McGahn*, at 2, No. 19-5331, (D.C. Cir. Aug. 31, 2020). Further, the Act states that any such declaration shall have the force and effect of a final judgment. 28 U.S.C. § 2201(a). These statutory requirements for declaratory judgment are met with the case or controversy comprising this Request for Declaratory Judgment, and Petition for Review of Treasury final action to preserve U.S. financial stability. *"The wording of the statute does not indicate that any independent cause of action is required to invoke"* the Declaratory Judgment Act. *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 80 (D.D.C. 2008). The Supreme Court has never stated that the Act *does not* create a right of action. *Id.* *"The Declaratory Judgment Act 'presupposes the existence of a judicially remediable right.' C&E Servs., Inc. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir.2002) (quoting Schilling v. Rogers, 363 U.S. 666, 677 (1960))."* *Comm. on the Judiciary* at 3. That judicially remedial right is the review of Treasury inaction regarding its non-discretionary, top statutory duty under Dodd-Frank to preserve U.S. financial stability. *"The Act is a vehicle for vindicating a separate and independent substantive right."* *Id.* at 4.

> *"In the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding, Glenn v. Fay, 222 F. Supp. 3d 31, 35 (D.D.C. 2016)."*
>
> Hartford Insurance v. New Ledroit Co., at 5, No. 17-1489 (D.D.C. Apr. 27, 2018).

To that end as set forth by *Glenn v. Fay*, declaratory judgment would clarify the issue of the imminent threat to U.S. financial stability, and afford relief from the uncertainty from the parties inability to communicate on the

matter for over one year completely caused by Treasury with no rational basis.

# The Judicially Remedial Right of Petitioner is Clear & Universal, Including Where There is No Other Adequate Remedy in Court: *Protection of U.S. Financial Stability as a Top Statutory Duty.*

32. The judicially remedial right of Petitioner is specifically provided independently by the APA as set forth by Court decisions, because Dodd-Frank does not bar judicial review in this instance to protect U.S. financial stability, and its judicial review and agency discretion provisions are all inapplicable in this instance, but instead specified for SEC, CFTC, Department of Labor, FDIC, federal insurance office, corporations, financial companies and their liquidation, regulations, monetary claims, cease and desist proceedings, employees, and counseling. This judicially remedial right of Treasury's inaction and complete, long-term refusal to communicate is specifically provided by the APA and Court decisions:

*"The APA by its terms independently authorizes review," Bennett, 520 U.S. at 162, for a party suffering "legal wrong because of ... or adversely affected or aggrieved by agency action," 5 U.S.C. § 704, "only when 'there is no other adequate remedy in a court,'" Bennett, 520 U.S. at 162 (quoting 5 U.S.C. § 704). When there is no such adequate remedy, the independent APA cause of action "applies universally" except to the extent that an authorizing or enabling statute precludes judicial review or commits the action to agency discretion. Id. at 175 (citing 5 U.S.C. § 701). See Chapter XII.A, infra (discussing the presumption of reviewability and its exceptions).*

*The "generous review provisions" of the APA thus "provide[] specifically not only for review of '(a)gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court.'" Abbott Lab'ys, 387 U.S. at 140 (quoting 5 U.S.C. § 704). The cause of action authorized in Section 704 of the APA, described in Sections 702 and 701, and for which the various elements are detailed in Section 706, thus provides an independent, "generic" fallback in those instances in which an authorizing or enabling statute does not provide a cause of action. See Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 188 & n.9 (collecting cases).*

*Consistent with the above described provisions, an injured party may have a cause of action under APA Section 706(1) to compel agency action that was unlawfully delayed or under Section 706(2) to challenge agency action on one of the six grounds defining when a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions," 5 U.S.C. § 706(2). Notably, then, the standards set forth in Section 706 and described in Section A above, not only prescribe how courts will review challenged agency action, but also define the elements of the causes of action available under the APA.*

*An important judicial gloss on the causes of action defined in Section 706 should be noted: Under Section 706(1), "the only agency action that can be compelled ... is action legally required." Norton v. S. Utah Wilderness All., 542 U.S. 55, 63 (2004) (emphasis in original). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Id. at 64 (emphasis in original); see also Benzman v. Whitman, 523 F.3d 119, 130–32 (2d Cir. 2008). But the availability of a claim under Section 706(1) does not render a claim under Section 706(2) unavailable. See, e.g., Dayton Tire v. Sec'y of Lab., 671 F.3d 1249 (D.C. Cir. 2012) (allowing a party to pursue a claim that an agency's delay in reaching a final decision rendered that decision arbitrary and capricious under Section 706(2), because "Section 706(1) does not state that a petition to compel is a party's only option in the face of agency delay").*

From 2023 Post Publication Update at 122-23, for *FEDERAL STANDARDS OF REVIEW*, prepared by Harry T. Edwards, Senior Circuit Judge U.S. Court of Appeals for the D.C. Circuit

# Prayer for Relief

33.    Petitioner's prayer for relief asks that this Court:

1. Enter a judgment declaring Petitioner has a justifiable request for relief, and considering that the parties have not been able to communicate for over one year on imminent issues of great weight for U.S. financial stability, order an immediate hearing to clarify the issues of the parties, and to proceed before a magistrate judge to discuss possible settlement in the best interests of U.S. financial stability. The Motion for a Hearing is part of the consolidated pleadings document of this case.

2. Declare that injunctive relief is appropriate and granted given the documented imminent threat to U.S. financial stability contained in this Declaratory Judgment Request and 30-Day Notice to Treasury.

3. Award Petitioner's attorneys' fees for Defendant's persistent bad faith increasing the U.S. financial stability threat, preventing any resolution, and causing the need and extensive work to repeatedly inquire to Treasury top management, and prepare the 30-Day Notice, this Declaratory Judgment Request, and Hearing Motion.  Interim awards before final judgment are allowed for bad faith.  The Motion for Attorney Fees is part of the consolidated pleadings document of this lawsuit.

4. For such other and further relief as this Court deems necessary and just.


Due to the long-term refusal of Defendant to communicate at all, Defendant's position on this Request for Declaratory Judgment cannot be ascertained in order for the parties to ensure compliance with this Court's Rule.


I declare under penalty of perjury that the foregoing is true and correct.


Respectfully Submitted,

## Mike Italiano

**Mike Italiano** DC Bar #411066, Member, D.C. District Ct.
mts@sustainableproducts.com
4919 Ashby St., NW, Wash., DC 20007
202-298-6556

## Attorney for Petitioner & Counsel of Record


**Attorney Advisors**

## Brian Davis

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com
651-308-7141

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
Bar #s 492945 & 206276

November 10, 2023

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DR. HAROLD R. WANLESS,**
1300 Campo Sano Ave, Coral Gables, FL 33146

        **Petitioner,**

**JANET YELLEN, SECRETARY** in her official
  capacity
**U.S. DEPARTMENT OF THE TREASURY**

**FINANCIAL STABILITY OVERSIGHT
COUNCIL**

1500 Pennsylvania Ave., NW, Wash., DC  20220

       **Respondents.**

Civil Action No. _____

**MOTION FOR ATTORNEYS FEES;
REQUEST FOR DECLARATORY
JUDGMENT**

# Motion for Attorneys Fees

 **1.** **Motion for $622,625 in Detailed Attorneys Fees due to Defendant's Long-term Bad Faith**
which are within the discretion of this Court as an interim award, and specifically provided for since
Defendant's longstanding bad faith caused this lawsuit.  Award of attorneys fees for bad faith are
authorized by (1) the Supreme Court, (2) 28 U.S. Code § 2412(c)(2) where *"the US acted in bad faith, then the
award shall be paid by any agency found to have acted in bad faith and shall be in addition to any relief
provided in the judgment,"* and (3) by §220 on Attorneys Fees of DOJ's Civil Resource Manual also codifying
this provision providing for attorneys fees against the US for bad faith.

 **2.** Petitioner respectfully requests attorneys' fees due to Defendant's bad faith Stonewall of nine
communications to top management for 16 months on a preeminent matter of U.S. financial stability that
Defendant has a top non-discretionary statutory duty to protect.  This includes Petitioner's 30-Day Notice of
this lawsuit whereby Defendant's General Counsel Attorney with responsibility for the subject matter

in conference calls with Petitioner's attorneys, requested the Notice to his email, then in a subsequent call Stonewalled and (1) refused to discuss the Notice and whether it was received, (2) refused to identify another attorney to discuss the Notice with, (3) refused to discuss Treasury Order 107-04 stating the General Counsel accepts service, and (4) refused consider discussions that could preclude litigation. These material facts are detailed in Petitioner's Attorneys Sept. 16, 2023 Affidavit that is part of this request for Declaratory relief and fees in the consolidated pleadings document of this lawsuit including this Motion. The Supreme Court provides for attorneys fees for bad faith. Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991). Bad faith is defined as *"lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform."* Wright v. Howard Univ., 60 A.3d 749, 754 (D.C. 2013) cited in Camarada v. CERTIFIED FINANCIAL PLANNER BOARD OF STANDARDS, INC., at 3, No. 1:13-cv-00871 (D.C. Cir. Oct. 4, 2016). There was by Treasury, clear and long-term purposeful failure to perform, and interference with Petitioner's and his counsel's ability to perform. The fees were incurred because of, and solely because of, the misconduct at issue causing this lawsuit, and thus should be awarded. Goodyear v. Haeger, S. Ct. No. 15-1406 (Apr. 18, 2017).

3.      **The total hours / fees are detailed below after the proposed order, for a grand total of $622,625:**

- Attorney M. Italiano Total fees for 17 mos. = $529,140
  July 2022 – Nov. 7, 2023
- Attorney B. Davis Total Fees for 11 mos. = $63,600
  July 2022 – Sept. 2023
- Attorney C. Dillard Total Fees for 5 mos. = $29,885
  May 2023 – Sept. 2023

Due to the long-term refusal of Defendant to communicate at all, Defendant's position on this Motion for Attorneys Fees cannot be ascertained in order for the parties to ensure compliance with this Court's Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

# Mike Italiano

**Mike Italiano** DC Bar #411066, Member, D.C. District Court
mts@sustainableproducts.com
4919 Ashby St., NW, Wash., DC 20007
202-298-6556
**Attorney for Petitioner & Counsel of Record**

**Attorney Advisors**
**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com
651-308-7141

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DR. HAROLD R. WANLESS,** | |
| **Petitioner,** | Civil Action No. _____ |
| | |
| **JANET YELLEN, SECRETARY** in her official capacity | |
| **U.S. DEPARTMENT OF THE TREASURY** | |
| **FINANCIAL STABILITY OVERSIGHT COUNCIL** | |
| **Respondents.** | |

## ORDER

Upon consideration of Petitioner's motion for a attorneys fees for bad faith by defendant's long-term refusal to act or communicate including its position on this case and its motions, and the entire record in this case, the Court finds that an interim award prior to judgment, of attorneys fees of $622,625 is justified. These fees shall be paid by defendant within 45 days of this order due to the longstanding inability of the parties to communicate at all including no reasons provided for such lack of communication by Defendant, and the issue

before the Court is detailed as an imminent threat to U.S. financial stability that Defendant has a non-discretionary top statutory duty to protect. Further, due to the described imminent threat, the parties shall meet

at the earliest time possible before a Magistrate Judge to discuss possible settlement.

Therefore, it is hereby

ORDERED that Petitioner's motion for attorneys fees is granted.

This is a final, appealable order.

_____
UNITED STATES DISTRICT JUDGE

# Attorneys Hours / Fees

**Mike Italiano**, environmental & capital markets attorney & scientist with over 30 yrs. experience, DC Bar Member, & Counsel of Record for Petitioner litigation against U.S. Treasury for bad faith failure to act on Treasury top statutory duty to protect U.S. financial stability.

**July 2022**
Seven emails and calls to Treasury top management regarding available private sector financing need to preserve U.S. financial stability from impending collapse of Antarctic glaciers greatly accelerating sea level rise flooding. Treasury was told that 29 years of NASA Jet Propulsion Lab & European Union ice-penetrating aerial imagery documented that protections from 2' of rise by 2030 are required to maintain commerce and national security at a calculated U.S. cost of about $5 trillion. Treasury was also told that Massachusetts calculated protection costs using actual cost data are $326 billion, and South Florida is an imminent threat of financial contagion from coastal real estate devaluation due to porous bedrock preventing permanent engineering solutions.

Let Treasury know the glaciers' collapse according to NASA is *"explosive & disturbing."* Communications were repeatedly with Janet Yellen's Scheduler, General Counsel, Climate Counselor John Morton, & Rich Delmar, Chairman, statutory Inspector Generals Financial Stability Oversight Council. Delmar forwarded the communications to Morton, the responsible official. These communications also included the fact that higher-credit rated private financing is available through Green + Resilient Building Bonds providing cheaper capital and higher appraised value, that falls within Treasury's publicly announced high priority private financing for this purpose. There were no responses at all to these communications.

Zoom calls with national green building and resilience leaders about the need to pursue litigation against Treasury to force deployment of its private sector financing program to pay for near term $multi-trillion resilience costs

including for accelerating sea level rise flooding with $5 trillion in U.S. existing protection costs. These leaders represented the American Institute of Architects (AIA), California AIA, Perkins&Will, HOK, Gensler, Victor Insurance that provides resilience coverage, and Amazon.

Emails & calls to Massachusetts Attorney General and Governor's Office, re Treasury private sector financing to pay for Massachusetts calculated $326 billion in existing sea level rise flooding protection costs based on existing cost data and Surging Seas mapping. Similar emails & calls to Chair, SF Fed, Maine & Washington Governors.

Calls with S&P regarding its threatened downgrade of Florida credit rating for lack of sea level rise flooding protection costs, and building owner CEO Summit to rapidly deploy the private financing.

Call Florida Pension retirees re reversing S&P State credit rating downgrade threat   Call with Raymond James re reversing downgrade threat with underwriting.

Discussed sea level rise flooding protection costs with Sen. Sheldon Whitehouse staff. Emailed and called Rhode Island Governor Office regarding about $25 billion in RI sea level rise flooding existing protection costs. Emailed & called Sierra Club national & DC and Florida chapters, Sen. Richard Blumenthal, & NY & CA Insurance Commissioners regarding Treasury private financing program for sea level rise flooding protections.

Sent media notices re 3.0 national consensus resilience underwriting standard re ability to pay for private sector sea level rise protection costs through Treasury program. Worked with PR firm and NJ Senate Majority Leader Bob Smith securing referral to NJ Governor Phil Murphy to use Treasury private sector financing program to pay for existing $50 billion in sea level rise flooding protection costs.

Calls and meetings with green building leaders concluding that Treasury private financing program was best means to pay for existing sea level rise flooding protection costs to preserve commerce and national security.

Paid Zoom info $5,000 for Building CEO contacts for CEO Summit to start higher-rated private sector financing for sea level rise flooding protection costs. Called Treasury Climate Counselor John Morton re same.

Worked with Perkins&Will on 3.0 national consensus resilience underwriting standard for private financing. Talked with Covington & Burling resilience attorney about pursuing private sector financing with or without Treasury. Emailed Urban Land Institute regarding private financing.

Emails and calls with NJ PR Firm CEO and Brian Davis about contacting NJ Governor Phil Murphy re Treasury private financing need for accelerating sea level rise flooding protections. Zoom call with Brian Davis, Perkins&Will & investment banker re private sector financing with Treasury and draft letter to Gov. Gavin Newsom re same to protect U.S. financial stability from accelerating sea level rise flooding.

Emails and calls with Brian Davis to S. Florida republican leaders re private financing with Treasury to protect S. Florida economy from accelerating sea level rise flooding.

**August 2022**
Emails to multiple law firms requesting assistance with Treasury to rapidly deploy available private sector financing to preserve U.S. financial stability.

Called and emailed law firms to pursue Treasury private financing. Pursued Atelier Ten & NJ League of Conservation Voters support for meeting with NJ Governor Phil Murphy on private financing pursuant to referral to Governor from Senate Majority Leader Bob Smith. Responded to American National Standards Institute regarding American Petroleum Institute recusal in voting n preliminary 3.0 national consensus resilience underwriting standard. Call with Perkins&Will regarding 3.0 underwriting standard finalization for private financing.

Called S. Florida law firm with business relationship, about possible support in pursuing Treasury to deploy needed private financing.

Conference call with Brian Davis and S. Florida republicans on private financing need to support Treasury financing. Followed up with referral emails to republican law firms re same. Discussed Treasury private financing program and S. Florida need with representatives of S. Florida cities & Miami Beach and Miami Chambers of Commerce. Calls and emails re same with Amazon green building leader. Conference call on same with American Institute of Architects, Perkins&Will & 2030 green building challenge leaders. National consensus resilience underwriting calls with Perkins&Will for private financing.

Email and call with S. Florida Democratic commercial real estate attorney leader to support Treasury private financing. Call with Brian Davis and Miami Beach Chamber of Commerce attorney re Treasury private financing to pay S. Florida existing $90 billion in sea level rise flooding protection costs.

Conference call with Dodge Construction re Building Owner CEO Summit to start $multi-trillion, higher-rated Green + Resilience Financing market with or without Treasury. Calls with NJ Governor Phil Murphy staff regarding private sector protection financing with or without Treasury. Resent 3.0 underwriting standard media notices re final approval voting.

Emails and calls briefing U.S. General Services Administration / Federal green building leaders on sea level rise flooding protection need and Treasury private sector financing for this purpose. Email and call to S. Florida law firm Becker Lawyers expert in sea level rise flooding for interest in pursuing Treasury private financing, and same to Miami Waterkeeper.

Wrote to largest U.S. architectural firms informing them that their leading carrier Victor Insurance through its Resilience Policy, will deny coverage where buildings are not designed to protect against 2' minimum of sea level rise flooding by 2030, even if their clients refuse to pay. Email to S. Florida Chamber of Commerce attorney with list of building owners that would be interested in cheaper capital, higher appraised value, and resilience financing pursuant to a Treasury private sector financing program.

**61 hrs. @ $895/hr. = $54,595**

**September 2022**

Call with Perkins&Will re underwriting standard for private financing with or without Treasury. Conference calls with green building leaders on private sector financing. Sent Letter to CA Governor Gavin Newsom regarding private sector financing and CA and FL need & as a result, spoke with his Senior Climate Advisor.

Call with NJ PR Firm and Brian Davis regarding securing Governor Phil Murphy support for financing with or without Treasury. Called and emailed Miami & S. Florida law firms re assistance with Treasury financing program. Calls with Perkins&Will re underwriting standard for private financing. Call with Gov. Gavin Newsom's Office re financing.

Calls & emails with Perkins&Will, American Institute of Architects leader and Brian Davis re support for Treasury financing. Emails and call with Perkins&Will Sustainability Chief on building owners that can lead private sector financing with Treasury. Re same, call with Seattle law firm representing buildings. Call NJ PR firm & Autocase re same. Call with NJ Urban Land Institute re Gov. Phil Murphy support for Treasury financing.

Conducted 3.0 resilience underwriting standard national public meeting for private financing. Calls with Sierra Club Florida Chapter re $90 billion in existing protection costs and available private financing.

With Brian Davis, sent agenda to NJ PR Firm for law firm seminar supporting Gov. Phil Murphy private resilience financing with Treasury. Worked with Brian Davis, NJ PR Firm, & Langan Engineering leaders on Law Firm Resilience Finance Seminar. Talked with NJ Urban Land Institute leaders re same. With Brian Davis, prepared document showing why leaders need to discuss protections from accelerating flooding threats, and sent to Greater Miami Chamber of Commerce attorney we work with & S. Florida republican leaders.

Call and email with H. Marlow, CEO of government relations firm on accelerating sea level rise flooding, re high priority Treasury protection financing program. Calls & emails with Autocase CEO re Treasury financing program. At referral of former South Miami Mayor, emailed and called S. Florida elected officials about Treasury financing. Emailed Florida Sierra Club leader at suggestion of Sierra Club attorney, re Treasury private financing for accelerating sea level rise flooding protections.

Call with Brian Davis re need for 30 Day Notice to Treasury of Petition on financing. Online meeting with Brian Davis and Perkins&Will re Gov. Phil Murphy support of Treasury financing.

**55 hrs. @ $895/hr. = $49,225**


**October 2022**
Calls with Perkins&Will re 3.0 underwriting financing standard, and call re resolving Standard voting results. Call with NJ Langan Engineering re law firm event to support NJ Jersey Governor Phil Murphy on Treasury financing.

Repeated emails and calls with AIA & Perkins&Will green building financing leaders re Treasury, & Sierra Club national, Connecticut Economic Development Office, AIA & Perkins&Will CEO re same. Calls with Brian Davis and NJ PR Firm re sending out notice for NJ Law Firm Seminar supporting NJ Governor Phil Murphy.

Calls & emails with Seattle law firm Chairman, representing building owners interested in starting private financing with Treasury. With Brian Davis, email to NJ PR firm about scheduling call to discuss sending invite to NJ law firms on seminar supporting Gov. Phil Murphy on required sea level rise flooding protections, and same with Langan Engineering management.

Secured referral from former South Miami Mayor to Sierra Club attorney who worked in Florida to assist with Treasury matter. Talked with this attorney who reached out to her Florida contacts to assist.

Prepared OpEd with Brian Davis published by NJ PR Firm newsletter, and sent to NJ law firms with Resilience Seminar invite in support of Gov. Phil Murphy.

With Brian Davis, prepared summary of 30-Day Notice of Petition for Review to Treasury. Sent to Florida environmental attorney for comment.

Email response to Amazon green building leader on how Green + Resilient financing provides cheaper capital & higher appraised value to building owners globally. Email to CT Economic Development Commissioner John Lehman, former Goldman Sachs commercial mortgage-backed securities (CMBS) Head, on supporting Treasury for private financing.

**30 hrs. @ $895/hr. = $26,850**

**November 2022**
Sent law firm event invites supporting Governor Phil Murphy & Treasury financing. Call CT Office of Economic Development re Treasury financing. Meetings with Perkins&Will Re resilience underwriting standard for private financing with Treasury. Convened Meeting with NJ law firms on private financing with Treasury, and talked with law firm environmental attorneys and Langan engineer re same.

Call with DC Bar Chair re law firm assistance program with Treasury, and meeting with DC Bar staff re same. Sent letter to Colliers and Boston Properties re financing with Treasury. Emailed Sierra Club top management re Treasury financing.

**25 hrs. @ $895/hr. = $22,375**

**December 2022**
Calls with NJ law firm environmental leader securing support for Gov. Phil Murphy support for Treasury private financing. Sent emails re same to NJ building leader.

Meeting with Gov. Newsom Senior Climate Advisor re private sector financing with Treasury. Call with former investment banker M. Beam re Treasury program. Call with Colliers & DC Bar re Treasury financing program.

Talked with DC Bar Chair about assistance with Treasury matter and was referred to DC Bar program head for nonprofit Member Assistance in securing Counsel. Prepared summary of need whereby for DC area alone $25 billion in existing accelerating sea level rise flooding protections as documented in DC AG's cost recovery suit against Exxon.

Identified for DC Bar that DC Water Blue Plains treatment plant
on the Potomac across from National Airport, constructed 22' sea
walls for accelerated sea level rise flooding protections.  Upstream
on the Anacostia, the Washington Naval Yard is constructing 14'
protective sea walls, but as a side effect, these 14' walls will flood
out adjacent SW DC residents, completely devaluing their homes
and destroying their household net worth.

Prepared letter with investment banker and sent to Colliers for
meeting with building owner clients on Treasury financing.  Sent
background to investment banker on Amazon green buildings to
refinance to start private financing market, and sent email to Amazon
on added financial value to Amazon of Treasury financing.  Sent background
on 5 Stone green buildings to investment banker for possible Treasury
financing support.

**26 hrs. @ $895/hr. = $23,270**

**January 2023**
Calls with & emails to Colliers re financing for Boston Properties, and prepared
slide for Boston Properties on financing benefits w/ Treasury, and sent to Colliers.
Emailed DC Bar re Treasury financing program.

**14 hrs. @ $895/hr. = $12,530**

**February 2023**
Call with Colliers re financing.  Meeting with DC Bar & Latham & Watkins formal
Engagement on pursuing national private sector financing with Treasury.  Calls and
meetings with Latham and Brian Davis on Treasury matter.  Revised summary of 30
Day Notice to Treasury.  Sent email on DC Bar Treasury matter to Latham&Watkins
with answers to questions.  Sent slide for Latham on higher-rated private financing
to Brian Davis for comment.  Follow-up call with Latham attorney on Treasury matter.

In response to request, sent Latham Administrative Record of Treasury matter (30-Day
Notice Exhibits 1-3).

**17 hrs. @ $895/hr. = $15,215**

**March 2023**
Calls with Latham & Watkins re Treasury Program.  Calls with DC Bar re administrative
matters for Latham engagement.  Meeting with Latham & Watkins attorneys & Brian Davis
on higher-rated Green + Resilient building bonds for Treasury private finance program.

Call with Latham Global Properties Director in NYC on Latham green building offices increased
attorney productivity gains and reduced sick leave.   Finalized slide with investment banker
on $500 million in expected five-year Latham revenue from its capital markets practice from
higher-rated Green + Resilient Building Bonds, & sent to Latham attorneys.  Call with
Latham on slide.

Call & follow-up email with Environmental Law Institute (ELI) attorney and Brian Davis

on ELI Law Firm Program for Treasury private financing & same with Stanford University. Emailed inquiries to ELI attorney contacts for outside counsel program for Treasury matter.

At referral of Greater Miami Chamber of Commerce attorney, sent email to Miami-Dade Co. Chief Bay Officer re Treasury private financing, based on $4 billion sewer connection need for Miami Dade Co. septic tanks incapacitated from upwelling sea level rise flooding, releasing nutrients to Biscayne Bay causing flesh-eating bacteria algal blooms.

Sent draft letter to Latham, for Boston Properties to start higher-rated financing market with Treasury for online meeting with Latham attorneys. Email and call with Altisource Mortgage Originators re securing $400 million green building mortgage as higher-rated bond to start $multi-trillion private global financing market with Treasury. Reviewed *"Can Florida Survive Climate"* article sent FYI by former Bank of America Business Capital CEO.

Sent email to Latham on its CMBS attorneys and sea wall construction for protections from accelerating sea level rise flooding in DC tidal areas of Potomac and Anacostia Rivers, plus Cadwalader experience with $5 billion of this green building financing that sold-out 10 times from unprecedented investor demand, providing owners cheaper capital / more bond proceeds. Responded to Latham request to brief its real estate attorneys on Treasury financing, by sending Federal government report on Latham global green building office leadership increasing attorney productivity and thus Latham billable hours and profitability.

Emails to investment banker on (1) more data for Latham slide on added value of Treasury Financing, changing a substantial law firm cost center into a profit center, & (2) need to pivot from office market with substantial defaults from remote work, to multifamily apartment financing market which is very profitable.

Discussions with Brian Davis on Latham non-responsiveness and potential ethical issues with the DC Bar on potential withdrawal after clearing conflicts, engagement, and two months of work.

**32 hrs. @ $895/hr. = $28,640**

**April 2023**
Secured Petitioner Dr. Hal Wanless meeting standing requirements for Treasury matter. Call with Latham attorney re Petitioner for Treasury matter. Call with U.S. Green Building Council (USGBC) General Counsel re Treasury matter and benefits to USGBC green building certifications.

Email to Latham attorneys on firm revenue from Treasury financing program and request for Meeting. Emailed DC Bar regarding Latham matter re Treasury. Email to DC Bar Chair re Latham status and request for a call. Calls with DC Bar leaders re Latham's unexplained withdrawal, suspected due to business conflicts.

Email communications with ELI attorney managing outside counsel program, on nature of higher-rated financing market. Worked with DC Bar on substituting Orrick Law Firm for Latham. Outreach to Orrick Law Firm re DC Bar law firm assistance program for Treasury matter. Call with NYC Orrick attorney re same.

Emails with Treasury Petitioner and former So. Miami Mayor, re new published research showing historical glacier melt of 2,000 ft. / day that NASA calls *"alarming"* from glaciers lifting off ocean floor from above freezing ocean waters, which is happening now

in Antarctica.

18 hrs. @ $895/hr. = $16,110

**May 2023**
Calls with DC Bar law firm leaders re engagement for Treasury matter, & Chesapeake Bay
Foundation re referrals to law firms re same. Emails and calls with Orrick NYC attorney
re Treasury matter and starting financing market with Westbank.

Emails & calls with Chesapeake Legal Alliance and Environmental Law Institute attorneys
re their law firm program & Treasury matter. Call with Attorney Carter Dillard re
assistance re Treasury matter.

Sent draft email for Orrick NYC attorney to send to NYC capital markets attorneys re
Treasury matter. Scheduled zoom with Orrick Structured Finance Head on Treasury financing.
Email introduction of investment banker to NYC Orrick attorney.

Calls and emails with Carter Dillard on Treasury financing global reach & documented ability
to solve Climate Crisis through large scale carbon pollution reductions.

Calls and emails with MAXEX on green mortgage origination for Treasury financing. Emails
to five law firms for assistance with Treasury matter.

14 hrs. @ $895/hr. = $12,530

**June 2023**
Calls & emails with Orrick NYC capital markets and marketing attorneys re Treasury
matter. Email with Orrick on outreach to $30 billion green building developer Westbank
to start financing market. Calls and zoom meeting with Offit Kurman Law Firm
re DC Bar law firm assistance program for Treasury matter, & developed talking points
on same with Brian Davis. Sent slides on substantial revenue to Offit and Orrick from
Treasury matter. Call with Carter Dillard re Treasury matter.

Call with Stanford U. Law School re legal assistance re Treasury matter. Emails to & meeting
with Offit Kurman Practice Head securing Offit Kurman engagement for DC Bar law
firm assistance program for Treasury matter. Emails to Orrick attorney re Treasury matter
& meeting with Orrick NYC mortgage backed securities attorneys re Treasury matter.
Email to Paul Geller at Robbins Geller re assistance with Treasury matter.

Prepared conflict of interest recusal request successfully executed against
American Petroleum Institute (API) for initial voting relating to 3.0 national
consensus resilience underwriting standard. The standard was offered to be
used with Treasury for green + resilient private bonds that can rapidly deploy
available investor assets for protections. API did not dispute its existing $5 trillion
U.S. sea level rise flooding protection costs as an API contingent liability.

Calls and emails with Stanford Law School attorney on attorney assistance program
For Treasury matter. Email to Westbank Partner on higher-rated green financing
providing added $165 million for Westbank San Jose $2 billion in zero operating
carbon emission projects.

Incorporated Brian Davis comments on Treasury 30-Day Notice, & sent him email on inability of S. Florida permanent engineering solutions for sea level rise flooding protections due to porous bedrock. Developed 15 page 30-Day Notice to Treasury of Petition to Review and sent with three exhibits of administrative record to lead attorney with Offit, including well-documented facts showing imminent S. Florida contagion threat from accelerating S. Florida sea level rise flooding, jurisdiction, standing, venue, legal violations from Treasury's top statutory duty and failure to act.

Email to Offit, Brian Davis, & Carter Dillard on 30-Day Notice &, (1) U.S. Senators request to Treasury to initiate financing, (2) need for about $90 billion in S. Florida protections to stop contagion and extend real estate life, (3) how financing can achieve IPCC Planetary 2030 Climate Crisis Deadline preserving commerce, national security, near term cost-effective resilience & a habitable Planet, & (4) what steps could be taken with Treasury to start the financing. Sent edits on 30-Day Notice to Treasury to Offit.

Communications with Carter Dillard on Florida Petitioners. Sent 30-Day Notice to S. Berman at Hagens Berman for referral to law firms, and same to three other firms at suggestion of P. Geller at Robbins Geller.

Incorporated suggested changes on 30-Day Notice by Petitioner.

**63 hrs. @ $895/hr. = $56,385**

**July 2023**
Meeting with Fleming Law, Petitioner and Brian Davis re filing 30 day Notice to Treasury of Intent to File. Call with Carter Dillard re law firms to assist w/ Treasury matter. Meeting with Evans & Page and Greenfire law firms with Carter Dillard & Brian Davis on 30-Day Notice to Treasury.

Communications with Petitioner including email to Board Member of Miami Waterkeeper assistance with Treasury matter. Call with Orrick NYC attorney re starting financing, and sent draft email for Orrick real estate practice head. Sent 30-Day Notice to Carter Dillard for recruiting law firms, & same to Greenfire firm. Sent draft letter to Carter Dillard to B. Bernanke on imminent s. Florida contagion threat.

Recruited former Idaho AG & Supreme Court Chief Justice Jim Jones to help with Treasury. Jones is also an Opinion Contributor including on climte, to *The Hill*. Sent Jones draft 30-Day Notice transmittal letter to Treasury and secured his comments.

**19 hrs. @ $895/hr. = $17,005**

**August 2023**
Calls with former Idaho AG & Supreme Court Justice Jim Jones on assistance with Treasury matter. Research on Warburg Pincus and U.S. financial stability leadership. Meeting with Orrick attorneys including real estate practice head re starting financing with or without Treasury. Meeting with Carter Dillard and Brian Davis on next steps with Treasury.

Email and calls to B. Bernanke re U.S. financial stability threat and Treasury private Financing solution. At Jim Jones' suggestion, prepared a slide showing the Unacceptable imminent threat to U.S. financial stability, available global private sector financing solution, and U.S. and societal benefits including financial.

Emails with Carter Dillard re former Orrick attorney assistance re Treasury financing. Participated in zoom call re same. Drafted letter to Robbins Geller attorneys regarding requested support for Treasury matter and sent to Jim Jones for comment. Email to Montana Senator Jon Testor with financial stability oversight responsibility, on Treasury Private financing.

Emails with Carter Dillard on potential Greenfire Law Firm interest in sending 30-Day Notice to Treasury. Sent updated 30-Day Notice to Carter Dillard to send to Greenfire. Emails to Labaton Law Firm re Treasury matter participation. Sent slides to Carter Dillard for former Orrick attorney on Treasury matter support. With Carter Dillard, sent emails to Greenfire Law Firm answering questions on 30-Day Notice to Treasury. Sent summary slide on Treasury matter to Carter Dillard and Greenfire. Sent email to Greenfire & Evans and Page Law Firms on deadline for sending 30-Day Notice to Treasury, copying Carter Dillard.

Meeting with Orrick Real Estate Head re Westbank starting the private sector financing market and need to respond to Westbank inquiry re same. Obtained comments from Carter Dillard, on Bernanke / Geithner letter to protect U.S. financial stability from accelerating sea level rise flooding with Treasury high priority private financing program for this purpose. Sent Bernanke / Geithner letter with revisions to Greenfire Law Firm. Reviewed Greenfire engagement agreement on Treasury matter with comments to Carter Dillard. Meeting with Carter Dillard & Brian Davis on sending 30-Day Notice to treasury without Greenfire Law Firm. Made change in footnote on 30-Day Notice to Treasury in response to Brian Davis comment. Call with Carter Dillard re Greenfire comments on 30-Day Notice to Treasury. Emailed documents to be included in 30-Day Notice to Treasury, to Jim Jones, Brian Davis & Carter Dillard. Meeting with Carter Dillard & Brian Davis on submitting 30-Day Notice to Treasury deciding that Notice will be sent by Dillard.

Sent letters to B. Bernanke and Tim Geithner re Treasury private financing program to Protect U.S. financial stability. Call with EPA Administrator Office re same.

**41 hrs. @ $895/hr. = $36,695**

**September 2023**
Prepared analysis showing that EPA, Urban Land Institute, and Capital Markets Partnership all have seven essential skill sets and expertise for rapidly deploying private financing for sea level rise flooding protections to prevent financial contagion, and Treasury has none.

Email and call to EPA Deputy Chief of Staff re Treasury 30-Day Notice and possible EPA Support as a Treasury Climate Advisor. EPA decided that it would participate in Treasury accelerating sea level rise flooding protection financing matter when Treasury responds to 30-Day Notice.

Calls to Bernanke and Geithner re receipt of letter to them on U.S. financial stability threat from accelerating sea level rise flooding. Email briefing of Senator Sheldon Whitehouse and staff on 30-day Notice to Treasury.

Calls with Atelier 10 to reach out to Westbank client to start the private sector financing. Calls with EPA including Energy Star Buildings re accelerating sea level rise flooding threat and available large scale private financing for protections. Sent Dentons law firm agreement on private green building financing to Orrick for its consideration.

Email and call Urban Land Institute EVP re Treasury private financing program. Sent email to Carter Dillard, Brian Davis, & Jim Jones re Treasury General Counsel Office contacts to call re receipt of 30-Day Notice and Treasury Order stating that General Counsel Office accepts service. Call with Carter Dillard re 30 day notice to Treasury.

Conference calls with Treasury attorney Mark Schlegel on 30 day notice transmittal, by M. Italiano, Brian Davis & Carter Dillard, whereby Schlegel stated he could not talk about whether he received the 30-Day Notice that he asked be sent to him by email, that there was not other attorney in the General Counsel's Office to discuss this with, that he also couldn't talk about the Treasury Directive requiring the Office of General Counsel to accept service, and that we should send another email.

Emails & calls with CFO of S. Florida $20 billion financial institution re financial contagion threat from imminent devaluation of S. Florida coast real estate from accelerating sea level rise flooding, & Treasury private financing program for protections.

Call with Urban Land Institute EVP on private sector financing & sent slide on financing solution to unacceptable threat to U.S. financial stability and private financing solution. Call to Real Estate Roundtable attorney re private financing need & Treasury Program. Meeting with Atelier 10 re Green + Resilient Building bonds with client Westbank. Calls to many attorneys for sponsorship to become Member of D.C. District Ct. Call with Jim Jones re Treasury.

Finalized Declaration / Affidavit executed by M. Italiano, Carter Dillard & Brian Davis on emails to and calls with Treasury Office of General Counsel attorney Mark Schlegel on his refusal to discuss receipt of 30-Day Notice he requested we send him, that no other Treasury attorney could discuss this, and his refusal to discuss Treasury Directive requiring Office of General Counsel to accept service. Declaration documented this continuation of bad faith acts by Treasury and in effect, Treasury's termination of the 30-Day notice it requested, thus allowing filing a Petition for Review at any time.

Determined that DOJ policy states that service to Treasury is effective by registered mail. Sent 30 day notice to Treasury via registered mail insured for $5,000. Received registered mail Confirmation of delivery of 30-Day Notice to Treasury.

Prepared 1st Draft of 10 page Petition for Review & Declaratory Judgment to Treasury & sent to Brian Davis & Carter Dillard for comment. Call with Carter Dillard on his role as Attorney Advisor on Treasury matter. Sent Petition to Petitioner for review and secured Petitioner's Approval for filing with Treasury.

Prepared draft press release and sent to Jim Jones with draft transmittal to Treasury Climate Counselor, which Jones sent requesting that Counselor participate in discussions on avoiding imminent threat to U.S. financial stability, to which Treasury did not respond.

Prepared OpEd on need for Treasury private financing execution as top statutory duty to stop

imminent threat to U.S. financial stability for Jim Jones publication in The Hill as its Opinion Contributor. Sent to Petitioner and five others for their review, engaged editor for revisions, and secured their approvals as co-authors.

Reviewed Washington Post article with Petitioner and Phil Stoddard on NASA JPL quote that large global glaciers are melting from warm ocean waters lifting them off the ocean floor, like what happed 15,000 yrs. ago from new discovery that glacier melt was 2,000 feet in one day, which could be 132 miles in one year. If this happens at Thwaites which is holding back other Antarctic glaciers from irreversible collapse, there could be more than six feet of sea level rise flooding in one year, due to NASA JPL Thwaites impending Collapse Schematic sent to Treasury top management in the 30-Day Notice.

Sent Petition for Review for Treasury final action, to Petitioner and phone conversation.

**93 hrs. @ $895/hr. = $83,235**

**October 2023**
Conversations with leading South Florida financial institutions about stopping adverse impacts to South Florida economy from imminent devaluation of South Florida coastal real estate from lack of accelerating sea level rise flooding Protections. Discussed Treasury's private sector financing solution and interest in pursuing with Urban Land Institute S. Florida and Greater Miami Chamber of Commerce.

Emails and calls with attorneys for sponsorship as a Member of D.C. District Ct. Call former South Florida Mayor P. Stoddard re OpEd on Treasury private financing. Meetings with PR firms on publication of OpEd on Treasury financing Need. Worked with Phil Stoddard and submitted to Miami Herald Editor, article: *"Sea Level Rise Will Affect 4 Out of 5 Miami Residents, Even Those Living Outside of Flood Zones,"* as part of OpEd publication consideration.

**9 hrs. @ $895/hr. = $8055**

**November 2023**
Prepared list of pleadings for filing with U.S. DC District Court & motion for attorneys fees for well-documented Treasury bad faith for failing to address top statutory duty to protect U.S. financial stability from accelerating sea level rise flooding, which can be done with Treasury's high priority private sector financing program. Finalized Motion for Hearing on Injunctive Relief, and Declaratory Judgment. Filed with the Court and by registered mail.

**63 hrs. @ $895/hr. = $56,385**

**Attorney M. Italiano Total fees for 17 mos. = $529,140**
July 2022 – Nov. 7, 2023

**Brian Davis**, environmental attorney with over 30 yrs. experience, MN Bar Member, & Attorney Advisor for Petitioner litigation against U.S. Treasury for bad faith

failure to act on Treasury top statutory duty to protect U.S. financial stability.

**July 2022**
Through multiple emails and calls, secured support of NJ PR firm & set up meeting with NJ Senate Majority Leader Bob Smith on NJ existing $50 billion in sea level rise flooding protection costs. Secured Sen. Smith's support who made referral to NJ Governor Phil Murphy regarding Treasury private sector sea level rise flooding protection costs. Mike Italiano assisted.

Zoom call with M. Italiano, Perkins&Will & investment banker re private sector financing with Treasury and draft letter to Gov. Gavin Newsom re same to protect U.S. financial stability from accelerating sea level rise flooding.

Emails and calls with M. Italiano to S. Florida republican leaders re private financing with Treasury to protect S. Florida economy from accelerating sea level rise flooding.

**19 hrs. @ $795 / hr. = $15,105**

**August 2022**
Conference call with M. Italiano and S. Florida republicans on private financing need to support Treasury financing. Call with M. Italiano and Miami Beach Chamber of Commerce attorney re Treasury financing to pay S. Florida existing $90 billion in sea level rise flooding protection costs.

**2 hrs. @ $795 / hr. = $1590**

**September 2022**
Call with NJ PR Firm and M. Italiano regarding securing Governor Phil Murphy support for financing with or without Treasury. With M. Italiano, sent agenda to NJ PR Firm for law firm seminar supporting Gov. Phil Murphy private resilience financing with Treasury. Worked with M. Italiano, NJ PR Firm, & Langan Engineering on Law Firm Resilience Finance Seminar. With M. Italiano, prepared document showing why leaders need to discuss protections from accelerating flooding threats and sent to Greater Miami Chamber of Commerce attorney we work with and S. Florida Republican leaders.

Online meeting with M. Italiano and Perkins&Will re Gov. Phil Murphy support of Treasury financing.

**7hrs. @ $795 / hr. = $5565**

**October 2022**
With M. Italiano, calls & emails to NJ PR Firm to send Invite to NJ law firms supporting Gov. Phil Murphy support of Treasury financing, & same with Langan Engineering management, & reviewed and transmitted Invite to NJ law firms on Resilience Seminar in support of Gov. Phil Murphy support of Treasury financing. Prepared OpEd with M. Italiano published by NJ PR Firm newsletter, and sent to NJ law firms with Resilience Seminar invite in support of Gov. Phil Murphy financing efforts with Treasury.

With M. Italiano, prepared summary of 30-Day Notice of Petition for Review to Treasury.

**11 hrs. @ $795 / hr. = $8745**

**February 2023**
Participate in calls and meetings with Latham & Watkins and M. Italiano on Treasury matter via DC Bar outside counsel program. Sent comments to M. Italiano on higher-rated financing slide for Latham&Watkins as counsel secured through DC Bar program.

**2 hrs. @ $795 / hr. = $1590**

**March 2023**
Meeting with Latham & Watkins attorneys & M. Italiano on higher-rated Green + Resilient building bonds for Treasury private finance program.

Call with Environmental Law Institute (ELI) attorney and M. Italiano on ELI Law Firm Program for Treasury private financing.

Discussions with M. Italiano on Latham non-responsiveness and potential ethical issues with the DC Bar on potential withdrawal after clearing conflicts, engagement, and two months of work.

**3 hrs. @ $795 / hr. = $2385**

**April 2023**
Email communications with ELI attorney managing outside counsel program, on nature of higher-rated financing market. Worked with DC Bar on substituting Orrick Law Firm for Latham. Outreach to Orrick Law Firm re DC Bar law firm assistance program for Treasury matter.

**2 hrs. @ $795 / hr. = $1590**

**June 2023**
Calls and zoom meeting with Offit Kurman Law Firm re DC Bar law firm assistance program for Treasury matter, & developed talking points on same with M. Italiano. Sent slides on substantial revenue to Offit and Orrick from Treasury matter. Call with Carter Dillard re Treasury matter. Sent comments to M. Italiano on Treasury 30-Day Notice, & communicated on inability of S. Florida permanent engineering solutions for sea level rise flooding protections due to porous bedrock.

**7 hrs. @ $795 / hr. = $5565**

**July 2023**
Meeting with Fleming Law, Petitioner and M. Italiano re filing 30 day Notice to Treasury of Intent to File. Meeting with M. Italiano re law firms to assist w/ Treasury matter. Meeting with Evans & Page and Greenfire law firms with M. Italiano & Carter Dillard on 30-Day Notice to Treasury.

**4 hrs. @ $795 / hr. = $3180**

**August 2023**
Meeting with Carter Dillard and M. Italiano on next steps with Treasury. Provided comments on slide suggested by Jim Jones, showing the unacceptable imminent threat to U.S. financial stability, available global private sector financing solution, and U.S. and societal benefits including financial. Meeting with M. Italiano & Carter Dillard on sending 30-Day Notice to treasury without Greenfire Law Firm. Recommended change in footnote on 30-Day Notice to Treasury to M. Italiano.

Meeting with Carter Dillard & M. Italiano on submitting 30-Day Notice to Treasury, deciding that Notice will be sent by Dillard.

**September 2023**
Conference calls with Treasury attorney Mark Schlegel on 30 day notice transmittal,
by M. Italiano, Brian Davis & Carter Dillard.  Calls to EPA Administrator Office Deputy
Chief of Staff re Treasury 30-Day Notice and possible EPA support as a Treasury Climate
Advisor.

Finalized Declaration / Affidavit executed by M. Italiano, Carter Dillard & Brian Davis on
emails to and calls with Treasury Office of General Counsel attorney Mark Schlegel on his
refusal to discuss receipt of 30-Day Notice he requested we send him, that no other Treasury
attorney could discuss this, and his refusal to discuss Treasury Directive requiring Office of
General Counsel to accept service.  Declaration documented this continuation of bad faith acts
by Treasury and in effect, Treasury's termination of the 30-Day notice it requested, thus
allowing filing a Petition for Review at any time.

Provided comments on 1st Draft of 10 page Petition for Review & Declaratory Judgment to
Treasury.

**17 hrs. @ $795 / hr. = $13,515**

**Attorney B. Davis Total Fees for 11 mos. = $63,600**
July 2022 – Sept. 2023

# Carter Dillard environmental attorney & DC Bar Member with over 20 years experience, & Attorney Advisor for Petitioner litigation against U.S. Treasury for bad faith failure to act on Treasury top statutory duty to protect U.S. financial stability.

**May 2023**
Calls & emails with Attorney M. Italiano re assistance re Treasury matter, including financing
global reach & documented ability to solve Climate Crisis through large scale carbon
pollution reductions.

**2 hrs. @ $695 / hr. = $1390**

**June 2023**
Call with M. Italiano & Brian Davis re Treasury matter.  Communications with M. Italiano
on Florida Petitioners.

**3 hrs. @ $695 / hr. = $2085**

**July 2023**
Call with M. Italiano re law firms to assist w/ Treasury matter.  Sent 30-Day Notice to
Treasury to law firms interested in assisting.  Meeting with Evans & Page and Greenfire
law firms with M. Italiano & Brian Davis on 30-Day Notice to Treasury, & communications
with other firms.

**14 hrs. @ $695 / hr. = $9730**

**August 2023**
Meeting with M. Italiano and Brian Davis on next steps with Treasury.  Emails with M. Italiano
re former Orrick attorney assistance re Treasury financing, & scheduled and participated in zoom

call re same.  Emails with M. Italiano on potential Greenfire Law Firm interest in sending 30-Day Notice to Treasury, and inquiry with Greenfire re same.  With M. Italiano, sent emails to Greenfire Law Firm answering questions on 30-Day Notice to Treasury.  Sent comments to M. Italiano on Bernanke / Geithner letter to protect U.S. financial stability from accelerating sea level rise flooding with Treasury high priority private financing program for this purpose.

Reviewed Greenfire engagement agreement on Treasury matter with comments to M. Italiano.  Meeting with M. Italiano & Brian Davis on sending 30-Day Notice to treasury without Greenfire Law Firm.  Call with M. Italiano re Greenfire comments on 30-Day Notice to Treasury.  Meeting with Carter Dillard & Brian Davis on submitting 30-Day Notice to Treasury deciding that 30-Day Notice will be sent by Dillard.

Sent 30-Day Notice to Treasury with copies to Geithner, Bernanke, VP Kamala Harris, Rich Delmar & Jim Jones.

**17 hrs. @ $695 / hr. = $11,815**

**September 2023**
Call with M. Italiano re 30 day notice to Treasury.  Conference calls with Treasury attorney Mark Schlegel on 30 day notice transmittal, by M. Italiano, Brian Davis & Carter Dillard.

Finalized Declaration / Affidavit executed by M. Italiano, Carter Dillard & Brian Davis on emails to and calls with Treasury Office of General Counsel attorney Mark Schlegel on his refusal to discuss receipt of 30-Day Notice he requested we send him, that no other Treasury attorney could discuss this, and his refusal to discuss Treasury Directive requiring Office of General Counsel to accept service.  Declaration documented this continuation of bad faith acts by Treasury and in effect, Treasury's termination of the 30-Day notice it requested, thus allowing filing a Petition for Review at any time.

Call with M. Italiano on Carter Dillard role as Attorney Advisor on Treasury matter.

**7 hrs. @ $795 / hr. = $4865**

**Attorney C. Dillard Total Fees for 5 mos. = $29,885**
May 2023 – Sept. 2023

August 31, 2023


**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**


| | |
|---|---|
| **DR. HAROLD R. WANLESS** | |
| **Petitioner,** | Civil Action No. _____ |
| **JANET YELLEN, SECRETARY** in her official capacity | **30 DAY NOTICE TO TREASURY OF PETITION FOR REVIEW OF** |
| **U.S. DEPARTMENT OF THE TREASURY** | **FINAL AGENCY ACTION** |
| **FINANCIAL STABILITY OVERSIGHT COUNCIL** | |
| **Respondents.** | |

Petitioner Dr. Hal Wanless hereby notifies Respondents of his intention to petition the Court for review of Treasury Final Action, 30 days from respondents' receipt of this Notice.  At this time this Notice has not been filed with the Court, but will be a part of a filed Petition for Review with the Court, and respectfully requests that within the 30 Days before Petition filing, that Respondents discuss this matter with Petitioner's attorneys to determine if a resolution is possible.


*Carter J. Dillard*

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
cjd328@nyu.edu
310-795-1986

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com

Attorneys for Petitioner

# **Contents**

## Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief

1.  Summary
2.  The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.
3.  Treasury Top Management Has Been Completely Nonresponsive to Repeated Written Requests.
4.  This Immediate Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision (RoD).
5.  Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act.
6.  South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise Flooding.
7.  Dodd-Frank and Treasury's High Priority Private Sector Climate Financing Program Can Ensure U.S. Financial Stability.
8.  Financial Stability Oversight Council (FSOC) Identified "*Climate Change As An Emerging and Increasing Threat to Financial Stability*."
9.  Exhibit 1, The Record of Decision (RoD), Included the Thwaites Glacier Collapse Schematic.
10. This Imminent South Florida Financial Contagion Threat is Extensively Documented in the RoD.
11. Importantly As Also Shown in the RoD, Treasury Was Notified That Available Required Protections for South Florida Can Be Rapidly Deployed.
12. The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now.
13. The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Eesilience.
14. Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation.
15. State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections was NOT Deployed.  However, the State Has Not Acted.
16. Treasury's Announced Private Sector Program Can Rapidly Deploy Required and Available $Trillions in Investor Assets Now to Stop Financial Contagion.
17. The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.
18. Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith if This Notice is Also Ignored, and Subjecting Top Management to Personal Liability.
19. There is Standing to Sue and Petition This Court.
20. Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued.
21. Emergency Injunctive Relief and Mandamus Will Be Requested.
22. Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided.
23. Venue is the D.C. U.S. District Court.
24. Judicial Review Will Immediately Request Temporary and Permanent Injunctive Relief

## Treasury's 100% Stonewall Including this Notice, Constitutes Final Agency Action.

25. Treasury's 100% Repeated Stonewall is Contrary to the Public Interest for a High Priority Statutory Duty.
26. The Supreme Court Test for Final Agency Action Has Been Met.
27. Petitioner Can Reach No Other Conclusion Than Treasury Has Completed its Decision-making Process.
28. Treasury's Final Agency Action Was Binding.  It Had Made Up Its Mind.

## The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.

29. APA Judicial Review of Final Treasury Actions Governs This Matter.
30. To Protect Financial Stability, Interim Relief is Authorized Pending Judicial Review.
31. This Matter is Not "Committed to Agency Discretion by Law."
32. This Court Has the Power to Force Treasury to Communicate.
33. There is No Political Question Preventing Judicial Resolution of Treasury Inaction.

## In Conclusion, Treasury Must Expeditiously Act in This Matter to Protect U.S. Financial Stability.

Figure 1.  NASA JPL Thwaites Glacier Collapse Schematic Prepared From 29 Years of Actual Data
Figure 2.  Thwaites Glacier Diagrams
Figure 3.  NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line (intersection of ice, bedrock, and ocean) retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.
Figure 4.  South Florida "Sunny Day" Sea Level Rise Flooding (2013)
Figure 5.  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)

Exhibit 1.  Record of Decision
Exhibit 2.  Treasury Announces High Priority Private Climate Finance Program
Exhibit 3.  Financial Stability Oversight Council Identifies Climate Change as an Emerging & Increasing Threat to Financial Stability

# Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief

1. **Summary.** This 30-Day Notice is provided to Treasury and the Financial Stability Oversight Council (FSOC) in a final effort to conduct good faith discussions to overcome Treasury's complete "stonewall" providing no response at all to seven separate written and oral inquiries to Treasury top management. The inquiries concerned Treasury's publicly-stated high priority private sector climate financing program supported by Dodd-Frank statutory duties of Treasury to protect U.S. financial stability. With investors with over $70 trillion in private sector assets ready to be rapidly deployed through available higher credit-rated financing, the impending systemic threat of financial contagion can be prevented as communicated to Treasury. This contagion threat was repeatedly documented to Treasury top management from expected complete devaluation at any time of about $1 trillion in South Florida coastal real estate from the very high probability failure of the real estate financing system to timely respond to existing well-documented accelerating sea level rise flooding.

Based on NASA Jet Propulsion Lab's Thwaites Glacier Collapse Schematic prepared from 29 years of ice-penetrating aerial imagery with its 16 references sent to Treasury, protections from 2' of sea level rise flooding and 10' of storm surge are required by 2030 to preserve commerce and national security. Thwaites is the largest source of global, accelerating sea level rise flooding and affectionately named the "Doomsday Glacier" by the news media. See Figures 1 and 2 below. South Florida's densely populated and highly developed coast is within this 2' zone of rise requiring protections now. Since South Florida coastal porous bedrock prevents permanent engineering solutions, contagion can now be triggered through expected massive litigation by permanent mortgage holders to recover their lost real estate value, similar to Subprime mortgage litigation that caused the global Financial Crisis. There is no market confidence that about $90 billion in required South Florida protections will be financed thus driving this contagion risk. Importantly as communicated to Treasury, the private funds are available and can be rapidly deployed eliminating this unacceptable contagion threat to U.S. financial stability.

Figure 3 is an actual image of the bedrock about 1,000 meters underneath Thwaites showing that the glacier has retreated inland to the precipice of a steep slope where it can at any time, collapse and plunge, greatly and rapidly accelerating global sea level rise flooding. Financial contagion can be triggered by Thwaites collapse or other means of market recognition of the lack of protections. Figures 4 & 5 are pictures of accelerating "sunny day" sea level rise flooding in South Florida from 2013 and 2015 respectively.

Due to this systemic risk, S&P in an unprecedented action, threatened to downgrade Florida's credit rating. Treasury has publicly recognized this growing climate / sea level rise flooding threat through its statutory responsibilities under Dodd-Frank to protect U.S. financial stability.

**Figure 1. NASA JPL Thwaites Glacier Collapse Schematic Prepared From 29 Years of Actual Data** / ice-penetrating aerial imagery.



Thwaites as it is today, is different from what may occur when Thwaites collapses as depicted herein, which could be in the next five years or more based on over 20 years of NASA JPL & EU ice-penetrating aerial imagery. To prevent unacceptable risks to commerce and national security since Thwaites is the greatest contributor to sea level rise flooding, protections by 2030 from two feet minimum of sea level rise are required by the approved 3.0 national consensus resilience standard. The standard and this Collapse Schematic recognize it is uncertain exactly when a two feet increase will occur.



## Figure 2

### Thwaites Glacier Diagrams



• Thwaites' grounding line ocean temperature is 3.6º F above ocean freezing and 5.4º F along the ocean bed farther into the Amundsen Sea Embayment. This warm ocean current is primarily causing the rapid retreat of Thwaites grounding line inland.

• The 3.6ºF water above freezing at the grounding line is likely a catalytic lubricant, which also may increase in force on the steep downslope further eroding the grounding line inland.



• Thwaites grounding line is moving about one mile / yr. toward the steep reverse slope facing inland. The grounding line is less than about 10 miles from the steep slope that can cause Thwaites' plunge.

• NASA documented "explosive & disturbing" melt of about 9 miles from 2015 –2017 in a cavity along Thwaites' grounding line



• Once past the steep slope, Thwaites current 4% contribution to global sea level rise will irreversibly and rapidly increase to about 40% since the inland ice sheet over bedrock is no longer held back by the floating ice shelf by "plunging into the deep part of Antarctica grounded about 2.5 km below sea level".

**Figure 3. NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.** This slide is the actual glacial subsurface at the grounding line from 29 years of NASA JPL and European Union ice-penetrating aerial imagery. The grounding line is the intersection of the ice, bedrock, and ocean interface where rapid melting is occurring from warm ocean bottom currents, causing Thwaites rapid retreat where it is expected to plunge into a deep inland depression and collapse, very likely triggering the collapse of the West Antarctic Ice Sheet that has been under irreversible retreat. This slide was a part of the information repeatedly sent to Treasury regarding this imminent and unacceptable threat to commerce, national security, and U.S. financial stability from accelerating sea level rise flooding.

      Schematic Reference 4 and Figure 3 note that Thwaites has been receding inland at about one mile per year, currently 3km from a steep slope where Thwaites can plunge downward and collapse. Reference 11 notes that based on marine and ice cores, Thwaites has undergone this instability collapsing before during periods of non-anthropogenic warming.



**Figure 4.  South Florida** "Sunny Day" Sea Level Rise Flooding, from Special Report: Sea Level Rise and Florida Impact -  Building & Infrastructure.  *Hot Spot:  Miami Beach Down the Drain* (July 8, 2013), Florida Trend:  Florida's Business Authority.



Areas of Miami Beach now experience "sunny day flooding," where high tides push water onto the streets.
Photo: Steve Rothaus / Miami Herald

**Figure 5.**  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)



*"Sunny Day flooding," as it is called, is now a phenomenon that is occurring throughout South Florida.  Without naming names, certain areas of Miami Beach, Fort Lauderdale and Delray Beach have now developed reputations for having streets with Sunny Day flooding"*
(from Zonelaw.com)

2.    **The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.**  The 2022 repeated requests for Treasury action included a written request by Rich Delmar, Chairman, Inspector Generals' Oversight Council on Financial Stability and Treasury Inspector General, to John Morton, the responsible Treasury Official, for which there was absolutely no response from Morton and Morton's assistant including to telephone inquiries.  The IG Oversight Council specific statutory authority to act in this regard is pursuant to Dodd-Frank §989E.

3.    **Treasury Top Management Has Been Completely Nonresponsive to Repeated Written Requests** in 2022 to rapidly deploy the private financing with many tens of trillions of dollars available:

> **June 30 –** Email request to Treasury Secretary Janet Yellen & her scheduler Ari Krupkin
>
> **July 1  –**  Follow-up phone call with Krupkin forwarding July 1 email at his request
>
> **July 8  –**  Follow-up phone call with Krupkin re-forwarding July 1 email at his request
>
> **July 8  –**  Call with Rich Delmar, Inspector General about our requests
>
> **July 20  –** Email to Delmar forwarding him previous written requests to Treasury, which Delmar sent to John Morton, the responsible Treasury Official
>
> **July 22  –** Voicemail & email forwarding July 20 Delmar email to John Morton & his assistant Damian Richardson
>
> **July 27 –** Email re-forwarding to Morton and Richardson, the July 22 email to them

4.    **This Immediate Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision** (RoD) as Exhibit 1 attached to this Notice.  Dodd-Frank requires that Treasury rapidly act to stop documented, systemic threats to U.S. financial stability that can cause another Financial Crisis, including FSOC's duty to *"respond to emerging threats to the stability of the United States financial system. …, monitor the financial services marketplace in order to identify potential threats to the financial stability of the United States … [and] (I) to enhance the integrity, efficiency, competitiveness, and stability of United States financial markets; (II) to promote market discipline; and (III) to maintain investor confidence."*  Sections 111, 112 relating to FSOC, and the purpose of Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, as Amended Through P.L. 117–286, Enacted December 27, 2022.  Section 202 of Dodd-Frank provides judicial review provisions none of which are applicable herein.  No Treasury guidance for Review Petitions could be found in this matter, which is outside of Treasury's tax responsibilities.

5.    **Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act** when there is a credible, imminent and documented threat to U.S. financial stability as Petitioner believes was set forth in the communications to Treasury and in this 30-Day Notice.  To the contrary, Dodd-Frank was enacted providing

Treasury with plenary power to act to protect U.S. financial stability when faced with imminent contagion from the complete devaluation of about $1 trillion of South Florida coastal real estate, and the harm to the real estate finance community comparable to Subprime mortgages that caused the global Financial Crisis as determined by the Financial Crisis Inquiry Commission.

6. **South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise** Flooding both up from below ground and at the tidal surface preventing permanent engineering solutions. Miami Beach published its consulting engineer's preliminary solution which was sea walls with permanent subsurface vertical and horizontal barriers. This would have made Miami Beach as a barrier island a leaky bathtub at a cost of about $1 trillion. This specific type of Siren's Song geo-engineering was dismissed as unworkable at the September 2016 White House Resilience Summit by all participants which included Miami Beach's consulting engineer. Miami Beach is spending about $200 million in groundwater pumping discharged to the rising ocean, as a temporary solution to decrease sunny day flooding. However, the $200 million was paid for by fees encouraging additional Miami Beach development, thus increasing the dollar amount of the contingent liability risk to permanent mortgage holders. Mami-Dade County estimates that $4 billion is needed to connect to sewers, underground sewage septic systems leaking from subsurface rising seas submerging the systems, and releasing the nutrients nitrogen and phosphorous causing algae blooms in Biscayne Bay comprised of flesh-eating bacteria closing beaches to swimming and recreation. City of South Miami Sea Level Rise Flooding Pilot (2020) (reference 4 of the Thwaites Glacier Collapse Schematic). The roughly $90 billion for South Florida protections can only extend the life of the coastal property and stop the contagion threat, but is not a permanent engineering solution. Without rapidly deploying the available private sector financing, permanent South Florida coastal mortgage holders' property can at any time now, be completely devalued starting massive litigation to recover this value which can very quickly start U.S. financial contagion comparable to Subprime mortgage litigation that caused the Financial Crisis. Contagion is caused by the lack of market confidence in the solution to a systemic financial risk, in this case, that the available private sector financing will NOT be rapidly deployed as required. As a long term South Florida resident, Petitioner believes this is an imminent, unacceptable risk to his health, well-being and net worth, in addition to U.S. financial stability. Petitioner is an expert witness on sea level rise flooding, and thus qualified to deliver his opinion to Courts.

7. **Dodd-Frank and Treasury's High Priority Private Sector Climate Financing Program Can Ensure U.S. Financial Stability** as stated by Treasury to: "***Bring to bear the full force of the Treasury Department … leveraging finance***" (emphasis by Treasury) in Exhibit 2 to this 30-Day Notice.

8. **Financial Stability Oversight Council (FSOC) Identified *"Climate Change As An Emerging and***

*Increasing Threat to Financial Stability,"* reported in Treasury's press release of October 21, 2021 in Exhibit 3: *"Established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, FSOC is charged with identifying risks to U.S. financial stability, promoting market discipline, and responding to emerging threats to the stability of the U.S. financial system."*

9. **Exhibit 1, The Record of Decision (RoD), Included the Thwaites Glacier Collapse Schematic** as attached in Exhibit 1 to this 30-Day Notice as summarized in preceding Figures 1 & 2, prepared with NASA Jet Propulsion Laboratory (JPL). NASA JPL stated *"explosive & disturbing"* glacial subsurface melt 3.6°F above ocean freezing and impending Thwaites Glacier collapse as the largest contributor to global sea level rise flooding, were demonstrated by over 20 years of ice-penetrating actual data aerial imagery. NASA JPL stated in the Schematic that this current unacceptable risk requires protections from 2' of sea level rise flooding minimum by 2030 to preserve commerce and national security as published by 26 news entities, and subsequently codified in 2022 by the 3.0 national consensus resilience standard. Federal statutes require Federal Agencies to follow national consensus standards unless Treasury has its own climate resilience standard which it does not.

10. **This Imminent South Florida Financial Contagion Threat is Extensively Documented in the RoD** and reiterated in this Notice.

11. **Importantly As Also Shown in the RoD, Treasury Was Notified That Available Required Protections for South Florida Can Be Rapidly Deployed** through more than available higher-credit rated private sector financing. The estimated $90 billion in protections are required based on actual cost data. See Massachusetts and Pennsylvania Existing, Partial Climate Resilience Costs including for sea level rise flooding with Massachusetts existing sea level rise flooding protection calculated costs at $326 billion, and Pennsylvania's at $1.9 billion for tidal waters of the Delaware River beyond the northern limits of Philadelphia (Nov. 2017).

12. **The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now** (stranded from sea level rise flooding) *"as a grenade to South Florida's economy,"* as stated publicly in 2020 by the leading expert of South Florida's real estate financing market, a South Florida Real Estate Developer and Chairman, South Florida Urban Land Institute (ULI). ULI is an IRC §501(c)(3) nonprofit

of leading real estate finance experts. *"New South Florida Climate Change Financial Report: Spend Billions Or Lose Much, Much More,"* WUSF Public Media - WUSF 89.7 | By Alex Harris - Miami Herald, Published October 17, 2020 at 8:00 AM EDT.

13. **The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Resilience** (out of $1 billion nationally) immediately subsequent to these preceding requests to Treasury, creating a dangerous, illusory, false sense of security as reported by unwittingly duped local news. Sent to Treasury was an OpEd containing the photo of a leading FIU Professor, former mayor, and an author of the Thwaites Schematic and OpEd published by 26 news entities. Although the most knowledgeable at FIU and one of several in South Florida of this systemic threat, the Professor was not invited to the Press Conference. Was this a coincidence? *"VP Kamala Harris Visits FIU to Address 'Urgent' Climate Crisis and Announce $1B in Climate Resiliency Projects,"* NBC 6 South Florida (Aug. 1, 2022).

14. **Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation**, including condo owners, whereby it's cost effective for them to initiate massive cost recovery litigation like what triggered Subprime / Global Financial Crisis:

- Prohibitive retrofit or relocation costs especially for condo owners that represent a large share of coastal property owners. Collapsed Surfside Condo owners could not afford the requested, costly, protective retrofit. A $1 billion settlement from insurers was judicially approved within a year of the filing of litigation. Only three occupants survived and 98 were killed.

- Subsurface structural steel rebar, cement and concrete are not protected from corrosive ocean salt water. Evidence of such salt water corrosion existed in the Surfside Condo basement.

- Potential defendants include insurers, local government, developers, realtors, law firms. There is material evidence of fraud that would very likely pierce any local government immunity.

- South Florida's entire economy can be devastated and contage with U.S. and global economies.

Contagion triggers can be Thwaites collapse or a failure to issue coastal mortgages, another coastal condo collapse, complete withdrawal of the property insurance market, more extensive publication of the risk by the news media, initiation of a cost recovery action by a mortgage holder, or another unforeseen cause.

15. **State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections Was NOT Deployed. However, the State Has Not Acted.** (FL 2021 Debt Report at 5).

16. **Treasury's Announced Private Sector Program Can Rapidly Deploy Required and Available $Trillions in Investor Assets Now to Stop Financial Contagion.** For example, the Investor Network on Climate Risk has over $50 trillion in assets ready to be deployed through available higher-credit rating private financing.

17. **The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.** Reinforcing the high priority of Treasury's announced private sector financing program, White House UN Special Climate Envoy John Kerry speaking on the private sector Climate Crisis engagement need in Pittsburgh on Sept. 22, 2022 finally announced: *"No government is going to solve this problem [or] … has enough money."* [1]  "In Pittsburgh, John Kerry says climate change solutions will be driven by private sector." NPR State (Sept. 22, 2022).

18. **Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith if This Notice is Also Ignored, and Subjecting Top Management to Personal Liability.** Given these well-documented unacceptable financial risks to society, and the fact that many $trillions of private sector capital protections are ready to rapidly deploy to stop contagion, Treasury and possible collusive White House complete stonewall lack of communication are:

- Extraordinarily reckless
- Dangerous
- Imprudent
- Illogical
- Antithetical to announced Treasury Climate and White House Policy furthering Dodd-Frank statutory requirements to protect U.S. financial stability
- Contrary to the public interest
- Substantially damaging to South Florida, its economy, social fabric, and quality of life
- With no rational basis
- In violation of law as shown below in case law precedent.

- Likely subjecting Treasury top management to personal liability for knowingly acting outside of its scope of employment, statutory duties, and Oath of Office, unprotected from any government immunity due to the extreme, imminent and unprecedented expected harm to society causing gross negligence.

Vice President Harris administered on January 26, 2021 as recorded by C-SPAN.org, the Treasury Secretary's Oath of Office, whereby the Secretary raised her right hand with her left hand on the Bible and stated:

> *"I DO SOLEMNLY SWEAR THAT I WILL SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES. AGAINST ALL ENEMIES FOREIGN AND DOMESTIC, THAT I WILL BEAR TRUE FAITH AND ALLEGIANCE TO THE SAME, THAT I TAKE THIS OBLIGATION FREELY, WITHOUT ANY MENTAL RESERVATION OR PURPOSE OF EVASION, **AND THAT I WILL BOW AND SAFELY DISCHARGE THE DUTIES OF THE OFFICE UPON WHICH I AM ABOUT TO ENTER**, SO HELP ME GOD."* (emphasis added)

Failure to safely discharge the priority statutory duty of the Office is a violation of the Secretary's Oath of Office, and there rationally can be no duty higher than to protect U.S. financial stability against credible, threats like imminent financial contagion that the Secretary is stonewalling. The Secretary is directed to address this specified sea level rise flooding threat pursuant to Dodd-Frank and the Secretary's statutory duty as Chair of the Financial Stability Oversight Council:

> *"The Council is charged by statute with … responding to emerging threats to the stability of the U.S. financial system. …. The Council … mitigates risks to U.S. financial stability. ….   In 2021, the Council identified three key priorities related to significant vulnerabilities in the financial system: nonbank financial intermediation, **climate-related financial risk**, and Treasury market resilience."* Duties of the Financial Stability Oversight Council on Treasury's website. (emphasis added).

The Secretary's violation of her Oath of Office by continuing to stonewall her clear and paramount statutory duty to address imminent, large scale financial contagion threatening U.S. financial stability, is outside her scope of government employment, thus subjecting her to personal liability for any continuing stonewall with no immunity due to the unprecedented severity of the imminent and dangerous harm to U.S. financial stability. If the Secretary continues to stonewall, she has no government immunity because her failure to act on a top statutory duty foremost in the public interest with no discretion, is outside her scope of employment. Harlow v. Fitzgerald, 457 U.S. 800 (1982).

The Secretary's abrogation of her duty to act placing her outside her scope of employment would be clear and convincing as completely contrary to her March 7, 2023 remarks to Treasury's Climate-related Financial Risk Advisory Committee published on Treasury's website:

> *"In October 2021, FSOC [Financial Stability Oversight Council] published its Report on Climate-related Financial Risk. As you know, the FSOC for the first time identified climate change as an emerging and increasing threat to U.S. financial stability. **The report stated that climate change will likely become a source of shocks to the financial system in the coming years. As climate change intensifies, natural disasters and warming temperatures can lead to declines in asset values that**

*could cascade through the financial system. And a delayed and disorderly transition to a net-zero economy can lead to shocks to the financial system as well.*

*These impacts are not hypothetical. They are already playing out. In the United States, there's been at least a five-fold increase in the annual number of billion-dollar disasters over the past five years compared to the 1980s, even after adjusting for inflation. States like California, Florida, and Louisiana recently have seen especially severe storms and wildfires. And recent devastating tornadoes across the South and intensifying storms on the West Coast are reminders of how climate change is accelerating.*

*In addition to the terrible toll of these disasters on individuals and families, the economic and financial impacts of these events are significant. For example, in response to rising insured losses, some insurers are raising rates or even pulling back from high-risk areas. This has potentially devastating consequences for homeowners and their property values. Developments like these can spill over to other parts of our interconnected financial system.*

*Taking climate change into account is prudent risk management. Our work builds on the scientific consensus regarding the projected effects of climate change and is based on a widely accepted understanding of how the financial system works.* (emphasis added).

19. **There is Standing to Sue and Petition This Court.** As a South Florida resident of Coral Gables and Professor at the University of Miami, the Petitioner is an immediately and adversely impacted South Florida resident with personal injury-in-fact standing to the adverse economic and social impacts of the imminent financial contagion to him and his community. Petitioner is also an expert witness on accelerating sea level rise flooding and worked with NASA JPL in preparation of the Thwaites Collapse Schematic, its 16 scientific references, and its OpEd publication by 26 news entities. The Supreme Court confirms such Article III standing on Petitioner since he has a *"personal stake, … close relationship to the harm,"* concrete injury-in-fact with the harm to him, his net worth, and his community from impending complete devaluation of South Florida coastal real estate and the resulting economic and social harm, and the harm is *"likely to be redressed by a favorable ruling."* Such monetary harms qualify for standing. TRANSUNION LLC v. RAMIREZ, S. Ct. No. 20-2997 (June 25, 2021), and Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019).

20. **Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued** with filing of the Petition for Review, and attorneys' fees requested to the Court for Treasury's bad faith, complete stonewall as an unacceptable and unlawful risk to the U.S. and global economies. The Petition and this Notice will be part of the Press Release.

21. **Emergency Injunctive Relief and Mandamus Will Be Requested** to compel Treasury's April 2021 announced private sector Program and financial stability protections required by Dodd-Frank, to rapidly

deploy available, estimated $90 billion for sea level rise flooding protection required to prevent South Florida financial contagion.

22. **Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided** by 5 U.S.C. §706 scope of review to *"compel agency action unlawfully withheld or unreasonably delayed,"* since Treasury's 100% failure to communicate is *"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."*

23. **Venue is the D.C. U.S. District Court.** *"Suits against government officers acting in their official capacities or under color of office or legal authority, and against government agencies or the United States, may be brought, pursuant to 28 U.S.C. § 1391(e), in any judicial district in which: A defendant in the action resides."* U.S. DOJ Civil Resource Manual §41. Venue – Government Officers and Agencies as Defendants.

24. **Judicial Review Will Immediately Request Temporary and Permanent Injunctive Relief** and mandamus if there is no response within 30 days of receipt of this 30 Notice, and D.C. District Court Treasury progress report public court hearings. Expected imminent irreparable harm is unprecedented.

## Treasury's 100% Stonewall to Repeated Inquiries to Top Management, with Such Inquiries Facilitated by Treasury Inspector General and Chairman IG Oversight Council on Financial Stability, and this Notice, Constitute Final Agency Action.

25. **Treasury's 100% Repeated Stonewall is Contrary to the Public Interest for a High Priority Statutory Duty** to protect U.S. financial stability, and such an egregious outlier of bad faith that no precedent could be found in the cases for such a profound, damaging, complete lack of communication.

26. **The Supreme Court Test for Final Agency Action Has Been Met** and is: Has the agency really reached a decision? And did that decision produce real, legal consequences? Both answers must be "yes" for a party to have its day in court. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Treasury reached a decision with profound

legal consequences by saying absolutely nothing and not responding at all to this imminent contagion

threat to U.S. financial stability that Treasury by statute is required to immediately act to stop. Treasury has no

higher priority duty. A complete stonewall to Treasury's statutory duty to protect U.S. financial stability has the

paramount legal consequence of jeopardizing commerce and national security of the United States and

Petitioner's economic and social well-being.

27**. Petitioner Can Reach No Other Conclusion than Treasury Has Completed its Decision-**

**Making Process,** if this 30-Day Notice is also stonewalled or rejected. Petitioner has exhausted its

administrative remedies, and there is final Treasury action ripe for this Court's review.

28. **Treasury's Final Agency Action Was Binding. It Had Made Up Its Mind.** The D.C. Circuit

held that in applying the Supreme Court's test in *Bennett*, the key consideration was whether the action was

*"informal, or only the ruling of a subordinate official, or tentative."* Soundboard Ass'n v. FTC, 251 F. Supp. 3d 55, 1267

(D.D.C. 2017). The written and oral requests to Treasury were to top Management, and Treasury's complete 100%

stonewall was not tentative and not informal for such a serious and documented matter threatening financial

stability. The D.C. Circuit in *Friedman v. FAA*, ruled that the FAA's constructive denial of a pilot's petition for

a commercial license constituted final agency action. The court focused on the fact that *"in practical effect if

not formal acknowledgment"* the agency had *"made up its mind."* 841 F.3d 537, 542 (D.C. Cir. 2016. A 100%

stonewall of seven separate requests to top management facilitated by Treasury Inspector General and

Chairman, Inspector Generals' Oversight Council for Financial stability, and this Notice, is in practical effect

that Treasury made up its mind.

# The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.

29. **APA Judicial Review of Final Treasury Actions Governs This Matter** and concerns *"the

whole, or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of

any agency in any matter other than rulemaking."* APA §2(d). This matter is also Treasury action defined by

APA §2(g): *"Agency action includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."* APA §10(a) provides Petitioner the right of judicial review: *"Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."* APA §10(c) provides jurisdiction because this Treasury action for this matter is *"agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, …or … for an appeal to superior agency authority."*

30. **To Protect Financial Stability, Interim Relief is Authorized Pending Judicial Review.** Section 10(d) of the APA as confirmed by the Attorneys General's Manual and APA legislative history, grants this Court the discretionary authority to use its equitable powers pending judicial review to grant interim relief to *"the extent necessary to prevent irreparable injury. … The function of such a power is, as heretofore, to make judicial review effective. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277). Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4 (1942).* Attorney's General Manual on the APA (1947), §10(d) Interim Relief.

31. **This Matter is Not *"Committed to Agency Discretion by Law"*** because Dodd-Frank specifically empowers and instructs Treasury to immediately act to protect financial stability including through FSOC.

32. **This Court Has the Power to Force Treasury to Communicate** because meaningful judicial review requires that Treasury must *"disclose the basis"* of its inaction. Further, this Court may inquire into *"the mental processes of administrative decisionmakers"* upon a *"strong showing of bad faith or improper behavior"* which Petitioner believes will exist if this 30-Day Notice is also ignored. Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019) *citing* Burlington Truck Lines, Inc. v. United States, 371 U. S. 156, 167–169. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 420 (1971).

33. **There is No Political Question Preventing Judicial Resolution of Treasury Inaction** since Dodd-Frank provides Treasury plenary authority and the responsibility to act to preserve and protect U.S. financial stability. Further, there is no issue of liability of responsible parties that would require additional

Congressional authority.  The available many $trillions of private sector financing is by investors ready to deploy through available higher-credit rated bonds for this purpose to provide protections.

## In Conclusion, Treasury Must Expeditiously Act in This Matter to Protect U.S. Financial Stability.

Petitioner would forgo a Petition for Review if Treasury would communicate, and if so, communicate in good faith to a resolution protecting U.S. financial stability.

Respectfully Submitted,

*Carter J. Dillard*

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
cjd328@nyu.edu
310-795-1986

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com

Attorneys for Petitioner

---

[1] This 30-Day Notice intentionally avoids any rationale of how society devolved to the unprecedented Predicament where the governments of the world neither have the will nor money to solve the Climate Crisis.  The reason is that this rationale is not needed for Treasury to act now to fulfil its top statutory priority to address the imminent contagion / financial stability threat now from Thwaites impending collapse and resulting accelerated sea level rise flooding based on 29 years of NASA JPL and EU ice-penetrating aerial imagery.  There are sufficient, available private assets.

The Predicament can be explained from the complaints of some 30 State and city climate suits against big oil recently greenlighted to State courts by the U.S. Supreme Court.  In the complaints are internal big oil documents since the 1970's showing that big oil and its front groups knew the dangers of their carbon pollution with chillingly accurate predictions of the climate extremes experienced by the Planet today.  These complaints also document the highly effective deception and disinformation that prevented the government from acting.  This 40 years of greenwash, or deception on the harms of carbon and other pollution, has caused the Predicament in conflict with truth in advertising law.  The repeated International Panel on Climate Change (IPCC) warnings on achieving the 2030 carbon pollution reduction deadline to preserve commerce, national security, and a habitable Planet, show that this greenwash deception on the fundamental hazards of pollution, have caused us to be on the brink of exceeding the carrying capacity of the Planet.  Nobel Laureate and former U.S. Secretary of Energy Steven Chu articulated this Predicament.  Chu warned that the global economy is on an unsustainable footing, reliant on an ever-increasing population which he described as a population "pyramid" or "ponzi" scheme (Forbes April 8, 2019 stated at the University of Chicago): *"The world needs a new model of how to generate a rising standard of living that's not dependent on a pyramid scheme."*

Are there factors that could quickly increase demand for truly green market performance?  Yes.  Exploding numbers of greenwashing lawsuits, as well as rising demands for climate reparations, show serious and increasing liabilities for many companies.  As described in *Newsweek*, the baseline for assessing the amount of liability, is currently being debated and baselines that would create higher levels of liability are being considered. A pending complaint before the United Nations Human Rights Council, as reported by *Inside Climate News*, could set such a baseline, requiring climate restoration via ecosocial birth equity entitlements as the most fundamental human right.  The complaint argues that had governments based family planning policies on what children need, reflected in things like the Children's Rights Convention, rather than on unsustainable economic growth models, we would not need to pay the climate reparations we now owe, which will never go far enough.  Stemming from that complaint, there is an effort to certify companies that are already considering such a standard for green performance, as donors begin to move away from charities and towards the child reparations model.  Given the complaint, the UN – just having a right to a healthy environment as a fundamental human right - could now set a higher baseline for reparations, and for assessing what constitutes greenwashing, that makes any delay more costly. At a domestic level here in the United States, there is forthcoming constitutional litigation meant to confront the fundamental threat to democracy, embodied by oligarchy, using fundamental family fairness and climate restoration as the best interpretation of generalized or unenumerated constitutional liberty."

**From:** **Mike Italiano** mike@sustainableproducts.com 📎 
**Subject:** Respectful Request for a Meeting with Secretary Janet Yellen to Stop Immediate South Florida Contagion Risk from Accelerating Sea Level Rise Flooding
**Date:** July 8, 2022 at 11:15 AM
**To:** Ari.Krupkin@treasury.gov
**Cc:** Hon. Janet.Yellen@treasury.gov, Ari Krupkin invitations@treasury.gov, Ari.Krupkin@treasury.gov, Didem.Nisanci@treasury.gov, Sean.Hoskins@treasury.gov, Joshua.Frost@treasury.gov, Neil.MacBride@treasury.gov, Shirley.Gathers@do.treas.gov Shirley.Gathers@do.Treas.gov, Hon. Sheldon_Whitehouse@whitehouse.senate.gov, Hon. Mary.Daly@sf.frb.org, Hon. Adrienne.Harris@dfs.ny.gov
**Bcc:** John Dalton jmldalton@gmail.com

Dear Ari, this confirms our additional conversation today.

You requested today we resend you again this Scheduling Request to stop the unacceptable risk of financial contagion from South Florida accelerating sea level rise flooding as documented by NASA JPL in the attached documents and published.

This accelerating flooding can render about $1 trillion in South Florida coastal real estate worthless since its porous bedrock prevents permanent engineering solutions.

There is no market confidence that sufficient flooding protections required now are being financed and will work.

This publicly recognized substantial devaluation risk can occur through any number of triggers, like banks stopping lending.

Similar to subprime litigation and defaults triggering contagion and the global Financial Crisis, this trigger will very likely cause massive defaults and mortgage holder litigation to recover the lost $1 trillion value against insurers, cities, developers, and realtors.

S&P threatened to downgrade the State of Florida's credit rating several years ago due to the State's lack of resilience from this systemic risk, and may issue a downgrade now. Ironically without sufficient protective financing, such downgrade could trigger contagion.

Sufficient higher-rated protective financing solutions are available through the capital markets to extend the real estate life, but are not being pursued.

We very much appreciate your leadership interest in stopping now this near term, unacceptable, systemic financial risk. Thank you.

On Jul 1, 2022, at 9:57 AM, Mike Italiano <mike@sustainableproducts.com> wrote:

Dear Ari, this confirms our discussion today about the description in the email below to you, of the South Florida contagion threat. Thank you.

**From:** Mike Italiano <mike@sustainableproducts.com>
**Subject: Respectful Request for a Meeting with Secretary Janet Yellen to Stop Immediate South Florida Contagion Risk from Accelerating Sea Level Rise Flooding**
**Date:** June 30, 2022 at 9:11:42 PM EDT
**To:** "Hon," <Janet.Yellen@treasury.gov>, Ari Krupkin <invitations@treasury.gov>, Ari.Krupkin@treasury.gov, Didem.Nisanci@treasury.gov
**Cc:** Sean.Hoskins@treasury.gov, Joshua.Frost@treasury.gov, Neil.MacBride@treasury.gov, "Shirley.Gathers@do.treas.gov" <Shirley.Gathers@do.Treas.gov>, "Hon." <Sheldon_Whitehouse@whitehouse.senate.gov>

# Dear Secretary Yellen, Ari & Didem,

Please see the attached draft prepublication Open Letter addressed to Secretary Janet Yellen and other financial stability leaders about the near term South Florida contagion risk from accelerating sea level rise flooding.

This risk is caused by unique South Florida's porous bedrock preventing permanent engineering solutions.

**Yet sea level rise flooding is greatly accelerating with the need to provide at least 2' of protections by 2030** based on NASA JPL ice-penetrating aerial imagery of the Thwaites Glacier impending collapse as shown in the attached Schematic published by the *The Invading Sea* Media Collaborative: https://www.theinvadingsea.com/2022/06/16/upgrading-our-building-standards-for-flooding-from-sea-level-rise-will-let-us-finance-resilient-construction-with-private-sector-green-bonds

Thwaites is the largest contributor to global sea level rise flooding, and as documented by NASA JPL with actual data in the attached Schematic and slide, the glacier is rapidly melting from above freezing subsurface ocean water, now three kilometers away and moving toward a steep slope at about 1.6 kilometers per year. The slope is a 200 meter drop over one kilometer which is 20% of the thickness of the glacier.

Accordingly, this drop can shake up the glacier and trigger its collapse, thus greatly accelerating global sea level rise flooding. NOAA's recent sea level report does not discuss Thwaites or these actual data from Thwaites, and uses unvalidated estimates *in situ* with no measure of precision and accuracy. IPCC and NASA JPL recognize this W. Antarctic collapse risk recommending sea level rise flooding estimates be recalibrated for Thwaites impending collapse.

**If Treasury would take the lead, the Miami and Miami Beach Chambers of Commerce and Durst Organization, a $10 billion NYC developer, are very interested in starting the higher-rated Green + Resilient Building Bond financing market** that can pay for areawide sea level rise flooding protections now with localities, with a half-day event for CEOs of large developers in Miami and / or at Durst's One World Trade Center NYC green building.

A similar approach is being used with Commerce and the City of San Jose to launch the Green IPO market with a Nov. 1, 2022 San Jose Event to stimulate the economy, assert a trade advantage, and greatly reduce carbon pollution globally.

***Secretary Yellen, is it possible to schedule a meeting with you at your very earliest convenience to stop this immediate contagion risk? Thank you.*** With best regards,

# Mike Italiano

Chief Executive Officer
*Founder, U.S. Green Building Council*
*Partner, First Acacia Capital, LLC*
CEO, Market Transformation to Sustainability
m

**Capital Markets Partnership**
4919 Ashby St., NW
Washington, DC 20007
202-298-6556

*Acting Now for a Healthy & Prosperous Tomorrow*

Prepublication 3d Draft

# Open Letter to Stop Unacceptable South

# Florida Financial Contagion / Crisis Risk

**TO:** **Lael Brainard**, Chair, Fed Financial Stability, **Janet Yellen**, Treasury Secretary, **Ben Bernancke**, Brookings

**Cc:** **Sheldon Whitehouse & Lindsey Graham**, Senate Judiciary, **Adrienne Harris**, Superintendent, NYS Dept. of Financial Services, **Ricardo Lara**, California Insurance Commissioner

South Florida coastal bedrock is porous and different from the rest of the U.S. where sea walls keyed into impermeable bedrock and other measures permanently manage accelerating sea level rise flooding.

Accordingly, there are no permanent engineering solutions for South Florida's estimated $1 trillion in coastal real estate, but this real estate life can be extended preventing near term unacceptable financial risks to commerce and national security.

Fortunately, as reported at *The Invading Sea* Media Collaborative, there are tens of $trillions in cheaper private sector capital available for protections extending the life of South Florida coastal real estate, which more than accommodates the calculated $5 trillion near term U.S. protection costs: _____

Much has been written and discussed about South Florida global financial contagion risk from sea level rise:

- **Peer-reviewed Green Bond & Stock Business Case released at the NYSE** by JPMorgan and Sierra Club, updated by leading economists containing 10 years of statistical data documenting that bona fide green bonds and stocks are more profitable, less risky & preferred by investors with over $70 trillion in assets, resulting in higher credit ratings for green property bonds and Nov. 2022 Green IPO market launch.
- **Defense Department** climate officers, Assistant Secretary for global resilience and the DoD Comptroller, recognizing the contagion threat and securing 2017 appropriations for areawide military base protections.
- **Former Treasury Secretary Hank Paulson** in the *Risky Business* report using the preceding Business Case
- **White House Sept. 2016 Resilience Conference** reporting that if South Florida coastal real estate can't be sold, it's cost-effective for the owners to sue insurers, cities, developers and real estate agents to recover the value, before any judicial determination of liability.
- **South Florida Urban Land Institute Chairman** (a multistate developer) stating publicly that a "trigger" can happen now like a bank stopping Miami Beach lending due to the substantial risk that the real estate may not be habitable and thus can't be sold, leaving the assets worthless and stranded.
- **Earth Day 2022 Leslie Marshall National Radio Show** discussed how South Florida litigation over the lost real estate value can "trigger" global financial contagion similar to subprime mortgage default and litigation triggering the 2008 financial crisis as determined by the Financial Crisis Inquiry Commission.

Notwithstanding this extensive national documentation and discussion, no action has been taken while the near-term contagion risk to society has reached an unacceptable level.

Ben Bernanke demonstrated that very expensive, fast and disruptive measures by global financial markets are required to stop contagion, at enormous costs to taxpayers. The Fed documented that $20 trillion in taxpayer net worth was lost during the Financial Crisis, plus taxpayers had to pay to stop the defaults.

If we act now, private markets can prevent this unacceptable risk to commerce and national security but time is of the essence.

This Open Letter is being delivered to you separately by *The Invading Sea* Media Collaborative, and the courtesy of a reply by you or your designee is appreciated. Thank you.



Thwaites Final 4
20 202…mp.pdf

 Ice-ocean interaction at grounding line margin around Antarctica  



**From:** Mike Italiano  mike@sustainableproducts.com  📎
**Subject:** Fwd: Respectful Request to Treasury to Help Stop Current High Risk Contagion Threat from South Florida's Inability to Protect From Accelerating Sea Level Rise Flooding
**Date:** July 27, 2022 at 7:02 PM
**To:** John.Morton@treasury.gov, Damian.Richardson@treasury.gov
**Cc:** Rich Delmar  delmarr@oig.treas.gov, Hon. Janet.Yellen@treasury.gov, Ari.Krupkin@treasury.gov
**Bcc:** John Dalton  jmldalton@gmail.com



**Dear John & Damian,**

This is a follow-up to our July 22, 2022 request to you below at the referral of Rich Delmar, to discuss a market solution of deploying the $5 trillion in sea level rise flooding protections required by 2030 to preserve commerce and national security as determined by NASA JPL.

This financing is also required to prevent near term South Florida financial contagion from this unacceptable risk, including a pending S&P downgrade of Florida's credit rating from lack of sea level rise flooding protections as detailed in the prior emails attached.

**One market option to rapidly deploy the required $5 trillion is conduct of the CEO Summit for launching the private $multi-trillion higher-rated Green + Resilient Building Bond market described in the attached Invite**, at Durst's $4 billion LEED green One World Trade Center with our partner the NYS Green Bank.  This market launch appears to be consistent with your market approach mandate:  https://home.treasury.gov/news/press-releases/jy0134

Durst is a $10 billion green building developer and already a Summit Sponsor.  We had to delay the Summit and then butted up against Florida hurricane season and moved it to NYC.

Goldman Sachs and other banks will do the underwriting, S&P will very likely participate in the Summit, and the building owner issuers desperately need the cheaper capital assistance from the higher credit ratings.  We're also launching the $multi-trillion Green IPO market on December 1, 2022 with the U.S. Commerce Department and San Jose.

U.S. and NYC office building market is destroyed from the pandemic with occupancy rates in the 30% level, whereas they are only profitable over 70%.  This level will not change due to telecommuting which is here to stay.

***Is this possible to discuss?  Thank you.***  With best regards,

# Mike Italiano
Chief Executive Officer
*Founder, U.S. Green Building Council*
*Partner, First Acacia Capital, LLC*
CEO, Market Transformation to Sustainability
m
**Capital Markets Partnership**
4919 Ashby St., NW
Washington, DC  20007
202-298-6556

*Acting Now for a Healthy & Prosperous Tomorrow*






# Building Bond CEO Summit

**for owners & developers executing Green + Resilient Building Bond Higher Credit Ratings**

The Summit purpose is to ensure a $400 million higher-rated Green Building Bond is issued and extensively promoted, so green building owners globally can rely on the cheaper capital and higher valuations from the higher credit ratings for all types of green building financing and investments

Green + resilient properties substantially increase cash flow and reduce risk as documented in 10 years of statistical data released at the NYSE, resulting in higher credit ratings for Green + Resilient property bonds secured by the mortgage.

* Cheaper Capital        * Improved Pricing
* Increased Valuations   * Bond Oversubscriptions 3X-10X

This $multi-trillion global market is documented in the Business Case released at NYSE, as achieving IPCC's 2030 420+ gigaton / $14+ trillion carbon pollution reduction Deadline so resilience doesn't soon become cost prohibitive, since investors with over $79 trillion in assets want to buy.

Invitees will help structure a $400+ million highly replicable bond with regional and NYSE marketing events on availability of higher credit ratings. Consensus green + resilient property underwriting standards have been completed with banks ready to underwrite.

$400 million Green Home Bond is already being structured.

**Press conference & reception follow.**
**Jim Cramer, CNBC Mad Money,**
**Invited Luncheon Speaker.**
**RSVP  mts@sustainableproducts.com**





**South Florida LEED Green Buildings**





Shanghai Tower LEED Platinum is the world's second largest building with the world's highest observation tower, wind turbines, 21% energy reduction, rainwater collection systems, & double glass facade reducing energy use by 34,000 tons of carbon / yr. The building has a 120° twist, the optimal rotation to minimize wind loads by 24%, which reduced materials costs by $58 million. Building cost was $2.4 billion. Each of the building's nine sky lobbies has gardens showcasing plants from China allowing a walk in the sky with trees. One-third of the site is green space.

**SPONSORS**











**From:** Mike Italiano <mike@sustainableproducts.com>
**Subject: Fwd: Respectful Request to Treasury to Help Stop Current High Risk Contagion Threat from South Florida's Inability to Protect From Accelerating Sea Level Rise Flooding**
**Date:** July 22, 2022 at 2:42:34 PM EDT

**Dear John & Damian,**

Confirming my voicemail, Rich Delmar told us today that he referred the July 20, 2022 request below to you.

***Is it possible to discuss?  Thank you.***  With best regards,

# Mike Italiano

**Chief Executive Officer**
*Founder, U.S. Green Building Council*
*Partner, First Acacia Capital, LLC*
CEO, Market Transformation to Sustainability
m

**Capital Markets Partnership**
4919 Ashby St., NW
Washington, DC  20007
202-298-6556

*Acting Now for a Healthy & Prosperous Tomorrow*

---

**From:** Mike Italiano <mike@sustainableproducts.com>
**Subject: Respectful Request to Treasury to Help Stop Current High Risk Contagion Threat from South Florida's Inability to Protect From Accelerating Sea Level Rise Flooding**
**Date:** July 20, 2022 at 3:48:30 AM EDT
**To:** Rich Delmar <delmarr@oig.treas.gov>, oigcounsel@oig.treas.gov
**Cc:** "Hon." <Janet.Yellen@treasury.gov>, Ari.Krupkin@treasury.gov, "Hon." <Sheldon_Whitehouse@whitehouse.senate.gov>, "Hon." <Angus_King@king.senate.gov>, "Hon." <Maura.Healey@mass.gov>, Gabrielle.Viator@mass.gov, "Hon." <Elizabeth_Warren@warren.senate.gov>, "Hon." <Edward_Markey@markey.senate.gov>, "Dudis, Dan (Whitehouse)" <Dan_Dudis@whitehouse.senate.gov>, "Hon." <Mary.Daly@sf.frb.org>, "Hon." <Adrienne.Harris@dfs.ny.gov>, Bethany.Beausang@maine.gov, Tara.Chicharro@governor.ri.gov, "Dockter, Lauren" <laurendockter@aia.org>, "Ona, Terry" <tona@aia.org>, Billie Faircloth <bfaircloth@kierantimberlake.com>, Gail Kubik <gkubik@fusedstudios.org>, Frank.Musica@victorinsurance.com

**Dear Rich,**

This responds to your request in our July 8th discussion, submitting this summary of the contagion threat to financial stability whereby about $1 trillion of South Florida coastal real estate is jeopardized and can quickly become worthless.

We are writing with the intent of constructively offering, discussing, and executing available solutions.

The cause of this substantial and systemic existing threat to South Florida real estate and U.S. financial stability is accelerating sea level rise flooding as publicly documented by NASA JPL in the attached Thwaites Glacier Collapse Schematic, published by *The Invading Sea* Media Collaborative:
https://www.theinvadingsea.com/2022/06/16/upgrading-our-building-standards-for-flooding-from-sea-level-rise-will-let-us-finance-resilient-construction-with-private-sector-green-bonds/

**This existing and publicly recognized contagion threat has been repeatedly communicated to Treasury to discuss the threat** on July 8, 2022, July 1, 2022 and June 30, 2022 as shown in the attached administrative record, but there has been no response at all.

NASA JPL stated in the attached that the W. Antarctic glacial melt is *"explosive and disturbing,"* driven by warm ocean bottom waters at the base of the glaciers 3.6°F above ocean freezing which is plenty of energy to continue to accelerate the large-scale melt.

**Nature of the immediate contagion threat from accelerating sea level rise flooding.** Unlike the rest of the country where the bedrock is impermeable allowing the sea level rise flooding to be controlled, South Florida bedrock is porous and permeable thus preventing permanent engineering solutions as documented in the attached published Thwaites Glacier Collapse Schematic References 4 & 13:
https://www.capitalmarketspartnership.com/_files/ugd/9f3072_70dc627067bc4f2b912730ab7904549b.pdf

Due to this impending glacial collapse, NASA JPL and its partners document the need for 2' minimum of sea level rise flooding protections by 2030 to protect commerce and national security at a calculated U.S. cost of about $5 trillion, which is being codified with the first step a September 29, 2022 national public meeting.

Massachusetts 2030 protection costs have been calculated at $326 billion:
https://www.capitalmarketspartnership.com/_files/ugd/9f3072_783ffc386dbd412aa82a5851a49c17a1.pdf

Accordingly, once any number of triggers occurs to the further market recognition of the total loss of value of this $1 trillion of South Florida real estate, there will be massive litigation by the mortgage holders to recover this substantial lost value.

Senator Sheldon Whitehouse recently explained in the Guardian, that funds for resilience including for sea level rise flooding (especially the required $5 trillion) are not going to be appropriated by Congress, and the roughly 30 city and State resilience cost recovery suits against big oil have stalled.

Importantly, there is sufficient and available higher-rated financing in the capital markets for these protections, but it has not been acted on.

**S&P recognized this sea level rise flooding protection need by threatening to downgrade the State of Florida's credit rating.** This additional, existing accelerated flooding threat documented by NASA JPL, can cause S&P to issue the downgrade. Ironically such downgrade could trigger contagion now since protective measures are not being financed and there is no market confidence that they will be.

*"S&P warned [the State of Florida] that ongoing focus on environmental risks and corresponding mitigations efforts will be needed in order to maintain long-term [State of Florida] credit quality."* Florida State Debt Report (Division of Bond Finance Dec. 2021 at 4-5 & 27)

Similar to Subprime mortgage total devaluation and resulting litigation causing the Financial Crisis, this South Florida extreme and massive litigation risk and / or State of Florida credit rating downgrade, can trigger financial contagion because there are no solutions being acted on and no market confidence that there will be solutions paying the calculated $5 trillion for U.S. protections.

The recent judicially approved Surfside South Florida condo collapse $1 billion settlement paid primarily by insurers, has causal evidence of chronic basement sea level rise flooding, whereby the cement, concrete, and steel rebar are not protected from the corrosive salt water.

Very expensive South Florida coastal real estate with resulting litigation over the loss of value, can quickly spread to national and global contagion if the substantial funds for protections are not available and thus there is no market confidence that contagion can be avoided or stopped.

As an I.R.C. §501(c)(3) nonprofit, we are simply asking Treasury to discuss

**As an I.R.C. §501(c)(3) nonprofit, we are simply asking Treasury to discuss facilitating a meeting of large building owners** who easily have the means to rapidly finance the $5 trillion in required sea level rise flooding protections from higher-rated green + resilient building bonds providing cheaper capital and higher building portfolio valuations

These bonds are selling out over 10x due to unprecedented investor demand providing greater bond proceeds for individual building protections, and regional government protections pro rata benefitting the owners.

For example, the Investor Network on Climate Risk has $47 trillion in assets ready to deploy. No governmental funds or guarantees are required.

The higher-ratings were secured on a nonprofit basis for a $multi-trillion global market, and document statistically that these properties in comparison to conventional, have 30% fewer defaults, 5%-15% discounted property insurance based on Fireman's Fund's improved green property loss ratios, 15% increased occupant productivity, 6% higher building rents, 15% higher building occupancy, 16% higher building appraised valuation, 40% higher retail sales, and 9% higher bank branch deposits, loan accounts, and loan balance.

Importantly, the highest credit rating is for zero emission buildings since they have the lowest operating costs.

Moreover, consensus underwriting standards required by SEC and launched by JPMorgan as a nonprofit activity, measure increased green + resilient building bond cashflow and are part of the higher ratings.

Resulting cheaper capital and more proceeds can pay now for protections and finance carbon pollution reductions and keep protections / resilience from very soon becoming cost prohibitive.

This near term prohibitiveness of resilience costs, is due to greatly accelerating carbon pollution increasing the breadth and intensity of impacts like sea level rise flooding, with positive feedback loops or accelerators like greatly increasing methane releases from melting global permafrost and ocean methane hydrates, and carbon pollution from global wildfires.

Financing the $5 trillion in required 2030 sea level rise flooding protections is in the public interest, however, unlike the federal government, the owners have no mandate to protect the public interest, in this case commerce and national security.

Moreover, building owners greatly need assistance since they are in crisis mode from the pandemic with NYC office occupancy rates financially untenable in the 30% range, forcing owners to retrofit to high-rise residential. These low occupancy levels are way below profitability in almost all large U.S. cities with Austin the highest at about 56% office occupancy, also financially untenable.

Further, in NYC and a growing number of jurisdictions, zero carbon pollution emission requirements for buildings have been mandated for 2030, and Moodys threatened a downgrade of large NYC commercial real estate loans due to potential 2030 statutory noncompliance fines.

**The facts show that a response to FSOC's statutory mandate has been required.**

**The facts show that a response to FSOC's statutory mandate has been required,** since the South Florida contagion threat is not emerging or becoming apparent, but existing and recognized publicly for several years as shown in the Draft open letter for publication in the attached request to Treasury.

As you know, the Financial Stability Oversight Council (FSOC) chaired by Treasury, is mandated to *"respond to emerging threats to financial stability."* Obviously, an existing threat is within this mandate.

This attached request to Treasury summarized this existing contagion threat:

*"You requested today we resend you again this Scheduling Request to stop the unacceptable risk of financial contagion from South Florida accelerating sea level rise flooding as documented by NASA JPL in the attached documents and published.*

*This accelerating flooding can render about $1 trillion in South Florida coastal real estate worthless since its porous bedrock prevents permanent engineering solutions.*

*There is no market confidence that sufficient flooding protections required now are being financed and will work.*

*This publicly recognized substantial devaluation risk can occur through any number of triggers, like banks stopping lending.*

*Similar to subprime litigation and defaults triggering contagion and the global Financial Crisis, this trigger will very likely cause massive defaults and mortgage holder litigation to recover the lost $1 trillion value against insurers, cities, developers, and realtors.*

*S&P threatened to downgrade the State of Florida's credit rating several years ago due to the State's lack of resilience from this systemic risk, and may issue a downgrade now. Ironically without sufficient protective financing, such downgrade could trigger contagion.*

*Sufficient higher-rated protective financing solutions are available through the capital markets to extend the real estate life, but are not being pursued."*

**Your financial crisis preparedness and management practices detail how action is required now,** especially given Secretary Janet Yellen's prescient March 31, 2021 warning to FSOC and press release quoted as follows, about this type of expected South Florida sea level rise flooding contagion threat:

*"Climate change is obviously the big one. It is an existential threat to our environment, and it poses a tremendous risk to our country's financial stability . . . . Our financial system must be prepared for the market and credit risks of these climate-related events . . . . On all these fronts, the [Financial Stability Oversight] Council has an important role to play, helping to coordinate regulators' collective efforts to improve the measurement and management of climate-related risks in the financial system."*

In response to your financial crisis management practices, Treasury also stated (Mar. 23, 2022) that it responds to such emerging threats as sea level rise flooding:

*"FSOC also plays an important role in addressing climate-related financial risks; … We will also remain vigilant in fulfilling FSOC's*
*statutory purposes of identifying risk to financial stability, promoting market discipline, and responding to emerging risks to the stability of the U.S. financial system."*

**The facts and law demonstrate that action is required now to this contagion threat.**
Contrary to Secretary Janet Yellen's preceding March 31 statement that *"Our financial system must be prepared for the market and credit risk of these climate-related events,"* the facts show that the financial system is NOT prepared.

Accordingly, action is required now to the existing threat to $1 trillion of South Florida infrastructure by Treasury's above stated statutory responsibility to act by – *"responding to emerging risks,"* and by Presidential Policy Directive 21 - Critical Infrastructure Security and Resilience, requiring Federal action disrupting threats to critical infrastructure like $1 trillion of South Florida coastal real estate and infrastructure:

*"It is the policy of the United States to strengthen the security and resilience of its critical infrastructure against both physical*
*and cyber threats. The Federal Government shall work with critical infrastructure owners and operators and SLTT entities to*
*take proactive steps to manage risk and strengthen the security and resilience of the Nation's critical infrastructure, considering*
*all hazards that could have a debilitating impact on national security, economic stability, public health and safety, or any*
*combination thereof.* ***These efforts shall seek to reduce vulnerabilities, minimize consequences, identify and disrupt***
***threats, and hasten response and recovery efforts related to critical infrastructure."*** [emphasis added]

**Moreover, Treasury recognizes its responsibility for required public-private actions addressing likely *"irreversible sea-level rise"* flooding contagion by:**

*"public-private efforts to mitigate climate-related operational risk, … [that] some of these impacts, such as sea-level rise, are likely to*
*be irreversible. … [and that] climate change will likely be a source of shocks to the financial system in the years ahead."* (FSOC Report
*on Climate-Related Financial Risks, 2021 at 27, 11 & 12 respectively) .*

Treasury further states on behalf of FSOC that it prudently acts to stop climate / sea level rise flooding contagion threats:

*"FSOC's approach to identifying risks and responding to emerging threats to financial stability is well suited to integrating climate-related*
*physical and transition risks because these stresses manifest as traditional risks to financial institutions such as credit risk, liquidity risk,*
*market risk, and operational risk,* ***which have long been the focus of prudential supervision and regulation by FSOC members."*** (Id. at 13, emphasis added)

We very much hope this background and request are constructive to executing a solution as required now.

We appreciate your expert and valuable time on how we might discuss with Treasury or another Agency Head this substantial threat to financial stability, and act on the existing solutions which can be easily executed. Thank you. With best regards,

**Mike Italiano**
**Chief Executive Officer**
*Founder, U.S. Green Building Council*
*Partner, First Acacia Capital, LLC*
CEO, Market Transformation to Sustainability
m
**Capital Markets Partnership**
4919 Ashby St., NW
Washington, DC 20007
202-298-6556

*Acting Now for a Healthy & Prosperous Tomorrow*



Thwaites Final 4
20 2022.pdf



Respectful
Reques...ng .pdf

6/21/23, 3:55 PM
Treasury Announces Coordinated Climate Policy Strategy with New Treasury Climate Hub and Climate Counselor | U.S. Department of the Treasury

https://home.treasury.gov/news/press-releases/jy0134

# U.S. DEPARTMENT OF THE TREASURY

## **Exhibit 2**

# Treasury Announces Coordinated Climate Policy Strategy with New Treasury Climate Hub and Climate Counselor

April 19, 2021

WASHINGTON — Today, the U.S. Department of the Treasury announced a coordinated climate policy strategy that will:

***Bring to bear the full force of the Treasury Department on domestic and international policymaking, leveraging finance and financial risk mitigation to confront the threat of climate change. These actions will position the economy for strong and sustainable growth consistent with a net-zero emissions future.***

To implement this strategy, Treasury will focus on the broad range of its climate-related policy work connected to 1) climate transition finance, 2) climate-related economic and tax policy, and 3) climate-related financial risks. As part of this strategy, Treasury is also creating a new Climate Hub and appointing a Climate Counselor to coordinate and lead many of its efforts to address climate change.

Treasury's unique responsibilities to lead on a range of programs related to climate change – including economic, financial sector, and government policies – will be reflected in the expanded climate strategy work program. The Treasury Climate Hub will coordinate and enhance existing climate-related activities by harnessing the tools, capabilities, and expertise from across the Department – including from Domestic Finance, Economic Policy, International Affairs, and Tax Policy. With a view of all Treasury climate initiatives, the Hub will enable Treasury to move nimbly and efficiently in prioritizing climate action.

Treasury's first Climate Counselor is John E. Morton, a recognized leader in the field of climate finance. Mr. Morton brings to Treasury more than 25 years of experience in emerging markets, investment finance, and economic and environmental policy. As Climate Counselor, he will lead the Climate Hub, report directly to and advise the Secretary on a broad range of climate matters,

and focus in particular on Treasury's efforts to facilitate and unlock the financing needed for investments to achieve a net-zero economy at home and abroad.

"Climate change presents new challenges and opportunities for the U.S. economy. The steep consequences of our actions demand that the Treasury Department make climate change a top priority," said Secretary Janet L. Yellen. "Climate change requires economy-wide investments by industry and government as well as actions to measure and mitigate climate-related risks to households, businesses, and our financial sector. Finance and financial incentives will play a crucial role in addressing the climate crisis at home and abroad and in providing capital for opportunities to transform the economy. I look forward to working with John and our team to leverage their expertise and ensure that Treasury is doing everything it can to respond to climate change while creating opportunities that strengthen our economy."

Treasury's climate policy strategy will support the Biden-Harris Administration's critical climate-related goals by:

- Mobilizing financial resources for climate-friendly investments at home and abroad, and prioritizing the expedited transition of high-emitting sectors and industries;

- Leveraging economic and tax policies to support building climate-resilient infrastructure and ensuring the transition to a net-zero decarbonized economy;

- Ensuring that environmental justice considerations feature centrally in programs, policies, and activities given the disproportionate impacts that climate change has on disadvantaged communities;

- Ensuring that policies designed and implemented to assist with the transition to a lower-carbon economy are broadly just and equitable and support well-paying jobs;

- Helping household, businesses, workers, and investors analyze, stay informed about, and adapt to the economic and financial risks and opportunities associated with climate change;

- Promoting globally consistent approaches to climate-related financial risks; and

- Understanding and mitigating the risks that climate change poses to the stability of the U.S. and global financial system and economy.

Consistent with President Biden's whole-of-government approach to climate change, Treasury will work with other stakeholders, including the National Climate Task Force and other agencies and regulators.  The efforts across the Department will support engagement by the Secretary, senior officials, and staff in related independent processes, including at the Financial Stability Oversight Council.

## ABOUT JOHN E. MORTON, CLIMATE COUNSELOR

John E. Morton was most recently a Partner at Pollination, a specialist climate change advisory and investment firm. Morton was a Presidential Appointee in the Obama Administration and served as White House Senior Director for Energy and Climate Change at the National Security Council. In this role, he had overall responsibility for coordinating the Obama Administration's policies and strategies on international energy and climate change issues. Earlier in the Administration, he served for six years as Vice President for Investment Policy, Chief of Staff, and Chief Operating Officer of the Overseas Private Investment Corporation (OPIC). Before his Government service, Morton was Managing Director of Economic Policy at The Pew Charitable Trusts and a private equity investor with Global Environment Fund. He began his career as a strategy consultant with Mercer and managing World Bank projects in environmental infrastructure sectors in the former Soviet Union.

####

6/21/23, 4:01 PM    Financial Stability Oversight Council Identifies Climate Change as an Emerging and Increasing Threat to Financial Stability | U.S. Department of the Treasury

https://home.treasury.gov/news/press-releases/jy0426

# U.S. DEPARTMENT OF THE TREASURY

# Financial Stability Oversight Council Identifies Climate Change as an Emerging and Increasing Threat to Financial Stability

October 21, 2021

*In First Step, FSOC Releases Report and Recommendations on Climate-related Financial Risk*

WASHINGTON — The Financial Stability Oversight Council (FSOC) has released a new report in response to President Biden's Executive Order 14030, Climate-related Financial Risk. For the first time, FSOC has identified climate change as an emerging and increasing threat to U.S. financial stability. The report and accompanying recommendations demonstrate FSOC's commitment to building on and accelerating existing efforts on climate change through concrete recommendations for member agencies to:

- Assess climate-related financial risks to financial stability, including through scenario analysis, and evaluate the need for new or revised regulations or supervisory guidance to account for climate-related financial risks;

- Enhance climate-related disclosures to give investors and market participants the information they need to make informed decisions, which will also help regulators and financial institutions assess and manage climate-related risks;

- Enhance actionable climate-related data to allow better risk measurement by regulators and in the private sector; and

- Build capacity and expertise to ensure that climate-related financial risks are identified and managed.

"Climate change is an emerging and increasing threat to America's financial system that requires action," Secretary of the Treasury Janet L. Yellen said. "FSOC's report and recommendations represent an important first step towards making our financial system more resilient to the threat of climate change.  These measures will support the Administration's urgent, whole-of-government effort on climate change and help the financial system support an orderly, economy-wide transition toward the goal of net-zero emissions."

While the report recommends that FSOC members take new actions on climate change data, disclosure, and scenario analysis, it also discusses how individual members are already taking important steps forward. For example:

- The Securities and Exchange Commission (SEC) has begun to evaluate its disclosure rules and requested public comment on ways to improve climate disclosure.

- The Federal Reserve Board (FRB) has established two committees to develop a better understanding of climate-related risks and incorporate them into its supervision of financial firms and into its financial stability framework.

- The Commodities Futures Trading Commission (CFTC) has engaged on climate-related financial risk issues through its Market Risk Advisory Committee (MRAC). In September 2020, the MRAC's climate subcommittee issued a report entitled Managing Climate Risk in the U.S. Financial System, with recommendations to address the growing impact of climate-related financial risk.

- Both the Federal Housing Financing Agency (FHFA) and the Treasury Department's Federal Insurance Office have requested information on climate-related financial risks from the public to inform their activities

Established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, FSOC is charged with identifying risks to U.S. financial stability, promoting market discipline, and responding to emerging threats to the stability of the U.S. financial system. FSOC consists of 10 voting members and 5 nonvoting members and brings together the expertise of federal financial regulators, state regulators, and an independent insurance expert appointed by the President.

The full report and recommendations can be found here.          A factsheet on FSOC's actions can be found here.          A copy of Secretary Yellen's remarks during the open session can be found here and a readout of FSOC's meeting can be found here.

September 16, 2023

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DR. HAROLD R. WANLESS** | |
| **Petitioner,** | Civil Action No. _____ |
| | **CERTIFICATE OF SERVICE** |
| **JANET YELLEN, SECRETARY** in her official capacity | **30 DAY NOTICE TO TREASURY OF** |
| | **PETITION FOR REVIEW OF** |
| **U.S. DEPARTMENT OF THE TREASURY** | **FINAL AGENCY ACTION** |
| **FINANCIAL STABILITY OVERSIGHT COUNCIL** | |
| **Respondents.** | |

Pursuant to §44 of DOJ Civil Resource Manual (SERVICE ON GOVERNMENT OFFICERS IN OFFICIAL CAPACITY, AGENCIES), Fed. R. Civ. P. 4(i)(2), 28 U.S. §1391(e)(3), and 39 CFR §491.2, service of this 30-Day Notice upon a Federal Agency officer, in his/her official capacity is accomplished by registered mail to the officer or agency. *"Failure to prove service does not affect the validity of service."* Fed. R. Civ. P. 4(l)(3).

Service of this 30-Day Notice was made by registered mail to the U.S. Treasury Department, September 29, 2023 with attached registered mail forms. Attested under penalty of perjury by:

*Carter J. Dillard*

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
cjd328@nyu.edu
310-795-1986

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com

Attorneys for Petitioner
October 18, 2023

# Registered Mail Delivery Insured for $5,000

Janet Yellen, Secretary
U.S. Department of the Treasury
Financial Stability Oversight Council
1500 Pennsylvania Avenue NW, Washington, DC 20220



## Additional Delivery

At the request of U.S. Treasury Attorney Mark Schlegel in the Office of the General Counsel during a phone call, Delivery was also made on September 7, 2023 by email to Eric.Nguyen2@treasury.gov, Mark.Schlegel@treasury.gov. Mr. Schlegel is identified as "Attorney-Advisor" to Treasury's Climate-related Financial Risk Advisory Committee of the Financial Stability Oversight Council, in the Committee's March 7, 2023 Minutes on Treasury's website.

November 10, 2023

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DR. HAROLD R. WANLESS**

                    **Petitioner,**

**JANET YELLEN, SECRETARY** in her official
    capacity

  **U.S. DEPARTMENT OF THE TREASURY**

  **FINANCIAL STABILITY OVERSIGHT**
**COUNCIL**
                  **Respondents.**

Civil Action No. _____

<u>**CERTIFICATE OF SERVICE**</u>
**DECLARATORY JUDGMENT**
**TO STOP  IMMINENT THREAT TO**
**U.S. FINANCIAL STABILITY;**
**MOTIONS FOR HEARING &**
**ATTORNEYS FEES**

Pursuant to §44 of DOJ Civil Resource Manual (SERVICE ON GOVERNMENT OFFICERS IN OFFICIAL CAPACITY, AGENCIES), Fed. R. Civ. P. 4(i)(2), 28 U.S. §1391(e)(3), and 39 CFR §491.2, service of this Declaratory Judgment action upon a Federal Agency officer, in his/her official capacity is accomplished by registered mail to the officer or agency. *"Failure to prove service does not affect the validity of service."* Fed. R. Civ. P. 4(l)(3).

Service of this Declaratory Judgment action was made by registered mail to the U.S. Treasury Department, November 13, 2023 & by email.

# Registered Mail Delivery Insured for $5,000

Janet Yellen, Secretary
U.S. Department of the Treasury
Financial Stability Oversight Council
1500 Pennsylvania Avenue NW, Washington, DC 20220

# Additional Delivery

At the request of U.S. Treasury Attorney Mark Schlegel in the Office of the General Counsel during a phone conference call of attorneys of the parties on September 7, 2023, delivery was also requested by email to Eric.Nguyen2@treasury.gov, Mark.Schlegel@treasury.gov. Mr. Schlegel is identified as "Attorney-Advisor" to Treasury's Climate-related Financial Risk Advisory Committee of the Financial Stability Oversight Council, in the Committee's March 7, 2023 Minutes on Treasury's website.

Attested under penalty of perjury & respectfully submitted by:

*Mike Italiano*

**Mike Italiano** DC Bar #411066, Member, D.C. District Ct.
mts@sustainableproducts.com
4919 Ashby St., NW, Wash., DC 20007
202-298-6556

**Attorney for Petitioner & Counsel of Record**


**Attorney Advisors**

*Brian Davis*

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com
651-308-7141

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
Bar #s 492945 & 206276