November 10, 2023

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**DR. HAROLD R. WANLESS**
1300 Campo Sano Ave, Coral Gables, FL 33146

**Petitioner,**

Civil Action No. _____

**JANET YELLEN, SECRETARY** in her official
    capacity

**U.S. DEPARTMENT OF THE TREASURY**

**FINANCIAL STABILITY OVERSIGHT COUNCIL**
1500 Pennsylvania Ave., NW, Wash., DC  20220

**Respondents.**

**REQUEST FOR DECLARATORY JUDGMEMT & HEARING, PETITION FOR REVIEW OF FINAL AGENCY ACTION**

# REQUEST FOR DECLARATORY JUDGMENT & PETITION TO REVIEW FINAL AGENCY ACTION

**Introduction.**  This case is to stop imminent financial contagion from well-documented market awareness of complete devaluation at any time, of about $1 trillion of South Florida coastal real estate from rapidly accelerating sea level rise flooding demonstrated by 29 years of NASA and EU ice-penetrating aerial imagery.  U.S. Treasury's top non-discretionary statutory duty is to prevent contagion to preserve U.S. financial stability, including through its stated high priority, private climate financing program where required protective financing of over $60 trillion in available investor assets can be rapidly deployed for protections.  Figures 1-5 below show this demonstrated imminent threat.

Time is of the essence to act.  The question is stark, unprecedented, and cannot be further delayed.

U.S. Treasury decided for 16 months, that it does not have the courage to either act or communicate to preserve U.S. financial stability, as shown by the 30-Day Notice to Treasury and this Request for Declaratory Judgment.  At least Treasury should have the courage to step aside, and let this Court decide.

Treasury's decision to in effect terminate the 30-Day Notice of this Petition for Review by perpetuating its 16-month Stonewall is set forth in the September 16, 2023 Declaration / Affidavit of Petitioner's attorneys' communications with Treasury's General Counsel Office Attorney, part of the pleadings that includes the 30-Day Notice.  This Attorneys' Declaration documents the continued Stonewall, and failure of Treasury to execute mandated U.S. financial stability protections including by its announced high priority private sector climate financing or equivalent.

Petitioner respectfully sets forth the facts for decision and legal basis for injunctive relief on this imminent threat to U.S financial stability contained in the Motion for Rules 57 and 65 Injunctive and Declaratory Relief Hearing as part of the pleadings submitted to the Court, with a Motion for Attorneys Fees for Treasury's long-term bad faith to either act or communicate thus forcing this lawsuit.

This Request for Declaratory Judgment includes the top non-discretionary statutory duty for Treasury to immediately act, covering facts, standing, jurisdiction, venue, final agency action, judicial review, declaratory judgment, and specific prayer for relief.

# Contents

## Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief

1.  Factual Summary
2.  The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.
3.  Treasury Top Management Has Been Completely Nonresponsive to Nine Repeated Written Requests Over 16 Months.
4.  This Imminent Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision (RoD).
5.  The Record of Decision (RoD), Included the Thwaites Glacier Impending Collapse Schematic
6.  Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act.
7.  South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise Flooding.
8.  Dodd-Frank and Treasury's High Priority Private Sector Climate Financing Program or Equivalent Can Ensure U.S. Financial Stability.
9.  Financial Stability Oversight Council (FSOC) Identified "*Climate Change As An Emerging and Increasing Threat to Financial Stability.*"
10.  Importantly As Also Shown in the RoD, Treasury Was Notified That Available Required Protections for South Florida Can Be Rapidly Deployed.
11.  The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now.
12.  The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Resilience.  About $90 billion is Required Now for South Florida Coastal Protections.
13.  Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation.
14.  State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections was NOT Deployed.  However, the State Has Not Acted.
15.  The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.
16.  Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith, and Subjecting Treasury Top Management to Personal Liability.
17.  There is Standing to Sue and Petition This Court.

18.  Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued.
19.  Emergency Injunctive Relief is Requested.
20.  Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided.
21.  Venue is the D.C. U.S. District Court.

**Treasury's 100% Stonewall Including the 30-Day Notice, Constitutes Final Agency Action.**

22.  Treasury's 100% Repeated Stonewall is Contrary to the Public Interest for a Top, Non-discretionary Statutory Duty.
23.  The Supreme Court Test for Final Agency Action Has Been Met.
24.  Petitioner Can Reach No Other Conclusion Than Treasury Has Completed its Decision-making Process.
25.  Treasury's Final Agency Action Was Binding.  It Had Made Up Its Mind.

**The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.**

26.  APA Judicial Review of Final Treasury Actions Governs This Matter.
27.  To Protect U.S. Financial Stability, Interim Relief is Authorized & Should be Provided Pending Judicial Review.
28.  This Matter is Not "Committed to Agency Discretion by Law."
29.  This Court Has the Power to Force Treasury to Communicate About its Failure to Act to Protect U.S. Financial Stability.
30.  There is No Political Question Preventing Judicial Resolution of Treasury Inaction.

**Request for Declaratory Judgment.**

**The Judicially Remedial Right of Petitioner is Clear & Universal, Including Where There is No Other Adequate Remedy in Court: Protection of U.S. Financial Stability as a Top Statutory Duty.**

**Prayer for Relief.**

Figure 1.  NASA JPL Thwaites Glacier Impendin Collapse Schematic Prepared From 29 Years of Actual Data
Figure 2.  Thwaites Glacier Diagrams
Figure 3.  NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line (intersection of ice, bedrock, and ocean) retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.
Figure 4.  South Florida "Sunny Day" Sea Level Rise Flooding (2013)
Figure 5.  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)

# Statement of Facts, Standing, Jurisdiction, Venue & Request for Injunctive Relief

1.  **Factual Summary.**  The 30-Day Notice provided to Treasury and the Financial Stability Oversight Council (FSOC) was a final effort to conduct good faith discussions to overcome Treasury's complete 16 month "Stonewall" providing no response at all to nine separate written and oral inquiries to Treasury top management.  The inquiries concerned Treasury's publicly-stated high priority private sector climate financing program supported by Dodd-Frank statutory duties of Treasury to protect U.S. financial stability.  With investors with over $60 trillion in private sector assets ready to be rapidly deployed through available higher credit-rated financing, the impending systemic threat of financial contagion can be prevented as communicated to Treasury.  This contagion threat was repeatedly documented to Treasury top management from expected complete devaluation at any time of about $1 trillion in South Florida coastal real estate from the very high probability failure of the real estate financing system to timely respond to existing well-documented accelerating sea level rise flooding.

Based on NASA Jet Propulsion Lab's Thwaites Glacier Impending Collapse Schematic prepared from 29 years of ice-penetrating aerial imagery with its 16 references sent to Treasury, protections from 2' of sea level rise flooding and 10' of storm surge are required by 2030 to preserve commerce and national security. Thwaites is the largest source of global, accelerating sea level rise flooding and affectionately named the "Doomsday Glacier" by the news media.  See Figures 1 and 2 below.  South Florida's densely populated and highly developed coast is within this 2' zone of rise requiring protections now.  Since South Florida coastal porous bedrock prevents permanent engineering solutions, contagion can now be triggered through expected massive litigation by permanent mortgage holders to recover their lost real estate value, similar to Subprime Mortgage litigation that caused the global Financial Crisis.  There is no market confidence that about $90 billion in required South Florida protections will be financed thus driving this contagion threat.  Importantly as communicated to Treasury, the over $60 trillion in private funds are available and can be rapidly deployed eliminating this unacceptable contagion threat to U.S. financial stability.

Figure 3 is an actual image of the bedrock about 1,000 meters underneath Thwaites showing that the glacier has retreated inland to the precipice of a steep slope where it can at any time, collapse and plunge, greatly and rapidly accelerating global sea level rise flooding.  Financial contagion can be triggered by Thwaites collapse or other means of market recognition of the lack of protections.  Thwaites backstops other large glaciers also under irreversible collapse as announced at a NASA 2015 press conference with National Geographic.  Figures 4 & 5 are pictures of accelerating "sunny day" sea level rise flooding in South Florida from 2013 and 2015 respectively.

Due to this recognized systemic threat, S&P in an unprecedented action, threatened to downgrade Florida's credit rating, but the State has failed to act.  Treasury has publicly recognized this growing climate / sea level rise flooding contagion threat through its statutory responsibilities under Dodd-Frank to protect U.S. financial stability.

**Figure 1. NASA JPL Thwaites Glacier Collapse Schematic Prepared From 29 Years of Actual Data** / ice-penetrating aerial imagery.



Thwaites as it is today, is different from what may occur when Thwaites collapses as depicted herein, which could be in the next five years or more based on over 20 years of NASA JPL & EU ice-penetrating aerial imagery. To prevent unacceptable threats to commerce and national security since Thwaites is the greatest contributor to sea level rise flooding, protections by 2030 from two feet minimum of sea level rise are required by the approved 3.0 national consensus resilience standard. The standard and this Collapse Schematic recognize it is uncertain exactly when a two feet increase will occur.



**Figure 2**

## Thwaites Glacier Diagrams



• Thwaites' grounding line ocean temperature is 3.6º F above ocean freezing and 5.4º F along the ocean bed farther into the Amundsen Sea Embayment. This warm ocean current is primarily causing the rapid retreat of Thwaites grounding line inland.

• The 3.6ºF water above freezing at the grounding line is likely a catalytic lubricant, which also may increase in force on the steep downslope further eroding the grounding line inland.



• Thwaites grounding line is moving about one mile / yr. toward the steep reverse slope facing inland. The grounding line is less than about 10 miles from the steep slope that can cause Thwaites' plunge.

• NASA documented "explosive & disturbing" melt of about 9 miles from 2015 -2017 in a cavity along Thwaites' grounding line



• Once past the steep slope, Thwaites current 4% contribution to global sea level rise will irreversibly and rapidly increase to about 40% since the inland ice sheet over bedrock is no longer held back by the floating ice shelf by "plunging into the deep part of Antarctica grounded about 2.5 km below sea level".

**Figure 3.  NASA JPL / National Science Foundation / University of California at Irvine / Thwaites International Collaborative Slide of Thwaites grounding line retreat to the precipice of a steep slope where Thwaites can plunge and collapse, and greatly and rapidly increase global sea level rise flooding.**
This slide is the actual glacial subsurface at the grounding line from 29 years of NASA JPL and European Union ice-penetrating aerial imagery.  The grounding line is the intersection of the ice, bedrock, and ocean interface where rapid melting is occurring from above freezing ocean bottom currents, causing Thwaites rapid retreat where it is expected to plunge into a deep inland depression and collapse, very likely triggering the collapse of the West Antarctic Ice Sheet that has been under irreversible retreat.  This slide was a part of the information repeatedly sent to Treasury regarding this imminent and unacceptable threat to commerce, national security, and U.S. financial stability from accelerating sea level rise flooding.

Schematic Reference 4 and Figure 3 note that Thwaites has been receding inland from melt at about one mile per year, currently 3km from a steep slope where Thwaites can plunge downward and collapse.  Reference 11 notes that based on marine and ice cores, Thwaites has undergone this instability collapsing before during periods of non-anthropogenic warming.



**Figure 4. South Florida** "Sunny Day" Sea Level Rise Flooding, from Special Report: Sea Level Rise and Florida Impact -  Building & Infrastructure.  *Hot Spot:  Miami Beach Down the Drain* (July 8, 2013), Florida Trend:  Florida's Business Authority.



**Figure 5.**  South Florida Sunny Day Sea Level Rise Flooding from Zonelaw.com (2015)



*"Sunny Day flooding," as it is called, is now a phenomenon that is occurring throughout South Florida.  Without naming names, certain areas of Miami Beach, Fort Lauderdale and Delray Beach have now developed reputations for having streets with Sunny Day flooding"*
(from Zonelaw.com)

2.   **The Dodd-Frank Statute Names the Secretary of the Treasury as Financial Stability Oversight Council (FSOC) Chairman.**   The 2022-2023 repeated requests to Treasury top management for Treasury action, included a written request by Rich Delmar, Chairman, statutory Inspector Generals' Oversight Council on Financial Stability and Treasury Inspector General, to John Morton.  There was also a written request to Morton's successor Ethan Zindler.  There was a complete Stonewall by these responsible Treasury Officials and Morton's assistant, including to telephone inquiries.  The IG Oversight Council specific statutory authority to act in this regard is pursuant to Dodd-Frank §989E.

3.   **Treasury Top Management Has Been Completely Nonresponsive to Nine Repeated Written & Oral Requests Over 16 Months** to rapidly deploy the private financing with many tens of trillions of dollars available, or equivalent, to preserve U.S. financial stability:

**2022**

| | |
|---|---|
| **June 30 –** | Email request to Treasury Secretary Janet Yellen & her scheduler Ari Krupkin |
| **July 1 –** | Follow-up phone call with Krupkin forwarding July 1 email at his request |
| **July 8 –** | Follow-up phone call with Krupkin re-forwarding July 1 email at his request |
| **July 8 –** | Call with Rich Delmar, Inspector General about our requests |
| **July 20 –** | Email to Delmar forwarding him previous written requests to Treasury, which Delmar sent to John Morton, the responsible Treasury Official |
| **July 22 –** | Voicemail & email forwarding July 20 Delmar email to John Morton & his assistant Damian Richardson |
| **July 27 –** | Email re-forwarding to Morton and Richardson, the July 22 email to them |

**2023**

| | |
|---|---|
| **Aug 31 –** | 30-Day Notice of Intent to File Petition for Review of Final Agency Action |
| **Sept 7 –** | Conference call of Petitioner's Attorneys with Treasury Office of General Counsel Attorney Mark Schlegel whereby Schlegel requested the 30-Day Notice to his email |
| **Sept 12 –** | Conference call of Petitioner's Attorneys with Schlegel during which he refused to answer or discuss whether (1) he received the Notice, (2) the fact that Treasury Order 107-04 provides for the Office of General Counsel to accept service, (3) what attorney in the General Counsel's Office is responsible for the 30-Day Notice, & (4) discussion that could preclude litigation. |
| **Sept 21 –** | Email to Treasury Climate Counselor Ethan Zindler from former Idaho Attorney General & Supreme Court Chief Justice Jim Jones requesting a discussion & transmitting a Draft Press Release to be issued if a lawsuit was filed because the public has a right to know. A follow-up voicemail was left with Zindler by Petitioner's Attorneys. |

The 30-Day Notice to Treasury is part of the pleadings along with this Request for Declaratory Judgment.

4. **This Imminent Threat to U.S. Financial Stability Was Documented to Treasury in the Record of Decision** (RoD) as Exhibit 1 part of the 30-Day Notice and this Request for Declaratory Judgment.  As a non-discretionary requirement, Dodd-Frank requires that Treasury rapidly act to stop documented, systemic threats to U.S. financial stability that can cause another Financial Crisis, including Financial Stability Oversight Council's (FSOC) duty to *"respond to emerging threats to the stability of the United States financial system. …, monitor the financial services marketplace in order to identify potential threats to the financial stability of the United States …* [and] *(I) to enhance the integrity, efficiency, competitiveness, and stability of United States financial markets; (II) to promote market discipline; and (III) to maintain investor confidence."*  Dodd-Frank specifies that the Secretary of the Treasury is FSOC Chairman.  Sections 111, 112 relating to FSOC, and the purpose of Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, as Amended Through P.L. 117–286, Enacted December 27, 2022. Section 202 of Dodd-Frank provides judicial review provisions none of which are applicable herein.  No Treasury guidance for Review Petitions could be found in this matter, which is outside of Treasury's tax responsibilities.

5. **The Record of Decision (RoD), Included the Thwaites Glacier Impending Collapse Schematic** as Exhibit 1 to the 30-Day Notice to Treasury, which is summarized in preceding Figures 1 & 2, prepared with NASA Jet Propulsion Laboratory (JPL).  NASA JPL stated *"explosive & disturbing"* glacial subsurface melt 3.6ºF above ocean freezing and impending Thwaites Glacier collapse as the largest contributor to global sea level rise flooding, were demonstrated by 29 years of ice-penetrating actual data aerial imagery.  NASA JPL stated in the Schematic that this current unacceptable threat requires protections from 2' of sea level rise flooding minimum by 2030 to preserve commerce and national security as published by 26 news entities, and subsequently codified in 2022 by the 3.0 national consensus resilience standard.  Federal statutes require Federal Agencies to follow national consensus standards unless Treasury has its own climate resilience standard which it does not.

6. **Dodd-Frank Makes No Provision for Treasury Within Its Discretion, To Not Act** when there is a credible, imminent and documented threat to U.S. financial stability as was set forth in the communications to Treasury, the 30-Day Notice, and this Request for Declaratory Judgment.  To the contrary, Dodd-Frank was enacted providing Treasury with non-discretionary plenary power to act to protect U.S. financial stability when faced with imminent contagion from the complete devaluation of about $1 trillion of South Florida coastal real

estate, and the harm to the real estate finance community comparable to Subprime Mortgages that caused the global Financial Crisis as determined by the Financial Crisis Inquiry Commission.  Congress clearly did not want a repeat of the highly destructive 2008 Financial Crisis.  Treasury is unequivocally directed by Dodd-Frank to *"respond to emerging threats to the stability of the United States financial system."*

7.    **South Florida is Unique Due to Porous Bedrock Causing "Sunny Day" Sea Level Rise** flooding both up from below ground and at the tidal surface preventing permanent engineering solutions.  Miami Beach published its consulting engineer's preliminary solution which was sea walls with permanent subsurface vertical and horizontal barriers.  This would have made Miami Beach as a barrier island a leaky bathtub at a cost of about $1 trillion.  This specific type of Siren's Song geo-engineering was dismissed as unworkable at the September 2016 White House Resilience Summit by all participants which included Miami Beach's consulting engineer.  Miami Beach is spending about $200 million in groundwater pumping discharged to the rising ocean, as a temporary solution to decrease sunny day flooding.  However, the $200 million was paid for by fees encouraging additional Miami Beach development, thus increasing the dollar amount of the contingent liability to permanent mortgage holders.  Mami-Dade County estimates that $4 billion is needed to connect to sewers, underground sewage septic systems leaking from subsurface rising seas submerging the systems, and releasing the nutrients nitrogen and phosphorous causing algae blooms in Biscayne Bay comprised of flesh-eating bacteria closing beaches to swimming and recreation.  City of South Miami Sea Level Rise Flooding Pilot (2020) (reference 4 of the Thwaites Glacier Collapse Schematic).  The roughly $90 billion for South Florida protections can only extend the life of the coastal property and stop the contagion threat, but is not a permanent engineering solution.  Without rapidly deploying the available private sector financing, permanent South Florida coastal mortgage holders' property can at any time now, be completely devalued starting massive litigation to recover this value which can very quickly start U.S. financial contagion comparable to Subprime Mortgage litigation that caused the Financial Crisis.  Contagion is caused by the lack of market confidence in the solution to a systemic financial threat, in this case, that financing for protections will NOT be rapidly deployed as required.  As a long-term South Florida resident, Petitioner believes this is an imminent, unacceptable threat to his health, well-being and net worth, in addition to U.S. financial stability.  Petitioner is an expert witness on sea level rise flooding, and thus qualified to deliver his opinion to Courts.

8.    **Dodd-Frank and Treasury's Announced High Priority Private Sector Climate Financing Program or Equivalent, Can Ensure U.S. Financial Stability** as stated by Treasury to:  *"**Bring to bear the full force of the Treasury Department … leveraging finance**"* (emphasis by Treasury) in Exhibit 2 to the 30-Day Notice.  Secretary Yellen stated in the announcement *"Climate change requires economy-wide investments*

*by industry … as well as actions to … mitigate climate-related risks to households, businesses, and our financial sector.*"  (Apr. 19, 2021).

9.   **Financial Stability Oversight Council (FSOC) Identified** *"Climate Change As An Emerging & Increasing Threat to Financial Stability,"* reported in Treasury's press release on its website of October 21, 2021 in Exhibit 3 to the 30-Day Notice:   *"Established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, FSOC is charged with identifying risks to U.S. financial stability, promoting market discipline, and responding to emerging threats to the stability of the U.S. financial system."* In Treasury's announced FSOC finding, Secretary Yellen emphasized that *"Climate change is an emerging and increasing threat to America's financial system **that requires action**."* (emphasis added).

10.   **Importantly As Also Shown in the RoD, Treasury Was Notified That Required Protections for South Florida Can Be Rapidly Deployed** through available higher-credit rated private sector financing with Treasury's announced private financing program or equivalent.  The estimated $90 billion in required South Florida coastal protections is based on actual cost data.  See Massachusetts and Pennsylvania Existing, Partial Climate Resilience Costs including for sea level rise flooding with Massachusetts existing sea level rise flooding protection calculated costs at $326 billion, and Pennsylvania's at $1.9 billion for tidal waters of the Delaware River beyond the northern limits of Philadelphia (Nov. 2017).  For example, the Investor Network on Climate Risk has over $60 trillion in assets ready to be deployed through the available higher-credit rating private financing with assistance by the Urban Land Institute.

11.   **The Roughly $1 Trillion in South Florida Real Estate Assets Can Become Worthless at Any Time Now** (stranded from sea level rise flooding) *"as a grenade to South Florida's economy,"* as stated publicly in 2020 by the leading expert of South Florida's real estate financing market, a South Florida Real Estate Developer and Chairman, South Florida Urban Land Institute (ULI).  ULI is an IRC §501(c)(3) nonprofit of leading real estate finance and climate resilience experts.  *"New South Florida Climate Change Financial Report:  Spend Billions Or Lose Much, Much More,"* WUSF Public Media - WUSF 89.7 | By Alex Harris - Miami Herald, Published October 17, 2020 at 8:00 AM EDT.

12   **The White House Announced at a News Conference at Florida International University (FIU) a Highly Insufficient $30 Million for South Florida Resilience** (out of $1 billion nationally) immediately

subsequent to these preceding requests to Treasury, creating a dangerous, illusory, false sense of security as reported by unwittingly duped local news. About $90 billion in South Florida coastal protections are required now. Sent to Treasury was an OpEd containing the photo of a leading FIU PhD. Scientist, Professor, former mayor, sea level rise expert, and an author of the Thwaites Schematic and OpEd published by 26 news entities. Although the most knowledgeable at FIU and one of several in South Florida of this systemic threat, the Professor was not invited to the Press Conference. Was this a coincidence? *"VP Kamala Harris Visits FIU to Address 'Urgent' Climate Crisis and Announce $1B in Climate Resiliency Projects,"* NBC 6 South Florida (Aug. 1, 2022).

13.   **Permanent South Florida Coastal Mortgage Holders Representing About $1 Trillion in Real Estate Assets, Are Currently Unprotected From Complete Property Devaluation**, including condo owners, whereby it's cost effective for them to initiate massive cost recovery litigation like what triggered Subprime / Global Financial Crisis:

- Prohibitive retrofit or relocation costs especially for condo owners that represent a large share of coastal property owners. Collapsed Surfside Condo owners could not afford the requested, costly, protective retrofit. A $1 billion settlement from insurers was judicially approved within a year of the filing of litigation. Only three occupants survived and 98 were killed.

- Subsurface structural steel rebar, cement and concrete are not protected from corrosive ocean salt water. Documented evidence of such salt water corrosion existed in the Surfside Condo basement.

- Potential defendants include insurers, local government, developers, realtors, law firms. There is material evidence of fraud that would very likely pierce any local government immunity.

- South Florida's entire economy can be devastated and contage with U.S. and global economies.

Contagion triggers can be Thwaites collapse or a failure to issue coastal mortgages, another coastal condo collapse, further withdrawal of the property insurance market, continued publication of the threat by the news media, initiation of a cost recovery action by a mortgage holder, or another unforeseen cause.

14.   **State of Florida Was Warned by S&P of a Potential Unprecedented Adverse State Credit**

**Rating Downgrade if Substantially More Capital for Sea Level Rise Flooding Protections Was NOT Deployed.  However, the State Has Not Acted.** (FL 2021 Debt Report at 5).

**15.   The Governments of the World Have Neither the Will Nor Money to Solve the Climate Crisis.**

Reinforcing the high priority of Treasury's announced private sector financing program, White House UN Special Climate Envoy John Kerry speaking on the private sector Climate Crisis engagement need in Pittsburgh on Sept. 22, 2022 finally announced: *"No government is going to solve this problem [or] … has enough money."* [1]   "In Pittsburgh, John Kerry says climate change solutions will be driven by private sector." NPR State (Sept. 22, 2022).

**16.   Treasury's Behavior is Reckless, a Violation of the Oath of Office, Acting in Bad Faith Stonewalling the 30-Day Notice, and Subjecting Top Management to Personal Liability.**  Given this well-documented unacceptable imminent financial threat to society, and the fact that many $trillions of private sector capital protections are ready to rapidly deploy to stop contagion, Treasury and possible collusive White House complete refusal to act and Stonewall lack of communication are:

- Extraordinarily reckless
- Dangerous
- Imprudent
- Illogical
- Antithetical to announced Treasury Climate and White House Policy furthering Dodd-Frank statutory requirements to protect U.S. financial stability
- Contrary to the public interest
- Substantially damaging to South Florida, its economy, social fabric, and quality of life
- With no rational basis
- In violation of law as shown below in case law precedent.
- Likely subjecting Treasury top management to personal liability for knowingly acting outside of its scope of employment, statutory duties, and Oath of Office, unprotected from any government immunity due to the extreme, imminent and unprecedented expected harm to society as gross negligence.

Vice President Harris administered on January 26, 2021 as recorded by C-SPAN.org, the Treasury Secretary's Oath of Office, whereby the Secretary raised her right hand with her left hand on the Bible and stated:

> *"I JANET YELLEN DO SOLEMNLY SWEAR THAT I WILL SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES. AGAINST ALL ENEMIES FOREIGN AND DOMESTIC, THAT I WILL BEAR TRUE FAITH AND ALLEGIANCE TO THE SAME, THAT I TAKE THIS OBLIGATION FREELY, WITHOUT ANY MENTAL RESERVATION OR PURPOSE OF EVASION, **AND THAT I WILL WELL AND FAITHFULLY DISCHARGE THE DUTIES OF THE OFFICE UPON WHICH I AM ABOUT TO ENTER**, SO HELP ME GOD."* (emphasis added)

Failure to *"well and faithfully discharge"* the top non-discretionary statutory duty of the Office is a violation of

the Secretary's Oath of Office, and there rationally can be no duty higher than to protect U.S. financial stability against credible, threats like imminent financial contagion that the Secretary is Stonewalling. The Secretary is directed to address this specified sea level rise flooding threat pursuant to Dodd-Frank and the Secretary's statutory duty as Chair of the Financial Stability Oversight Council:

> "*The Council is charged by statute with … responding to emerging threats to the stability of the U.S. financial system. …. The Council … mitigates risks to U.S. financial stability. ….   In 2021, the Council identified three key priorities related to significant vulnerabilities in the financial system: nonbank financial intermediation, **climate-related financial risk**, and Treasury market resilience*."   Duties of the Financial Stability Oversight Council on Treasury's website.  (emphasis added).

The Secretary's violation of her Oath of Office by continuing to Stonewall her clear and paramount statutory duty to address imminent, large scale financial contagion threatening U.S. financial stability, is outside her scope of government employment, thus subjecting her to personal liability for any continuing Stonewall with no immunity due to the unprecedented severity of the imminent and destructive harm to U.S. financial stability.  If the Secretary continues to Stonewall, she has no government immunity because her failure to act on a top statutory duty foremost in the public interest with no discretion, is outside her scope of employment.  Harlow v. Fitzgerald, 457 U.S. 800 (1982).  The Secretary's abrogation of her duty to act placing her outside her scope of employment would be clear and convincing as completely contrary to her March 7, 2023 remarks to Treasury's Climate-related Financial Risk Advisory Committee published on Treasury's website:

> "*In October 2021, FSOC [Financial Stability Oversight Council] published its Report on Climate-related Financial Risk.  As you know, the FSOC for the first time identified climate change as an emerging and increasing threat to U.S. financial stability.  **The report stated that climate change will likely become a source of shocks to the financial system in the coming years.  As climate change intensifies, natural disasters and warming temperatures can lead to declines in asset values that could cascade through the financial system.**  And a delayed and disorderly transition to a net-zero economy can lead to shocks to the financial system as well.*
>
> ***These impacts are not hypothetical.  They are already playing out.***  *In the United States, there's been at least a five-fold increase in the annual number of billion-dollar disasters over the past five years compared to the 1980s, even after adjusting for inflation.  States like California, Florida, and Louisiana recently have seen especially severe storms and wildfires.  And recent devastating tornadoes across the South and intensifying storms on the West Coast are reminders of how climate change is accelerating.*
>
> *In addition to the terrible toll of these disasters on individuals and families, the economic and financial impacts of these events are significant.  **For example, in response to rising insured losses, some insurers are raising rates or even pulling back from high-risk areas.  This has potentially devastating consequences for homeowners and their property values.  Developments like these can spill over to other parts of our interconnected financial system.***
>
> ***Taking climate change into account is prudent risk management.***  *Our work builds on the scientific consensus regarding the projected effects of climate change and is based on a widely accepted understanding of how the financial system works*.  (emphasis added).

17.  **There is Standing to Sue and Petition This Court.**  As a South Florida resident of Coral Gables and Professor at the University of Miami, the Petitioner is an immediately and adversely impacted South Florida resident with personal injury-in-fact standing to the adverse economic and social impacts of the imminent financial contagion to him and his community.  Petitioner is also an expert witness on accelerating sea level rise flooding and worked with NASA JPL in preparing the Thwaites Collapse Schematic, its 16 scientific references, and its OpEd publication by 26 news entities.  The Supreme Court confirms such Article III standing on Petitioner since he has a *"personal stake, … close relationship to the harm,"* concrete injury-in-fact with the harm to him, his net worth, and his community from impending complete devaluation of South Florida coastal real estate and the resulting economic and social harm to the economy, and the harm is *"likely to be redressed by a favorable ruling."*  Such monetary harms qualify for standing.  TRANSUNION LLC v. RAMIREZ, S. Ct. No. 20-2997 (June 25, 2021), and Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019).

18.  **Since It Is In The Public Interest, a Press Release on Treasury's Reckless Breach of the Public Trust Will Be Issued** with filing of this Request for Declaratory Judgment as notified to Treasury in the Aug. 31, 2023 30-Day Notice and email of Sept. 21, 2023 by Jim Jones to Treasury Climate Counselor Ethan Zindler transmitting a Draft Press Release.  Jones is former Idaho Attorney General and Supreme Court Chief Justice.  Treasury was also told in the 30-Day Notice that attorneys' fees will be requested to this Court for Treasury's long-term bad faith, complete Stonewall as an unacceptable and unlawful threat to the U.S. and global economies, and that this Request for Declaratory Judgment will be linked to the Press Release since the public has a right to know about this unacceptable, yet preventable, imminent threat to U.S. financial stability completely caused by Treasury long-term bad faith.

19.  **Treasury was Also Informed by the 30-Day Notice, that Emergency Injunctive Relief Will be Requested by Judicial Review** to compel Treasury's April 2021 announced private sector financing program, or equivalent, and financial stability protections required by Dodd-Frank, to rapidly deploy available, estimated $90 billion for sea level rise flooding protection required to prevent South Florida financial contagion.  Treasury General Counsel requested, then Stonewalled the Notice, continuing its long-term bad faith inaction, increasing

the threat.  Imminent irreparable harm is unprecedented.

20.  **Judicial Review Jurisdiction of Treasury's 100% Stonewall Lack of Response is Provided** by 5 U.S.C. §706 scope of review to *"compel agency action unlawfully withheld or unreasonably delayed,"* since Treasury's 100% failure to act or communicate is *"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."*

21.  **Venue is the D.C. U.S. District Court.**  *"Suits against government officers acting in their official capacities or under color of office or legal authority, and against government agencies or the United States, may be brought, pursuant to 28 U.S.C. § 1391(e), in any judicial district in which:  A defendant in the action resides."*  U.S. DOJ Civil Resource Manual §41. Venue – Government Officers and Agencies as Defendants.

## Treasury's 100% Stonewall to Repeated Inquiries to Top Management, with Such Inquiries Facilitated by Treasury Inspector General and Chairman IG Oversight Council on Financial Stability, and the 30-Day Notice, Constitute Final Agency Action.

22.  **Treasury's 100% Repeated Long-term Stonewall is Contrary to the Public Interest for a Top Non-discretionary, Statutory Duty to preserve U.S. financial stability**, and such an egregious outlier of bad faith that no precedent could be found in the cases for such a profound, damaging, long-term, complete lack of action or communication.

23.  **The Supreme Court Test for Final Agency Action Has Been Met** and is:  Has the agency really reached a decision?  And did that decision produce real, legal consequences?  Both answers must be "yes" for a party to have its day in court.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Treasury reached a decision with profound legal consequences by saying absolutely nothing and not responding at all to this imminent contagion threat to U.S. financial stability that Treasury by statute with no discretion, is required to immediately act to stop.  Treasury has no higher priority duty.  A complete long-term Stonewall to Treasury's top non-

discretionary statutory duty to protect U.S. financial stability has the paramount legal consequence of jeopardizing commerce and national security of the United States and Petitioner's economic and social well-being.

24. **Petitioner Can Reach No Other Conclusion than Treasury Has Completed its Decision-Making Process,** since the 30-Day Notice was also Stonewalled and in effect rejected.  Petitioner has exhausted its administrative remedies, and there is final Treasury action ripe for this Court's review.

25. **Treasury's Final Agency Action Was Binding.   It Made Up Its Mind.**  The D.C. Circuit held that in applying the Supreme Court's test in *Bennett*, the key consideration is whether the action was *"informal, or only the ruling of a subordinate official, or tentative."*  Soundboard Ass'n v. FTC, 251 F. Supp. 3d 55, 1267 (D.D.C. 2017).  The nine written and oral requests over 16 months to Treasury were to top Management, and Treasury's complete, 100% long-term Stonewall was not informal, not involving a subordinate official, and not tentative.  These repeated requests to Treasury top Management by Petitioner were a comprehensive, substantive response to a serious, well-documented, imminent threat to U.S. financial stability.  The 30-Day Notice to Treasury of this litigation was requested by the Treasury Office of General Counsel Attorney with climate responsibility in a conference call with Petitioner's attorneys, and then in a subsequent conference call with Petitioner's attorneys, Treasury's same attorney refused to:  (1) answer if he received the 30-Day Notice, (2) discuss that Treasury Order 107-04 states that the Office of General Counsel accepts service, (3) discuss who in the Office of General Counsel is responsible for the 30-Day Notice, and (4) discuss any resolution of the Notice precluding litigation.   The Treasury General Counsel Office Attorney refused to talk at all and unilaterally terminated the conference call.  As part of the pleadings of this lawsuit, the Sept. 16, 2023 Declaration of Petitioner's attorneys details these actions by a responsible Treasury Attorney official in the Office of General Counsel.  Petitioner believes it's clear and unequivocal to any reasonable observer, that these demonstrated, entirely consistent material facts of Treasury's long-term failure to actor communicate, show that Treasury had made up its mind.  Petitioner cannot reach any other conclusion and knows no other means to find out other than the requested Hearing by Motion, before this Court compelling Treasury to participate.  The D.C.

Circuit in *Friedman v. FAA*, ruled that the FAA's constructive denial of a pilot's petition for a commercial license constituted final agency action.  The court focused on the fact that *"in practical effect if not formal acknowledgment"* the agency had *"made up its mind."*  841 F.3d 537, 542 (D.C. Cir. 2016.  In practical effect and formal acknowledgement that Treasury made up its mind, are the 100% Stonewall of nine separate requests to top management over 16 months facilitated by Treasury Inspector General and Chairman, statutory Inspector Generals' Oversight Council for Financial Stability, and requested and then specifically-Stonewalled 30-Day Notice by the Office of General Counsel.  The Notice was also sent, insured for $5,000, and received by Treasury by registered mail which by law is acceptable service to federal agencies as shown in the 30-Day Notice Certificate of Service part of the pleadings of this lawsuit.  As of the date of this Request for Declaratory Judgment, there has still been no action by Treasury to reduce the demonstrated imminent threat to U.S. financial stability, or to communicate at all, thereby continuing to increase the threat to U.S. financial stability by extending the unacceptable delay.

# The Administrative Procedure Act (APA) Provides Petitioner the Right of Judicial Review.

26.   **APA Judicial Review of Final Treasury Actions Governs This Matter** and concerns *"the whole, or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rulemaking."*  APA §2(d).  This matter is also Treasury action defined by APA §2(g):  *"Agency action includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."*  APA §10(a) provides Petitioner the right of judicial review:  *"Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."*  APA §10(c) provides jurisdiction because this Treasury action for this matter is *"agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, … or … for an appeal to superior agency authority."*

27.   **To Protect U.S. Financial Stability, Interim Relief is Authorized & Should be Provided Pending Judicial Review To Prevent Irreparable Harm.**   Section 10(d) of the APA as confirmed by the Attorneys General's APA Manual and APA legislative history, grants this Court the discretionary authority to use its equitable powers pending judicial review to grant interim relief to *"the extent necessary to prevent irreparable injury. … The function of such a power is, as heretofore, to make judicial review effective. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277). Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4 (1942).*   Attorney's General Manual on the APA (1947), §10(d) Interim Relief.

28.   **This Matter is Not** *"Committed to Agency Discretion by Law"* because Dodd-Frank specifically empowers and instructs Treasury to immediately act to protect financial stability including through the Financial Stability Oversight Council (FSOC).

29.   **This Court Has the Power to Force Treasury to Communicate** because meaningful judicial review requires that Treasury must *"disclose the basis"* of its inaction on a well-documented imminent threat to U.S. financial stability.   Further, this Court may inquire into *"the mental processes of administrative decisionmakers"* upon a *"strong showing of bad faith or improper behavior,"* which Petitioner believes exists since the 30-Day Notice was also requested by, then Stonewalled by the Office of General Counsel, preventing any communications of the parties on a documented imminent threat to U.S. financial stability for over one year.   Quoted from Department of Commerce v. New York, S. Ct. No. 18–966 (June 27, 2019) *citing* Burlington Truck Lines, Inc. v. United States, 371 U. S. 156, 167–169.   Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 420 (1971).   On a *"strong showing of bad faith or improper behavior, an inquiry may be warranted and may justify extra-record discovery."*   Id. at 2573-74.

> *"The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived [or no] reasons would defeat the purpose of the enterprise."*
>
> Department of Commerce v. New York at 2575–76 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

This Court should inquire since reasons of bad faith acts are *"unlikely to ever appear within the four corners of the official administrative record." Earth Island v. Evans,* 256 F. Supp. 2d at 1078 n.16; see *Beta Analytics*

*Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004).  For example, government officials will *"seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate."*  Smith v. Town of Clarkton, 682 F.2d 1055, 1064 (4th Cir. 1982).   And *"agency officials are not likely to keep a written record of improper political contacts."* Sokaogon Chippewa Cmty. v. Babbitt, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997).   Thus, in a case where bad faith or improper behavior is at issue, *"the court's responsibility to reach a just resolution"* may require that it have *"all relevant evidence before it,"* id. at 1280—including, at times, testimony from agency decisionmakers.  See *Latecoere Intern. v. U.S. Navy*, 19 F.3d at 1364-65 (11th Cir. May 1994).

Moreover, because this evidence is, by its nature, generally in the exclusive possession of agency defendants, discovery beyond the administrative record may be necessary to ensure effective judicial review.  The *"only way to uncover [improper] contacts,"* for example, may be *"by examining relevant phone records and by asking these officials about their discussions."* Sokaogon, 961 F. Supp. at 1281.  In appropriate circumstances, then, courts may authorize limited extra-record discovery of agency officials.  Without this ability, courts would be unable to carry out their *"important"* role in *"ensuring that agencies have engaged in reasoned decisionmaking."* Judulang v. Holder, 565 U.S. at 53.  The courts must inquire in certain circumstances, so that a reviewing court ultimately can determine whether an agency decisionmaker's unstated additional reasons were legally forbidden.  This is particularly true where, as here, available evidence suggests that Treasury sought to conceal important aspects of its decisionmaking process, including the reasons for its extended failure to act or communicate on an imminent threat to U.S. financial stability.  *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998) (acknowledging that the *"actual subjective motivation of agency decisionmakers"* is relevant where *"there is a showing of bad faith or improper behavior"*).

Such an inquiry is warranted since an imminent threat to U.S. financial stability is documented to Treasury and Treasury failure to provide its statutorily required response is completely covered-up and repeatedly Stonewalled for 16 months, increasing the unacceptable imminent threat to the U.S. economy.

30.  **There is No Political Question Preventing Judicial Resolution of Treasury Inaction** since Dodd-Frank provides Treasury plenary authority and the responsibility to act to preserve and protect U.S.

financial stability.  Further, there is no issue of liability of responsible parties that would require additional Congressional authority.  The available many $trillions of private sector financing are by investors ready to deploy through higher-credit rated bonds for this purpose to provide required protections.

# Request for Declaratory Judgment

31.     The Declaratory Judgment Act authorizes this Court to *"declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought,"* so long as there is *"a case of actual controversy"* over which a federal court may exercise jurisdiction. *Committee on the Judiciary of the House v. McGahn*, at 2, No. 19-5331, (D.C. Cir. Aug. 31, 2020).   Further, the Act states that any such declaration shall have the force and effect of a final judgment.  28 U.S.C. § 2201(a).   These statutory requirements for declaratory judgment are met with the case or controversy comprising this Request for Declaratory Judgment, and Petition for Review of Treasury final action to preserve U.S. financial stability. *"The wording of the statute does not indicate that any independent cause of action is required to invoke"* the Declaratory Judgment Act. *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 80 (D.D.C. 2008).  The Supreme Court has never stated that the Act *does not* create a right of action. *Id.* *"The Declaratory Judgment Act 'presupposes the existence of a judicially remediable right.' C&E Servs., Inc. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir.2002) (quoting Schilling v. Rogers, 363 U.S. 666, 677 (1960))."* *Comm. on the Judiciary* at 3.  That judicially remedial right is the review of Treasury inaction regarding its non-discretionary, top statutory duty under Dodd-Frank to preserve U.S. financial stability. *"The Act is a vehicle for vindicating a separate and independent substantive right."* *Id.* at 4.

> *"In the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding, Glenn v. Fay, 222 F. Supp. 3d 31, 35 (D.D.C. 2016)."*
>
> *Hartford Insurance v. New Ledroit Co.*, at 5, No. 17-1489 (D.D.C. Apr. 27, 2018).

To that end as set forth by *Glenn v. Fay*, declaratory judgment would clarify the issue of the imminent threat to U.S. financial stability, and afford relief from the uncertainty from the parties inability to communicate on the matter for over one year completely caused by Treasury with no rational basis.

# The Judicially Remedial Right of Petitioner is Clear & Universal, Including Where There is No Other Adequate Remedy in Court: *Protection of U.S. Financial Stability as a Top Statutory Duty.*

32.    The judicially remedial right of Petitioner is specifically provided independently by the APA as set forth by Court decisions, because Dodd-Frank does not bar judicial review in this instance to protect U.S. financial stability, and its judicial review and agency discretion provisions are all inapplicable in this instance, but instead specified for SEC, CFTC, Department of Labor, FDIC, federal insurance office, corporations, financial companies and their liquidation, regulations, monetary claims, cease and desist proceedings, employees, and counseling.  This judicially remedial right of Treasury's inaction and complete, long-term refusal to communicate is specifically provided by the APA and Court decisions:

> "The APA by its terms independently authorizes review," *Bennett*, 520 U.S. at 162, for a party suffering "legal wrong because of ... or adversely affected or aggrieved by agency action," 5 U.S.C. § 704, "only when 'there is no other adequate remedy in a court,'" *Bennett*, 520 U.S. at 162 (quoting 5 U.S.C. § 704). When there is no such adequate remedy, the independent APA cause of action "applies universally" except to the extent that an authorizing or enabling statute precludes judicial review or commits the action to agency discretion. *Id.* at 175 (citing 5 U.S.C. § 701). See Chapter XII.A, infra (discussing the presumption of reviewability and its exceptions).

> The "generous review provisions" of the APA thus "provide[] specifically not only for review of '(a)gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court.'" *Abbott Lab'ys*, 387 U.S. at 140 (quoting 5 U.S.C. § 704). The cause of action authorized in Section 704 of the APA, described in Sections 702 and 701, and for which the various elements are detailed in Section 706, thus provides an independent, "generic" fallback in those instances in which an authorizing or enabling statute does not provide a cause of action. See *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 & n.9 (collecting cases).

> Consistent with the above described provisions, an injured party may have a cause of action under APA Section 706(1) to compel agency action that was unlawfully delayed or under Section 706(2) to challenge agency action on one of the six grounds defining when a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions," 5 U.S.C. § 706(2). Notably, then, the standards set forth in Section 706 and described in Section A above, not only prescribe how courts will review challenged agency action, but also define the elements of the causes of action available under the APA.

> An important judicial gloss on the causes of action defined in Section 706 should be noted: Under Section 706(1), "the only agency action that can be compelled ... is action legally required." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (emphasis in original). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Id.* at 64 (emphasis in original); see also *Benzman v. Whitman*, 523 F.3d 119, 130–32 (2d Cir. 2008). But the availability of a claim under Section 706(1) does not render a claim under Section 706(2) unavailable. See, e.g., *Dayton Tire v. Sec'y of Lab.*, 671 F.3d 1249 (D.C. Cir. 2012) (allowing a party to pursue a claim that an agency's delay in reaching a final decision rendered that decision arbitrary and capricious under Section 706(2), because "Section 706(1) does not state that a petition to compel is a party's only option in the face of agency delay").

From 2023 Post Publication Update at 122-23, for *FEDERAL STANDARDS OF REVIEW*, prepared by Harry T. Edwards, Senior Circuit Judge U.S. Court of Appeals for the D.C. Circuit

# Prayer for Relief

33.   Petitioner's prayer for relief asks that this Court:

**1.** Enter a judgment declaring Petitioner has a justifiable request for relief, and considering that the parties have not been able to communicate for over one year on imminent issues of great weight for U.S. financial stability, order an immediate hearing to clarify the issues of the parties, and to proceed before a magistrate judge to discuss possible settlement in the best interests of U.S. financial stability. The Motion for a Hearing is part of the pleadings of this case.

**2.** Declare that injunctive relief is appropriate and granted given the documented imminent threat to U.S. financial stability contained in this Declaratory Judgment Request and 30-Day Notice to Treasury.

**3.** Award Petitioner's attorneys' fees for Defendant's persistent bad faith increasing the U.S. financial stability threat, preventing any resolution, and causing the need and extensive work to repeatedly inquire to Treasury top management, and prepare the 30-Day Notice, this Declaratory Judgment Request, and Hearing Motion. Interim awards before final judgment are allowed for bad faith. The Motion for Attorney Fees is part of the pleadings of this lawsuit.

**4.** For such other and further relief as this Court deems necessary and just.


Due to the long-term refusal of Defendant to communicate at all, Defendant's position on this Request for Declaratory Judgment cannot be ascertained in order for the parties to ensure compliance with this Court's Rule.


I declare under penalty of perjury that the foregoing is true and correct.


Respectfully Submitted,

# Mike Italiano

**Mike Italiano** DC Bar #411066, Member, D.C. District Ct.
mts@sustainableproducts.com
4919 Ashby St., NW, Wash., DC 20007
202-298-6556

## Attorney for Petitioner & Counsel of Record


**Attorney Advisors**

# Brian Davis

**Brian H. Davis** MN Bar #0125714
brianhdavis@gmail.com
651-308-7141

**Carter Jefferson Dillard** DC & CA Bar #s 492945 & 206276
Bar #s 492945 & 206276

_____